ARMANDO SERRANO,

      Plaintiff,

      v.

REYNALDO GUEVARA, et al.,

      Defendants.

and

JOSE MONTANEZ,

      Plaintiff,

      v.

REYNALDO GUEVARA, et al.,

      Defendants.

No. 17 CV 2869 and
No. 17 CV 4560

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Plaintiffs Armando Serrano and Jose Montanez each spent over two decades in prison for a murder they did not commit. Now, they both bring suit against the City of Chicago—and former police officers Reynaldo Guevara, Ernest Halvorsen, and Edward Mingey—as well as Cook County—and former prosecutors Matthew Coghlan and John Dillion. Their suits include claims for constitutional violations and torts they allege were committed during the investigation and prosecution of the case against them. The City and County defendants now move to dismiss

portions of the complaints for the failure to state a claim. For the reasons stated below, defendants' motions are granted in part, denied in part.

## I.    Legal Standards

A complaint must contain factual allegations that plausibly suggest a right to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). I must accept as true all of the facts alleged in the complaint and draw reasonable inferences from those facts in plaintiffs' favor, but I am not required to accept as true the complaint's legal conclusions. *Id.* at 678–79. In considering a motion to dismiss under Rule 12(b)(6), I review the complaint, exhibits attached to the complaint, and, if they are central to the claims, documents referenced by the complaint. *Otis v. Demarasse*, 886 F.3d 639, 647 n.33 (7th Cir. 2018).

## II.   Facts[1]

Plaintiffs Armando Serrano and Jose Montanez were wrongly convicted for the murder of Rodrigo Vargas.[2] In 1993, Vargas was shot to death in a van outside

---

[1] Serrano and Montanez each brought their own lawsuits against defendants, but their lawsuits are based on a criminal investigation and prosecution in which they were co-defendants and so their factual allegations and claims are largely identical. For this reason, the two cases were consolidated for pre-trial and discovery purposes, and the largely overlapping motions to dismiss are amenable for resolution in a single opinion.

[2] The facts are taken from the operative complaints, with inferences drawn in plaintiffs' favor. Bracketed numbers refer to entries on the *Serrano* district court docket, unless otherwise indicated. The County asserts that the complaints (in particular, the *Montanez* complaint) use improper group pleading. The complaints do sometimes refer to "defendants" collectively instead of specifying which particular defendants they are referring to. The *Serrano* complaint is more specific than the *Montanez* complaint, so I rely on the details provided by Serrano where applicable. Otherwise, I assume references to "defendants" include all defendants, and plaintiffs intend to prove that every defendant engaged in the alleged conduct. As the facts develop, it may become clear that the facts do not support a group allegation. That will be dealt with at a later stage of the litigation. *See Bolden v. City of Chicago*, 293 F.Supp.3d 772, 775 n.3 (N.D. Ill. 2017).

his home. Vargas's wife, Wilda, had no idea why anyone would kill her husband. One of Vargas's neighbors heard the gunshots, but she did not see anything. Another neighbor reported seeing an older, light-brown sedan, possibly with two doors, drive away. For four months, the police had no leads and the murder went unsolved. Then Detectives Guevara and Halvorsen took over.

Wilda Vargas told the detectives about a trip that she and her husband took to the gas station the night before he was murdered. Wilda said that her husband had just gone to the bank, so he had a roll of cash on him when he went inside to pay. Cash was found on Vargas's dead body the next day. Wilda also remembered that her husband honked at three Latino men in a tan-colored car that blocked his way at the gas station. With this information, the detectives invented a theory in which Vargas's murder was an armed robbery gone wrong, and they decided to frame three Latino men with histories of armed robberies to close the case. They settled on Serrano, Montanez, and Jorge Pacheco. The detectives showed Wilda photos of the three men, telling her that they were the Latino men she remembered from the tan car. The detectives drove Wilda to Montanez's house to show her his car (which she agreed was similar to the tan one she saw), and the detectives told her lies about the car being linked to her husband's shooting by ballistics evidence and witness statements.

Then the detectives decided to use a resource they had recently stumbled across—Francisco Vicente. Vicente was a heroin addict who was arrested and charged with several armed robberies, suffering in jail from the effects of heroin

withdrawal and facing up to 97 or 100 years in prison for his pending charges. The detectives told two prosecutors—Assistant State's Attorneys Coghlan and Dillion—that "the street" was saying plaintiffs and Pacheco were responsible for the Vargas murder, but they needed more evidence to bring them in. So the detectives proposed that they use Vicente to drum up evidence against plaintiffs and Pacheco in addition to suspects in two other murders. The prosecutors agreed and arranged to transport Vicente to their offices. By the time Vicente met with the prosecutors and detectives to discuss the Vargas murder, the detectives had already used violence (including hitting him with a phonebook) to coerce Vicente into giving false testimony against a suspect in a different murder.[3]

With the prosecutors and Halvorsen present, Guevara handed Vicente crime scene photos and fed him a narrative in which Vicente would say he was an eyewitness to plaintiffs' attempted robbery of Vargas. Everyone in the room knew that narrative was false. Vicente refused to say he was an eyewitness or that the suspects gave him the murder weapon, so Halvorsen suggested that Vicente say Montanez confessed to him and implicated Serrano and Pacheco along the way. The prosecutors promised Vicente they would protect him by getting him moved to special witness quarters at the jail and secure him a lower sentence. Vicente agreed to give the false testimony. After the meeting, the detectives prepared a supplemental police report stating that a confidential informant told them that

---

[3] This was not the first or the last time Guevara would use these tactics. For decades, Guevara used methods like physical assault, emotional manipulation, and threats (against "suspects" and their family members). *See* S. Compl. ¶¶ 84–125; M. Compl. ¶ 104. Halvorsen was involved in one of these incidents. *See* S. Compl. ¶ 120; M. Compl. ¶ 104(nn).

Montanez confessed to his involvement in the Vargas murder and that Montanez had also implicated Serrano and Pacheco. The detectives used the false report as a basis to arrest Serrano. But after about 24 hours of physical and psychological abuse, Serrano refused to make an inculpatory statement and was released.

So the detectives turned to Timothy Rankins, a 19-year-old facing charges for robbery. Rankins had experience serving as an informant for the detectives' supervisor, Sergeant Edward Mingey. The officers (Mingey, Guevara, and Halvorsen) knew that Rankins did not know anything about the Vargas murder, but they told Rankins that they wanted him to say he was an eyewitness. When Rankins initially refused, Guevara beat him, including by putting a phonebook against his head and striking it. Guevara showed Rankins photos of plaintiffs and Pacheco while feeding him the narrative he wanted Rankins to give. After more abuse, Rankins agreed to say that he saw plaintiffs and Pacheco shoot and kill Vargas and signed a statement saying so. Now armed with (faulty) probable cause, the detectives immediately arrested Serrano and, sometime later, Montanez and Pacheco.

Not long after the officers met with Rankins, the prosecutors brought Vicente back to their offices to sign his false witness statement. The statement, written by Halvorsen, said that Vicente was hanging out on a street corner when plaintiffs and Pacheco drove up in a tan car. The statement went on to say that Montanez told Vicente that he, Serrano, and Pacheco saw a Mexican man at a gas station with a wad of cash, attempted to rob him, and then shot him. Vicente signed the statement

in the presence of a different prosecutor (one who was not present for the previous discussions with Vicente).

A grand jury was convened. Both Rankins and Vicente testified consistent with their written statements, and the grand jury returned an indictment against plaintiffs and Pacheco. Nine months later, Rankins recanted his testimony and fled Chicago. Vicente was transferred to the special witness quarters he was promised and received other benefits, like cash, drugs, and conjugal visits. Vicente continued to be shuttled to the prosecutors' offices to be coached by the prosecutors on his testimony for the three murder prosecutions he was a witness in, including plaintiffs' prosecution.

About two years later, in 1995, plaintiffs were convicted in a bench trial. Their co-defendant, Pacheco, was acquitted. Guevara and Halvorsen testified for the prosecution, and so did Vicente, who largely kept to his written statement and grand jury testimony. The prosecutors, who had helped form Vicente's false testimony, knew it was a lie. Before trial, the prosecutors had helped get Vicente additional pre-trial custody credit to reduce his sentence, a fact that was not disclosed to plaintiffs' lawyers. Wilda could not credibly testify that plaintiffs were the men in the tan car at the gas station, so her identification testimony was rejected. Plaintiffs were each sentenced to 55 years in prison.

At post-conviction evidentiary hearings over a decade later, plaintiffs presented an affidavit from Vicente, admitting that his entire testimony was false. Although relief was initially denied, the Illinois Appellate Court reversed those

decisions.[4] The state moved to vacate plaintiffs' convictions and dismiss the murder charges. In 2016, plaintiffs were released from the Illinois Department of Corrections. Both were issued certificates of innocence. Before plaintiffs' exoneration, the City also commissioned an independent investigation into plaintiffs' case (and others), which concluded that plaintiffs were more likely innocent than not.

## III.  Analysis

### A.  The Prosecutors

Prosecutors are absolutely immune from federal tort liability for actions they take as prosecutors carrying out their prosecutorial duties. *See Imbler v. Pachtman*, 424 U.S. 409, 427 (1976); *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014) ("*Fields II*"). This includes "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ("*Buckley III*"). But prosecutors do not enjoy absolute immunity when they act as investigators. *See id.* Instead, prosecutors who act as investigators are afforded the same immunity extended to other investigators—qualified immunity. *Id.*

Qualified immunity protects officials from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). To determine whether qualified immunity applies, courts

---

[4] *See People v. Serrano*, 55 N.E.3d 285 (Ill. App. Ct. 2016); *People v. Montanez*, 55 N.E.3d 692 (Ill. App. Ct. 2016).

consider (1) whether plaintiffs have adequately alleged the violation of a constitutional right and (2) whether the right in question was "clearly established" at the time of the alleged misconduct. *Id*. at 232. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (citation omitted). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Supreme Court has often cautioned courts "not to define clearly established law at a high level of generality" but rather to focus on "whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 136 S.Ct. at 308 (emphasis in original) (citation omitted). Although dismissal on a Rule 12(b)(6) motion on qualified immunity grounds is often premature, qualified immunity issues should be resolved as soon as possible, which is sometimes at the pleadings stage. *See Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915–16 (7th Cir. 2015).

### 1. *Evidence Fabrication*

Plaintiffs allege that the prosecutors, along with Officers Guevara and Halvorsen, fabricated evidence by coercing Vicente to falsely implicate plaintiffs in the Vargas murder. The County argues that the prosecutors are protected by absolute immunity because their interview of Vicente was within the scope of their prosecutorial responsibilities. The County is right that interviewing witnesses to decide whether charges should be filed can be protected by absolute immunity under some circumstances, *see, e.g.*, *Bianchi v. McQueen*, 917 F.Supp.2d 822, 832

(N.D. Ill. 2013), but not where the prosecutors act before there is any probable cause to arrest anyone. *See Buckley III*, 509 U.S. at 274 ("A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested."). The complaints allege that the prosecutors met with Vicente (and the defendant officers) before any evidence pointed to plaintiffs as suspects, and plaintiffs were not charged until after the initial Vicente interview.[5] As plaintiffs put it, prior to the interview "not a shred of evidence suggested that Plaintiffs were involved in the murder of Vargas." [71] at 8. The County apparently does not contest this conclusion, because it does not point to any facts suggesting that probable cause did exist at the time of the first Vicente interview. "There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Buckley III*, 509 U.S. at 273. Plaintiffs have sufficiently alleged that the prosecutors were in the latter role, so the prosecutors are not entitled to absolute immunity on the fabrication claim.

The County also argues that "no evidence was actually procured at this alleged meeting that resulted in an arrest for a charge for murder" and that by the time Vicente signed his sworn statement, Rankins had provided the authorities

---

[5] After the initial Vicente interview, Serrano was arrested and detained for 24 hours before being released. S. Compl. ¶¶ 47–48. Serrano was re-arrested after the detectives secured Rankins's statement. S. Compl. ¶ 55. The Montanez complaint is not clear on when exactly he was arrested, but a reasonable inference is that it was after the Vicente interview. *See* M. Compl. ¶ 70.

with independent probable cause. [60] at 17. I take the County's point to be that the evidence used to prosecute plaintiffs came after probable cause and after the prosecutors' immunity attached. But Vicente's testimony was the evidence that convicted plaintiffs, *see* S. Compl. ¶ 64; M. Compl. ¶ 1, and that testimony derived from the fabricated evidence that the prosecutors obtained as investigators. They are not absolutely immune from the deprivation of liberty caused by that fabricated evidence. *See Avery v. City of Milwaukee*, 847 F.3d 433, 441–42 (7th Cir. 2017).

Nor does qualified immunity protect the prosecutors from the evidence fabrication claims. The County asserts that the complaints only allege that the prosecutors "promised to protect Vicente and give him special privileges in exchange for his testimony," which the County says constitutes coercion, not fabrication. [60] at 19. But this characterization ignores the context of the prosecutors' conduct. Plaintiffs allege that the prosecutors were sitting in a room with Detectives Guevara and Halvorsen as they proposed multiple false narratives to Vicente until one stuck. *See* S. Compl. ¶¶ 41–43; S. Compl. ¶¶ 38–42. So the prosecutors did not just offer Vicente protection and rewards to coerce him to testify—they offered those things to coerce him to testify to what they knew were falsehoods. That conduct is not just coercion; it is also fabrication. *See Fields II*, 740 F.3d at 1110 ("Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false. False testimony is the equivalent; it is testimony known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.").

And by 1993, when the initial Vicente interview occurred, it was long established "that a government lawyer's fabricating evidence against a criminal defendant was a violation of due process." *Id.* at 1114.

The County relies on *Buckley IV* to argue that the prosecutors' coercion of Vicente may have violated his rights, but it did not violate plaintiffs' rights as third parties. *Buckley IV* does acknowledge that coercion of a witness only violates that witness's rights, 20 F.3d 789, 794–95 (7th Cir. 1994), and "[f]abrication was alleged in *Buckley* as well, but . . . the focus was on coercion." *Fields II*, 740 F.3d at 1113. Fabrication is different—coercing a witness in order to fabricate evidence against someone else not only violates the witness's rights, it also violates those of the accused. *See Avery*, 847 F.3d at 439 ("[C]onvictions premised on deliberately falsified evidence will always violate the defendant's right to due process."); *Whitlock v. Brueggemann*, 682 F.3d 567, 581–82 (7th Cir. 2012); *Fields II*, 740 F.3d at 1113.

The County's motion to dismiss the evidence fabrication claims against the prosecutors is denied.[6]

### 2.    *Suppression of Evidence*

Absolute immunity bars Serrano's claim that the prosecutors suppressed exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).[7] "[A]

---

[6] The County also argues that the prosecutors are absolutely immune from liability for presenting false evidence at trial. I agree. *See Soulier v. Haukaas*, 477 Fed.App'x 388, 390 (7th Cir. 2012) ("[P]rosecutors are entitled to absolute immunity from civil liability under § 1983 for prosecutorial functions such as . . . the presentation of a state's case at trial."). To the extent any of plaintiffs' claims against the prosecutors are based on their presentation of false evidence at trial, they are dismissed.

*Brady* violation is not committed unless and until a prosecutor, in the course of preparing for or conducting a trial or direct appeal, does not turn over the material evidence in question" and, as a result, is "inherently prosecutorial." *Fields v. Wharrie*, 672 F.3d 505, 513–14 (7th Cir. 2012) ("*Fields I*"). Plaintiffs argue that because the prosecutors acted as investigators when fabricating Vicente's statement, the prosecutors should only be given the same immunity other investigators would have. But this is not the fabrication claim. I found that the prosecutors are not protected by absolute immunity for the fabrication claim because the alleged wrongful conduct—fabrication of Vicente's testimony—happened before there was probable cause and when the prosecutors were investigating. But the alleged wrongful conduct here—suppression of exculpatory evidence—by definition did not happen at least until the prosecutors were preparing for trial.

In support of their argument, plaintiffs cite to a case in which prosecutors who were alleged to have fabricated evidence sought immunity against a *Brady* violation claim. *Saunders v. City of Chicago*, No. 12-CV-09158, 2013 WL 6009933, at *9 (N.D. Ill. Nov. 13, 2013). The court in *Saunders* said it was unable to reach a decision about immunity based on the pleadings alone. *Id*. In doing so, the court quoted *Whitlock*: "[A] prosecutor whose investigatory conduct is the proximate cause of the due process violation that occurs when the false evidence is introduced at trial is held to the same standard of liability as a police officer who does the same

---

[7] Montanez only brings his *Brady* violation claim against the defendant officers.

thing." 682 F.3d at 583. But the *Whitlock* court also stated that "the question of immunity turns on the capacity or function that the prosecutor was performing *at the time of the alleged wrongful conduct.*" *Id.* at 579–80 (emphasis added). Plaintiffs mistakenly conflate the alleged misconduct of their *Brady* claims with that of their fabrication claims. The relevant conduct here is the suppression of exculpatory evidence, and, at the time of that conduct, the prosecutors were functioning in their prosecutorial capacities. *See Bianchi*, 917 F.Supp.2d at 830 ("[J]ust because a prosecutor was involved in a case in an investigatory role does not mean that he is deprived of immunity for what he did as a prosecutor.").[8]

The County's motion to dismiss the *Brady* violation claims against the prosecutors is granted. Because it is based on absolute immunity grounds, the dismissal is with prejudice. *See Koorsen v. Dolehanty*, 401 Fed.App'x 119, 120 (7th Cir. 2010).

### 3. *Prolonged Detention*

Only Serrano brings what he labels a "malicious prosecution" claim under 42 U.S.C. § 1983 against the prosecutors. Both plaintiffs' complaints include claims labeled "malicious prosecution," but "the fact that the plaintiffs have used the terminology 'malicious prosecution' is of no moment. What matters is whether they

---

[8] There is perhaps a separate argument to be made that a prosecutor who acts as an investigator could conceivably be liable not for violating the prosecutor's duty to disclose exculpatory evidence to the defense, but for violating the investigator's duty to disclose exculpatory evidence to the prosecution. *See Johnson v. Dossey*, 878 F.Supp.2d 905, 920–21 (N.D. Ill. 2012). To the extent this is the argument plaintiffs were trying to make, it fails. Such a claim would not be tenable when the prosecutor-investigators were also trial counsel, and anyway Serrano alleges that the prosecutor-investigators "deliberately withheld exculpatory evidence *from Plaintiff*," not the prosecution. S. Compl. ¶ 142 (emphasis added).

have identified the constitutional right at issue." *Hurt v. Wise*, 880 F.3d 831, 843 (7th Cir. 2018). The claims include allegations that defendants (just the officers, in the *Montanez* complaint, and the officers and prosecutors, in the *Serrano* complaint) violated plaintiffs' Fourth Amendment rights by causing them to be held without probable cause. Rather than a "malicious prosecution" claim, this is a claim for "unlawful pre-trial detention [ ] beyond the start of legal process." *Manuel v. City of Joliet, Ill.*, 137 S.Ct. 911, 920 (2017). This type of claim—a prolonged detention claim—is cognizable. *See id.* at 919.[9] But plaintiffs have not alleged facts to support a key component of such a claim—pre-trial detention. Although the elements of a prolonged detention claim in this circuit are yet unclear, *id.* at 922, it is safe to say one cannot have a claim for unlawful pre-trial detention beyond the start of legal process without pre-trial detention. Plaintiffs' complaints do not allege that they were held in detention pending trial. For that reason, Serrano's prolonged detention claim against the prosecutors is dismissed without prejudice.

Assuming the complaint can be amended to adequately allege pre-trial detention, qualified immunity would not bar the claim against the prosecutors at this stage. The County argues that the prosecutors are entitled to qualified immunity for Serrano's claim because the law is unclear now and was unclear at the time of violation. Prolonged detention claims are cognizable, as *Manuel* made clear. That *Manuel* was decided recently does not necessarily mean that defendants are

---

[9] To the extent plaintiffs' base their "malicious prosecution" claims on the Fourteenth Amendment, they are barred because state-law malicious prosecution claims (which plaintiffs also allege) provide them with a remedy. *See Bolden*, 293 F.Supp.3d at 782–83.

immune. "[W]hen the question is whether to grant immunity to a public employee, the focus is on his conduct, not on whether that conduct gave rise to a tort in a particular case." *Fields II*, 740 F.3d at 1114.[10] Serrano alleges that the prosecutors "caused [him] to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause." S. Compl. ¶ 151. That probable cause is required to detain someone has been long established. *See Baker v. McCollan*, 443 U.S. 137, 142 (1979) ("[T]he Fourth Amendment requires the States to provide a fair and reliable determination of probable cause as a condition for any significant pre-trial restraint of liberty."). Further, "[w]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing." *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978) (emphasis in original) (citation omitted). Any reasonable prosecutor would know continuing to detain someone without probable cause—or using what she knows is false evidence as a substitute for probable cause—violates

---

[10] The County points to a pre-*Manuel* case in which the Seventh Circuit noted that the issue of "whether a malicious-prosecution claim is *ever* cognizable as a Fourth Amendment violation remediable under § 1983" was the subject of dispute and held that "[w]ith the law this unsettled, qualified immunity applies." *Bianchi v. McQueen*, 818 F.3d 309, 323 (7th Cir. 2016) (emphasis in original). This holding is based on the first prong of the qualified immunity analysis—whether a constitutional violation was alleged—and not the second—whether the right was clearly established at the time of violation. Otherwise, the holding would conflict with the principle that qualified immunity is concerned with the conduct, not the tort. *See Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether the official defendant's *conduct* violated a clearly established constitutional right. (emphasis in original)); *Fields II*, 740 F.3d at 1114. In *Bianchi*, the court noted that *Manuel* might change the outcome of the qualified immunity analysis had the plaintiffs in *Bianchi* been in pre-trial detention. *Bianchi*, 818 F.3d at 323 n.6. This further suggests that after *Manuel*, officials might not enjoy qualified immunity even though there was no Fourth Amendment claim for prolonged pre-trial detention in this circuit.

the detained's constitutional rights. And the Supreme Court noted in *Manuel* that it "decided some four decades ago that a claim challenging pre-trial detention fell within the scope of the Fourth Amendment." 137 S.Ct. at 917–18 (citing *Albright v. Oliver*, 510 U.S. 266 (1994); *Gerstein v. Pugh*, 420 U.S. 103 (1975)).[11] After discovery yields more detail about the prosecutors' conduct in relation to the possible prolonged detention, this determination could change. But at this stage, dismissal based on qualified immunity would not be appropriate.

The County's motion to dismiss Serrano's prolonged detention claim against the prosecutors is granted, because pre-trial detention was not alleged.

### 4.    Failure to Intervene

The County also invokes qualified immunity to shield the prosecutors from plaintiffs' failure to intervene claims. I agree with plaintiffs that "a prosecutor acting as an investigator can be held liable for failing to intervene." *Harris v. City of Chicago*, No. 15 CV 3859, 2015 WL 5445012, at *4 (N.D. Ill. Sept. 15, 2015). But again, the qualified immunity analysis focuses on the defendant's conduct, not the remedies available for the conduct. Whatever the state of the law now, it was not clearly established in 1993 that prosecutors acting as investigators had a duty to intervene when their fellow officers committed constitutional wrongs. Plaintiffs argue that the alleged due process violations—evidence fabrication and *Brady* violations—were clearly established at the time. True as that may be, "a defendant cannot be said to have violated a clearly established right unless the right's

---

[11] *Albright* was decided in January 1994, after the investigation commenced in 1993. But Serrano was not tried until 1995, after the *Albright* opinion was issued.

contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014). So the issue is not just whether the plaintiffs' rights were clearly established, but also whether any reasonable official standing in the prosecutors' shoes in 1993 would have known that their actions—or inaction, as it were—would violate plaintiffs' rights.

In 1993, *Byrd v. Brishke*, which stated that "one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers['] wrongdoing, had been on the books for twenty years. 466 F.2d 6, 11 (7th Cir. 1972). The reference to police officers is clear, but it is not clear that prosecutors acting as investigators would also be subject to the duty. Plaintiffs, and the cases they cite, make a good argument for why prosecutors should have such a duty, but they have not pointed to any pre-1993 cases to show that prosecutors had that duty in 1993. Plaintiffs rely on *Whitlock* to argue that prosecutors who act as investigators are subject to the same standards as officers, but *Whitlock* was not decided until 2012, so it had no impact on the notice available to prosecutors in 1993. 682 F.3d 567.

The County's motion to dismiss the failure to intervene claims against the prosecutors is granted. Because it is based on qualified immunity grounds, the dismissal is with prejudice. *See Hinnen v. Kelly*, 992 F.2d 140, 144 (7th Cir. 1993).

### 5. *Conspiracy*

The County argues that prosecutors do not lose their immunity when they are alleged to be part of a broader conspiracy. It is true that a prosecutor who is

absolutely immune from liability because her conduct was within the scope of her prosecutorial duties does not lose that absolute immunity when engaged in an alleged conspiracy. *See French v. Corrigan*, 432 F.2d 1211, 1214 (7th Cir. 1970). But here, the prosecutors' alleged misconduct includes acts taken outside the scope of their prosecutorial duties. Just as inclusion in a conspiracy does not strip a prosecutor of immunity, nor does it automatically confer immunity. The conspiracy claims against the prosecutors survive to the extent they are based on conduct not subject to immunity, like investigative evidence fabrication.[12]

The County's motion to dismiss the conspiracy claims against the prosecutors is denied.[13]

### 6.    *Claims Against Cook County*

The County requests dismissal of plaintiffs' respondeat superior and indemnification claims against it. I agree that the County cannot be held liable for the prosecutors' actions under a respondeat superior theory, because the Cook County State's Attorney's Office (run by an elected state official) acts independently

---

[12] The County correctly notes that where "every defendant is alleged to be a state actor . . . a standalone conspiracy claim is usually superfluous." *Walker v. White*, No. 16 CV 7024, 2017 WL 2653078, at *7 (N.D. Ill. June 20, 2017) (citing *Scott v. City of Chicago*, 619 Fed.Appx. 548 (7th Cir. 2015)). Nevertheless, I decline to dismiss the conspiracy claims where they are based on surviving substantive claims. *See Geinosky v. City of Chicago*, 675 F.3d 743, 749 (7th Cir. 2012) (reversing dismissal of § 1983 conspiracy claim against all state actors where dismissals of substantive constitutional claims were also reversed); *see also Boothe v. Sherman*, 66 F.Supp.3d 1069, 1077–78 (N.D. Ill. 2014).

[13] Although the County summarily stated that "all of the claims against [the prosecutors] are barred by absolute prosecutorial immunity or qualified immunity," [60] at 7, the County did not provide actual argument for the state law claims of malicious prosecution, civil conspiracy, and IIED. This may be because the County argues that the specific conduct underlying those claims is protected by immunity. But all the prosecutors' conduct is not shielded by immunity, and so, in the absence of other argument, those claims are not dismissed.

from the County. *See Gordon v. Devine*, No. 08 C 377, 2008 WL 4594354, at *18

(N.D. Ill. Oct. 14, 2008) (citing *Biggerstaff v. Moran*, 284 Ill.App.3d 196, 199 (1996)).

I am not persuaded otherwise by plaintiffs' assertion that this issue "turns on a

number of factual disputes," given that they did not identify any specific "factual

disputes." [71] at 22. But the County remains a proper party for indemnification

purposes, as it concedes. *See Patterson v. Burge*, 328 F.Supp.2d 878, 903 (N.D. Ill.

2004) ("Defendant Cook County, though not an employer of any individual

defendant for purposes of *respondeat superior* liability . . . nevertheless may be

required to pay judgments entered against county officials in their official

capacities.").

The motion to dismiss the respondeat superior claims against the County is

granted. The motion to dismiss the indemnification claims against the County is

denied.

### B.    The Officers

#### 1.    *Rankins Statement*

The City moves to dismiss plaintiffs' evidence fabrication claims to the extent

they are based on conduct related to Rankins. Evidence fabrication only violates due

process if it results in a deprivation of liberty. *See Bianchi*, 818 F.3d at 319.[14] The

---

[14] Serrano's complaint includes violations of the Fifth Amendment in the claims of evidence fabrication and evidence suppression. As the City points out, "there are no allegations that Serrano made any statements—coerced or otherwise—to police, much less that any such statements were used against him in his criminal proceedings," [68] at 14, and so the Fifth Amendment was not violated. Plaintiffs made no argument to contest this. *See Cty. of McHenry v. Ins. Co. of the W.*, 438 F.3d 813, 818 (7th Cir. 2006) ("When presented with a motion to dismiss, the non-moving party must proffer some legal basis to support his cause

deprivation of liberty in evidence fabrication claims is often post-conviction incarceration resulting from the use of fabricated evidence at trial. *See Armstrong*, 786 F.3d at 551. The City argues that since Rankins never testified at trial, any alleged fabrication of his statement cannot violate due process. Plaintiffs respond that although Rankins himself did not testify at trial, Rankins's statement was introduced through Halvorsen's trial testimony. Plaintiffs attached a transcript of Halvorsen's trial testimony to their response brief, which includes testimony that Rankins made a statement saying he was an eyewitness to the Vargas murder. [72] at 43–46. Even if I take judicial notice of the transcript, the transcript shows that Halvorsen's testimony about Rankins was not admitted substantively. The trial judge repeatedly clarified that testimony about what Rankins said was only admitted "to show course of conduct, of investigation." [72] at 43. *See also* [72] at 45–46 ("If the witness is going to say that Timothy Rankins said A, B and C, he did the crime, I saw it, that's hearsay it doesn't come in. So this is all investigation."). This is consistent with plaintiffs' assertion in the complaints that plaintiffs "were convicted solely on the 'snitch' testimony of Francisco Vicente." S. Compl. ¶ 64. *See also* M. Compl. ¶ 1 ("[Montanez] was convicted solely because Defendants conspired among themselves . . . and coerced Francisco Vicente . . . to falsely implicate Plaintiff.").

Plaintiffs argue that evidence fabrication claims may also be based on pre-trial detention resulting from the use of fabricated evidence to secure an indictment.

---

of action." (citation omitted)). Anyway, I agree that Serrano's complaint does not plausibly allege any Fifth Amendment violations.

*See Hurt*, 880 F.3d at 843 (The Due Process Clause "forbids the state from depriving a person of liberty (including by pre-trial detention) based on manufactured evidence."); *Fields II*, 740 F.3d at 1112 ("[T]he fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him."). Although plaintiffs have alleged that Rankins testified in front of the grand jury, they did not allege pre-trial detention. Instead, they argue that "[a] fair inference from the fact that [plaintiffs] were indicted for murder is that they were incarcerated as a result. Indeed, it would be unreasonable to assume that they were not." [72] at 14. People charged with murder do get released on bond. *See, e.g., People v. Albitar*, 374 Ill.App.3d 718, 720 (2007). And if plaintiffs were released on bond, their pre-trial theory of liberty deprivation would be foreclosed. *See Alexander v. McKinney*, 692 F.3d 553, 557 (7th Cir. 2012). If plaintiffs were held in pre-trial detention, they must allege that in their complaints.[15]

The City argues that plaintiffs' *Brady* violation claims cannot be based on the Rankins statements either, primarily because they are just recharacterizations of plaintiffs' evidence fabrication claims. I agree. Plaintiffs "seek[ ] to charge the officers with a *Brady* violation for keeping quiet about their wrongdoing, not for failing to disclose any existing piece of evidence to the prosecution," but Seventh Circuit case law "makes clear that *Brady* does not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the

---

[15] Plaintiffs also say that Cook County court records show that plaintiffs were incarcerated from their arrests through their trial and ask me to take judicial notice of those records. But plaintiffs do not provide me with the records (either by link or attachment), and I will not go searching for them.

circumstances of their investigations to the prosecution." *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015). Plaintiffs point to *Smith v. Burge*, in which the plaintiff based his *Brady* violation claim against officers not on the failure to disclose their unlawful interrogation tactics, but rather their suppression of "implements of their torture" (bloody clothes, nightstick, and plastic bag) and evidence of systemic torture. 222 F.Supp.3d 669 at 681. The *Smith* plaintiff also alleged that defendants obstructed investigations into the systemic torture and discredited the findings of the investigations. *Id*. The *Montanez* complaint does include allegations that defendants suppressed evidence that "a jailhouse witness" was coerced and that defendants "intentionally secret[ed] discoverable reports, memos and other information." M. Compl. ¶¶ 82, 84. But these general allegations are not specific to Rankins, the focus of the City's motion to dismiss on these claims. And anyway, those allegations are too general for me to determine materiality— who is the "jailhouse witness" and what did the concealed documents say?

Plaintiffs also ask me to make a "fair inference" that Mingey suppressed the "bloody phonebook" with which he allegedly beat Rankins. The *Montanez* complaint does allege that defendants "put a phone book against Rankins's head and struck the phone book," but it does not say anything about hiding or suppressing the phone book (nor does the complaint describe the phonebook as "bloody," instead indicating that the type of abuse did not leave physical marks). M. Compl. ¶ 64. The Serrano complaint does not even mention a phonebook. To find that the complaint alleges

suppression of the phonebook would not be a "fair inference"—it would be reading in an absent allegation.

Because I find that plaintiffs' *Brady* violation claims are impermissible recasts of the evidence fabrication claims and do not allege the suppression of then-existing exculpatory evidence, I need not address the City's other arguments. But for the sake of completeness, I am not persuaded by the City's argument that evidence regarding the abuse or coercion of Rankins was not material. Even though Rankins did not testify at trial, it is plausible that evidence that the officers used coercive tactics when conducting their investigation could give rise to a reasonable probability that the verdict would have been different. Surely, it could have impacted the credibility of the officers and the investigation. *See Kyles v. Whitley*, 514 U.S. 419, 446 n.15 (1995). Of course, it depends on the particular evidence, which is why plaintiffs should be more specific about what was suppressed.

The City's motion to dismiss the evidence fabrication and *Brady* violation claims against the officers is granted with respect to the portions of the claims based on Rankins-related conduct.[16]

---

[16] The parties dispute to what extent Mingey is implicated by plaintiffs' allegations in the complaints. From the City's perspective, Mingey is only alleged to have been involved in conduct related to Rankins. But plaintiffs say that Mingey, a supervisor of the other defendant officers, is alleged to be involved in much more than that, including fabricating evidence from Vicente and Wilda Vargas; suppressing evidence of systemic abuse; and "aiding, facilitating, and failing to intervene during the constitutional violations of the others." [72] at 25. The citations to the complaints provided by plaintiffs in support of their assertion are not convincing. Many of the citations are to allegations about the other (specifically named) defendants. Others are to generic references to "defendants" in the *Montanez* complaint that, when compared to the *Serrano* complaint's allegations on the same topic, actually do not appear to include Mingey. *Compare, e.g.,* M. Compl. ¶¶ 29–31, *with* S. Compl. ¶¶ 27–30. The fact that Mingey was the other officers' supervisor does not automatically implicate him in their constitutional violations, absent adequately pleaded

2. *Statute of Limitations Arguments (Prolonged Detention and IIED)*

The City argues that plaintiffs' prolonged detention and intentional infliction of emotional distress claims are time-barred, because they accrued at or around the time of plaintiffs' arrests in 1993. Plaintiffs argue that the claims did not accrue until their convictions were favorably terminated in 2016, relying on the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994). Under *Heck*, plaintiffs seeking to recover damages for an "allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid" must prove that the conviction or sentence was invalidated or overturned. *Id.* at 486–87. Because favorable termination is a required element of such a claim, "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at 489–90.

As I noted in relation to Serrano's prolonged detention claim against the prosecutors, plaintiffs have not alleged pre-trial detention in their complaints. So

---

personal involvement. *See Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 614–15 (7th Cir. 2002) ("[U]nder § 1983, a plaintiff may not rely on the doctrine of respondeat superior to hold supervisory officials liable for the misconduct of their subordinates. Rather, the supervisory officials also must have had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct."). But the complaints do not allege that Mingey directed or consented to the non-Rankins challenged conduct. The closest they come is the conclusory statement that Mingey "facilitated, condoned and approved the constitutional violations." S. Compl. ¶ 17; M. Compl. ¶ 18. So I agree with the City that the complaints implicate Mingey primarily in Rankins-related conduct. But this does not excuse Mingey from all claims not specific to Rankins. For example, if plaintiffs' prolonged detention claims are amended to adequately state a claim, Mingey may be implicated. Mingey would then also be implicated in the derivative claims based on the prolonged detention—the conspiracy and failure to intervene claims.

their prolonged detention claims must be dismissed against the officers too. But if plaintiffs amend their complaints to adequately state prolonged detention claims, the claims would not be time-barred. When Fourth Amendment prolonged detention claims begin to accrue is a question currently before the Seventh Circuit on remand. *See Manuel*, 137 S.Ct. at 922. Without the benefit of that decision, I continue to reason that "since there can be no § 1983 claim that depends on questioning the validity of detention authorized by legal process until that detention is terminated in the accused's favor, it makes sense to hold that a Fourth Amendment claim of this sort does not accrue until favorable termination." *Bolden*, 293 F.Supp.3d at 782 (citing *Heck*, 512 U.S. at 486–87). *See also Carter v. City of Chicago*, No. 17 C 7241, 2018 WL 1726421, at *4 (N.D. Ill. Apr. 10, 2018). Plaintiffs received favorable termination in 2016, and they filed their complaints in 2017, within the two-year statute of limitations for § 1983 claims. *See Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017). The claims would be timely.

Similarly, IIED claims based on wrongful convictions do not accrue until the conviction is overturned. *See Walker*, 2017 WL 2653078, at *6. Plaintiffs' IIED claims are alleged generally and, in the context of the complaints, appear to be based on their wrongful convictions. The IIED claims are subject to a one-year statute of limitations, 745 ILCS 10/8-101(a), and both complaints were filed within one year of the date the convictions were overturned. However, the City correctly points out that if the IIED claims are based on conduct related to Rankins, accrual does not wait for the convictions to be overturned. That is because no substantive

evidence related to Rankins was used against plaintiffs at trial or used to convict plaintiffs. So *Heck* would not have barred plaintiffs from bringing their IIED claims based on the defendants' Rankins conduct back in 1993, and that is when the clock began to run. To the extent the IIED claims are based on Rankins-related conduct, they are dismissed.

The City's motion to dismiss the prolonged detention claims against the officers is granted. The City's motion to dismiss the IIED claims against the officers is granted to the extent the claims are based on Rankins-related conduct, but otherwise denied.

### 3. *Other Claims*

The City asserts that plaintiffs cannot sustain state-law malicious prosecution claims against the officers because the officers did not prosecute plaintiffs, the prosecutors did. "[S]uccessful malicious prosecution claims against police officers are rare." *Cooper v. Butler*, No. 96-3415, 1999 WL 50842, at *2 (7th Cir. Feb. 1, 1999). Officers may wrongfully arrest someone, but "the chain of causation is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements made by the officers to the prosecutor." *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996). Here, the chain of causation is broken by the alleged knowing involvement of the prosecutors in the officers' misconduct. The complaints do not contain any allegations that the officers pressured or influenced the prosecutors to prosecute plaintiffs—rather, the allegations are that the prosecutors knowingly and actively participated in the

misconduct. Because plaintiffs did not adequately plead causation, their malicious prosecution claims against the officers are dismissed.

The City also moves to dismiss the federal conspiracy and failure to intervene claims because they are derivative claims that must be dismissed if the underlying federal claims are dismissed. Although the federal claims based on Rankins-related conduct have been dismissed, federal claims remain on the non-Rankins conduct that the City has not moved to dismiss (for example, Vicente-related conduct). Since those claims survive, so do the derivative conspiracy and failure to intervene claims. Similarly, the City argues that the state civil conspiracy, respondeat superior, and indemnification claims must be dismissed if the other state-law claims are dismissed, but the IIED claims survive in part, so the other state-law claims survive too.

The City's motion to dismiss the malicious prosecution claims against the officers is granted. The City's motion to dismiss the § 1983 conspiracy, failure to intervene, state civil conspiracy, respondeat superior, and indemnification claims is denied.

## IV.    Conclusion

The County's motion to dismiss [46] and the City's motion to dismiss [55] are granted in part, denied in part. The dismissals are without prejudice unless otherwise noted.  Plaintiffs have permission to file amended complaints curing the pleading deficiencies described in this opinion. Amended complaints must be filed

by June 19, 2018, and responses to any amended complaints are due by July 10, 2018. A status hearing is set for July 19, 2018 at 9:30 a.m.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: May 29, 2018