## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JOSE MONTANEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 17-cv-4560 |
| CHICAGO POLICE OFFICERS | ) | |
| REYNALDO GUEVARA, ERNEST | ) | District Judge Manish S. Shah |
| HALVORSEN, EDWARD MINGEY, AND | ) | Magistrate Judge Jeffrey Cole |
| UNKNOWN OFFICERS; MATTHEW | ) | |
| COGHLAN, JOHN DILLON; the CITY OF | ) | |
| CHICAGO; and COOK COUNTY. | ) | |
| | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiff JOSE MONTANEZ, by his attorneys, LOEVY & LOEVY, complains of

Defendants REYNALDO GUEVARA, ERNEST HALVORSEN, EDWARD MINGEY,

UNKNOWN CHICAGO POLICE DEPARTMENT OFFICERS, former Assistant State's

Attorneys MATTHEW COGHLAN and JOHN DILLON, the CITY OF CHICAGO, and COOK

COUNTY, as follows:

### INTRODUCTION

1.     Plaintiff Jose Montanez was wrongfully convicted of the 1993 shooting death of

Rodrigo Vargas. Plaintiff was convicted solely because Defendants conspired among themselves

and with others and coerced Francisco Vincente, a heroin addict facing over 100 years of

incarceration on his own pending charges, to falsely implicate Plaintiff.

2.     This was a classic set-up by the now-notorious Chicago Police Detective

Defendant Reynaldo Guevara and his cohorts who specialized in precisely this type of

misconduct. Over two decades, Defendants engaged in a disturbing succession of similar abuses, frequently preying on young Latino men in order to close unsolved cases by framing them.

3.     Defendant Guevara has universally taken the Fifth about his activities as a Chicago police officer in the face of over 100 incidents of his misconduct, asserting his right to silence on grounds that truthful responses would subject him to criminal liability.

4.     For his part, Vicente has testified that his allegations against Plaintiff were all fabricated, fed to him by the Defendant Detectives and coerced from him by force.

5.     Shockingly, Vicente revealed that Defendants not only coerced him to frame Plaintiff, but also, time after time over a period of months, forced him to falsely implicate four other men. In each case, Vicente falsely claimed that the men had confessed murder to him.

6.     Former Assistant Cook County State's Attorneys Matthew Coghlan and John Dillon, while acting in an investigatory function before Plaintiff's arrest were in on the conspiracy. The two conspired among themselves and with the law enforcement Defendants to fabricate the false testimony from Vincente.

7.     Due to Defendants' foul play, Plaintiff was convicted of Rodrigo Vargas's 1993 shooting death and was sentenced to 55 years in prison.

8.     In 2016, after more than two decades in prison, Plaintiff was finally vindicated. On June 7, 2016, the Appellate Court issued a scathing opinion directing the trial court to fully hear Plaintiff's claims of actual innocence. The Appellate Court characterized the presented mountain of evidence of Defendant Guevara's misconduct as "profoundly alarming."

9.     Separately, the City conducted its own investigation into Defendant Guevara's misconduct against Plaintiff and determined that Plaintiff deserved to be exonerated based on his innocence.

10.     Subsequently, the State moved to dismiss all charges against Plaintiff, and he was finally set free on July 20, 2016. Without opposition, the state court issued Plaintiff a Certificate of Innocence on November 2, 2016.

11.      Plaintiff now brings this action to obtain justice and redress the devastating injuries that Defendants have caused him.

## JURISDICTION AND VENUE

12.     This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

13.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claim for indemnification pursuant to 28 U.S.C. § 1367.

14.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district, the majority of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

15.     Plaintiff Jose Montanez is a resident of Cook County, Illinois, who spent approximately 23 years in prison for a crime he did not commit.

16.     Defendant City of Chicago is an Illinois municipal corporation and is and/or was the employer of each of the Defendant Officers.  The City of Chicago is liable for the acts of the Defendant Officers while acting within the scope of their employment for the City.

17.     At all times relevant hereto, Defendants Reynaldo Guevara, Ernest Halvorsen, Edward Mingey, and other unknown law enforcement officers (collectively, the "Defendant Officers") were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago.

18.     Defendant Edward Mingey , at all relevant times, supervised the Police Officer Defendants. He facilitated, condoned and approved the constitutional violations committed by the Police Officer Defendants.

19.     At all relevant times, Matthew Coghlan and John Dillon were Assistant Cook County State's Attorneys. Coghlan and Dillon conspired with the Defendant Officers, prior to the initiation of probable cause to believe Plaintiff had committed a crime, and while acting in investigatory capacities, to conceal and fabricate evidence, manipulate witness testimony, and maliciously prosecute Plaintiff for Rodrigo Vargas's murder.

20.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office, and was at all relevant times the employer of Defendants Matthew Coghlan and John Dillon. Defendant Cook County is a necessary party to this lawsuit.

## FACTS

21.     At about 5:30 a.m. on February 5, 1993, in the Humboldt Park neighborhood of Chicago, Rodrigo Vargas left his home to go to work.

22.     Tragically, he was shot to death in his parked van, which was located directly in front of his home, with the engine running.

23.     Investigators found his body along with the van's pull-out radio in his hand and $190 still in his wallet. There was no evidence that any property was stolen during the murder. The shots that killed Vargas were fired from outside the van.

24.     A neighbor saw an older brown or tan car leave the scene. Apart from that vague clue, there were no leads on who killed Vargas and no motive for the crime – Vargas was not a member of a gang, a user of narcotics, or someone with enemies.

**Defendants Meet Their Prize Witness, Heroin Addict Vicente**

25.     The Vargas murder remained unsolved for months, without a lead or any further documented investigative activity.

26.     On May 14, 1993, heroin addict Francisco Vincente was arrested and charged with four felonies. He had been committing robberies to feed his heroin addiction.

27.     When he met the Defendant Officers, Vicente was facing up to 100 years in prison on his pending charges, was suffering symptoms of heroin withdrawal, and was highly vulnerable to Defendants' manipulation.

28.     Over the course of a few weeks during the summer of 1993, the Defendant Officers coerced Vicente to "solve" three unrelated murders, going back to him time and time again to fraudulently close more and more cases.

29.     First, Defendants violently coerced Vincente to falsely claim that while he was in a holding cell upon his arrest, a stranger named Robert Bouto confessed to him about committing murder.

30.     This was false. Bouto did not commit that murder and did not confess to Vicente. Indeed, the City itself has determined that Bouto is innocent of the murder and that Vicente's claim was a lie.

31.     During the entirety of Vicente's cooperation with the Defendant Officers on the Bouto case, Vicente did not mention anything about the Vargas murder or knowing about any other murders.

32.     Nevertheless, on June 2, 1993, Defendants Guevara and Halvorsen met with Assistant State's Attorneys Defendants Matthew Coughlan and John Dillon at the Cook County

State's Attorney's office to discuss the prosecution of Robert Bouto and also the investigation of the Vargas murder.

33.     Faced with no other way to "solve" the Vargas murder, Defendants Guevara, Halvorsen, Coghlan, and Dillon agreed that they should go back to the well again to get Vicente to falsely implicate Plaintiff in the Vargas murder.

34.     As prosecutors, Defendants Coghlan and Dillon (the "Defendant Prosecutors") would not have acted on their own to falsely implicate Plaintiff and the men who would become his co-defendants in the murder case, Armando Serrano and Jorge Pacheco.

35.     As prosecutors, Defendant Prosecutors knew that they would need the help and active involvement of police officers in order to lodge false charges against Plaintiff. Indeed, the Defendant Prosecutors joined the conspiracy only because they knew that the Defendant Officers would be complicit in securing the false evidence to frame the accused.

36.     In other words, the Defendant Prosecutors would not have filed false charges against Plaintiff without the Defendant Officers' willingness to fabricate evidence and their success in so doing. The Defendant Prosecutors would not have done the dirty work of beating Vincente or creating their own false police reports; but in light of the Defendant Officers' ready willingness to do both, the Defendant Prosecutors were willing to play their part in the conspiracy.

37.     Quite simply, the Defendant Prosecutors would not have prosecuted Plaintiff but for the involvement and encouragement of Defendants Guevara, Halvorsen, and Mingey. Indeed, the Defendant Prosecutors would never have prosecuted the case without having at least one police officer available to document and testify to the version of events that led to the initiation of charges against Plaintiff.

38.     The Prosecutor Defendants needed Defendants Guevara, Halvorsen, and Mingey to write false reports and back up their fabricated charges against Plaintiff. Without the involvement, agreement, and false reports of the police officer Defendants, Defendants Dillon and Coughlan would never have initiated or continued the charges against Plaintiff.

39.     Although not reported in the Vargas murder investigation file, on May 25, 1993, Defendant Guevara requested criminal history reports for Plaintiff, Serrano, and Pacheco.

40.     There was no legitimate basis to run criminal history reports for any of the three men at the time. For example, there is no suggestion that any of the three committed a crime on or about that date, which would have justified running their backgrounds.

41.     Furthermore, the reports were run before anyone suggested that these men had anything to do with the crime. Undoubtedly, this information was requested to determine whether Defendants could plausibly frame the three for the Vargas murder.

**Defendants Coerce Vincente to Implicate Plaintiff**

42.     On June 2, 1993, the Defendant Prosecutors arranged to have Vicente transported from Cook County Jail to the Cook County State's Attorney's office. There, Detective Guevara told Vicente, in the presence of Halvorsen, Coughlan, and Dillon, that he wanted Vicente to say that he was present when Plaintiff, Serrano, and Pacheco attempted to rob Vargas.

43.     Pleading in the alternative,, on June 2, 1993, Vincente met with Detectives Guevara and Halvorsen outside the presence of the Defendant Prosecutors and the Defendant Prosecutors were unaware that all of Vincente's subsequent statements incriminating Plaintiff were false and were coerced by the Defendant Officers.

44.     Defendant Guevara presented Vincente with crime scene photos and photos of Plaintiff, Serrano and Pacheco, telling Vincente that the three committed the murder. Defendants

Guevara and Halvorsen supplied Vincente with the details of the crime and told him what they wanted him to say in order to inculpate Plaintiff and the others. At this point in the Vargas investigation, there was absolutely no suggestion from any source that Plaintiff, Serrano, or Pacheco had anything to do with the crime.

45.     Defendants tried to force Vincente to admit to being an eyewitness to the Vargas murder. First, the Defendant Officers attempted to coerce Vincente to admit to witnessing the shooting, as the driver of the supposed culprits' car. The Defendant Prosecutors promised Vicente that he had nothing to worry about if he just cooperated and did what Guevara and Halvorsen told him to do. However, Vicente insisted that he would not make himself an eyewitness to the crime.

46.     When Vincente refused, Defendants – reluctant to have yet another murder where the (framed) culprits just "happened" to confess to Vincente – tried to force him to adopt a version where the suspects gave Vincente the murder weapon. When Vincente again refused, Defendants returned to their old stand-by and had Vincente claim that, once again, the villains just happened to confess to him.

47.     According to Vicente, the Defendant Officers beat him to persuade him to cooperate with their frame up. Having previously been beaten in the head repeatedly with a phone book before agreeing to frame Bouto, Vincente knew that his resistance was futile.

48.     Defendants concocted a story for Vincente of how the murder transpired. One of the details Defendants fed to Vincente was their invented motive for the crime: that Plaintiff, Serrano, and Pacheco had encountered Mr. Vargas at a gas station with his family the night before the shooting, seen that he was carrying a lot of money, and decided to follow him and rob him later, when he was not with his family ("the Gas Station Encounter").

49.     Unexplained in Defendants' Gas Station Encounter story is how Plaintiff, Serrano, and Pacheco would know that Mr. Vargas would leave very early the next morning, providing them the opportunity to rob him when few people would be in a position to witness the events.

50.     Nevertheless, as a result of physical abuse and undisclosed promises, Vincente falsely implicated Plaintiff, Serrano and Pacheco and, as instructed by Defendants, incorporated the Gas Station Encounter motive into his inculpation. He claimed that Plaintiff, Serrano, and Pacheco, after encountering the victim at the gas station, had laid in wait all night on the off-chance that the victim would be alone the following morning.

51.     Defendants falsely reported that only after they learned of the Gas Station Encounter motive from Vincente that they independently confirmed with the decedent's widow, Ms. Vargas, that the Gas Station Encounter had taken place. This was a complete fabrication.

52.     In reality, the Defendants knew about the Gas Station Encounter long before they fed this fact to Vicente.

53.     Back in February 1993, Ms. Vargas told Defendants about events similar to the Gas Station Encounter. In her version of the event, while speculating about who could have killed her husband, the Gas Station Encounter was a benign event: The night before the shooting, her family had stopped at the gas station, after her husband had cashed a check at the bank; an occupant from a car had entered the gas station, as Rodrigo Vargas was leaving; because the car was blocking her family's van, they had to wait for the car to leave before they could leave; and the car left the same way as the Vargas' van and drove behind them for a short while.

54.     Critically, Ms. Vargas's testimony about the encounter diverged from the story falsely regurgitated by Vicente in several material respects. According to her, there is no

evidence that the three men from the gas station on the night before the murder saw Vargas'
money, followed the Vargas family home, or were responsible for the murder.

55.     To falsely corroborate Vicente's story, Defendants manipulated Ms. Vargas into
identifying Plaintiff's car as the one she had seen at the gas station the night before the murder.

56.     Specifically, Defendants Guevara and Halvorsen drove Ms. Vargas to Plaintiff's
car and lied to her that ballistics evidence taken from Plaintiff's car forensically matched
evidence from the scene of the crime. This was entirely false. There was no ballistics evidence
that could possibly link Plaintiff's car to the crime scene, but Ms. Vargas trusted the detectives
and, based on their misrepresentation to her, identified Plaintiff's car as the one she had seen at
the gas station.

57.     To cover up their misconduct, Defendants falsely claimed that Ms. Vargas
identified Plaintiff's car while they merely drove around with her until she indicated that she
spotted the car that she had seen (benignly) parked at the gas station the night before her husband
was murdered four months before.

58.     Defendants also withheld the fact that they had falsely told Ms. Vargas that
ballistics evidence from the crime scene matched Plaintiff's car.

59.     Eventually, Vincente gave in to Defendants' coercion and falsely claimed that on
February 5, 1993, at around 8:00 or 9:00 a.m., he encountered Montanez, Serrano, and Pacheco
and that the three were talking about having just committed a murder.

60.     According to Vincente's coerced statement, Montanez complained that Serrano
had botched the plan, so they were not able to get any money off of the victim. Vincente claimed
that Montanez described the context for the shooting, explaining that the trio had seen a Mexican
man at a gas station with a lot of cash the night before, so they decided to rob him, but they

10

waited until morning to get him alone, because the man had been with his wife and children at the gas station.

61.     After meeting with Vicente and the Defendant Prosecutors, Defendants Guevara and Halvorsen prepared a fictitious supplemental police report, falsely claiming that a confidential informant told them that Montanez admitted his involvement in the murder and further implicated Plaintiff, Serrano, and Pacheco.

62.     Pleading in the alternative, after meeting with Vicente, Guevara and Halvorsen prepared a fictitious supplemental police report, falsely claiming that a confidential informant told them that Montanez admitted his involvement in the murder and further implicated Plaintiff, Serrano, and Pacheco.

63.     On June 28, 1993, the Defendant Prosecutors arranged to have Vicente brought to the Cook County State's Attorney office to formalize the false witness statement Defendants constructed with him prior to Plaintiff's arrest.

### Yet Another Man Supposedly Confesses to Vincente

64.     After coercing Vincente to frame Montanez, Serrano, Pacheco, and Bouto, Defendants returned to the Vincente well one final time and coerced Vincente to "solve" a third unrelated murder.

65.     At Defendants' behest, a few weeks after falsely accusing Plaintiff, Vincente falsely implicated a man named Iglesias in that third murder. Vincente claimed that Iglesias confessed that he committed murder to Vincente while the two were in the bullpen together, awaiting court. Defendants again fed Vincente the details of the crime for the "confession."

66.     All told, in a matter of weeks, Vicente claimed that five different men confessed to three murders – all reported by him after he was facing over 100 years in prison on pending

charges, and two of the "confessions" conveniently coming from strangers who supposedly confessed to Vincente after he was incarcerated on his own charges.

67.     In exchange for his testimony on all three murder cases, Defendant Guevara promised Vincente that his four pending felony charges, for which he was facing up to 100 years in prison, would "work out fine."

68.     Defendant Guevara also paid Vincente money and arranged to get him special privileges while he was incarcerated. While in jail, Vincente received perks like cigarettes, a radio, home-cooked meals, conjugal visits, and other things not generally available to inmates, in order to ensure his continued cooperation in the Montanez prosecution.

69.     In fact, after testifying before the grand jury, Vicente was placed in the State's Attorney's witness quarters where he spent the next three years, receiving a wide array of benefits in exchange for his cooperation in the three separate murder prosecutions. According to Vicente, he was transported back and forth between these quarters and the Cook County State's Attorney's office more times than he could count where he was prepped and coached by the Defendant Prosecutors in preparation for his testimony in the murder prosecutions against Bouto, Plaintiff (and his co-defendants), and Iglesias.

**Defendants Coerce Evidence from Timothy Rankins**

70.     Recognizing that their case against Plaintiff, Serrano, and Pacheco was flimsy, Defendants sought to devise further false evidence. On June 10, 1993, a Chicago police officer arrested Timothy Rankins and put him in a car with Defendants Guevara, Halvorsen, and Mingey. Defendants told Rankins that he had to falsely implicate Plaintiff, Serrano and Pacheco for murder, and when Rankins refused, Defendants Guevara, Halvorsen, and Mingey kicked, beat and threatened him.

71.     Resorting to a tried and true method of abuse used by abusive Chicago Police detectives of that era, as part of this beating Defendants put a phone book against Rankins's head and struck the phone book, causing a very painful concussive effect without leaving physical marks.

72.     Defendants presented Rankins with a statement, purporting to be his own statement, and commanded him to learn the contents. During their efforts to force Rankins to adopt the statement as his own, Defendants choked Rankins, beat him, kicked him, and hit him in his genitals. He was assaulted until he agreed to sign the statement.

73.     Defendants told Rankins that he would be charged with an armed robbery, but that the charges would be dismissed if he cooperated in implicating Plaintiff, Serrano and Pacheco.

74.     Rankins' entire implication was false, fabricated by Defendants. Defendants forced Rankins to repeat the false accusations against Plaintiff to the prosecutor and the grand jury. Rankins did not know Plaintiff, Serrano, or Pacheco, and had never met them.

75.     Defendants ensured that Rankins was housed along with Vincente in the special witness quarters. Defendants brought the two "witnesses" money and afforded them special privileges.

76.     Nevertheless, Rankins ultimately refused to falsely implicate Plaintiff and did not testify at his trial.

### Plaintiff, Serrano, and Pacheco Deny Involvement

77.     Defendants arrested Plaintiff, Serrano, and Pacheco based exclusively on evidence they fabricated via Vincente and Rankins.

78.     Plaintiff remained incarcerated from the day of his arrest on July 9, 1993, through his trial, and until his eventual exoneration.

79.     Each man has consistently denied having any involvement in the Vargas murder from start to finish.

80.     During Serrano's interrogation, Defendant Guevara hit him in the face with an open hand while Serrano was shackled to a police station wall in a failed attempt to get him to confess. When Serrano's mother and father arrived at the police station, they could hear their son screaming for a lawyer.

**Plaintiff's Trial**

81.     No inculpatory evidence other than the evidence fabricated by Defendants was relied upon at Plaintiff's criminal trial.

82.     Vincente testified at trial in exchange for his plea deal. He testified, in accordance with the Defendants' fabricated story, that on the morning of the shooting, he encountered Plaintiff, Serrano, and Pacheco, and they confessed the murder to him. Per Defendants' instructions, Vincente testified that the trio's motive for the murder was that they had seen the decedent carrying a lot of money at a gas station the night before.

83.     Defendants Guevara and Halvorsen falsely testified at trial that law enforcement first learned of the Gas Station Encounter from Vincente, confirmed that information with Ms. Vargas, and then had her independently identify Plaintiff's car.

84.     The court found Plaintiff guilty of armed robbery and murder. The court expressly found the evidence to be slim, and acquitted Pacheco on the same evidence. But the court ultimately relied on Vincente's supposed insider knowledge of the Gas Station Encounter as proof that Plaintiff and Serrano must have confessed to him.

85.     The court sentenced Plaintiff to 55 years of incarceration.

86.     Without the Defendants' misconduct, Plaintiff would never have been prosecuted for or convicted of Vargas' murder.

87.     To secure Plaintiff's conviction, Defendant Dillon cut a deal with Vicente that gave him less than the minimum sentence for his crimes: Dillon gave Vicente 344 days of pre-trial custody credit to which he was not entitled, in effect knocking two years off the time he would have to serve in the penitentiary. This benefit was never disclosed to Plaintiff.

**Policy and Practice of Prosecuting Innocent Persons in Violation of Due Process**

88.     The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, no fewer than 70 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been discovered.

89.     The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants employed against Plaintiff in this case, including: (1) procuring false witness testimony from detainees and "jailhouse snitches"; (2) concealment of exculpatory evidence; (3) manipulation of witnesses in order to obtain false identifications; (4) manipulation of witnesses in order to influence their testimony; and (5) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

90.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to detainees to make false witness statements implicating innocent persons, knowing full well that

15

those statements were false. As a matter of widespread custom and practice, members of the
Chicago Police Department, including the Defendants in this action, contrived false witness
narratives that were fed to vulnerable "jailhouse snitches" who then adopted those false witness
narratives as their own for the purpose of wrongly convicting an innocent person. Furthermore,
Chicago Police Department officers systematically suppressed exculpatory and/or impeaching
material by concealing evidence that a jailhouse witness was coerced, manipulated, threatened,
pressured or offered inducements to make false statements.

91.     Consistent with the municipal policy and practice described in the preceding
paragraph, employees of the City of Chicago, including the named Defendants, procured false
testimony from detainee witnesses knowing full well that their testimony was false and would
lead to the wrongful conviction of Plaintiff. The tactics and inducements used to gain
cooperation from these jailhouse witnesses was concealed from Plaintiff.

92.     At all times relevant hereto, members of the Chicago Police Department,
including the Defendants in this action, systematically suppressed exculpatory and/or
impeaching material by intentionally secreting discoverable reports, memos and other
information in files that were maintained solely at the police department and were not disclosed
to the participants of the criminal justice system. As a matter of widespread custom and practice,
these clandestine files were withheld from the State's Attorney's Office and from criminal
defendants, and they were routinely destroyed at the close of the investigation, rather than being
maintained as part of the official file.

93.     Consistent with the municipal policy and practice described in the preceding
paragraph, employees of the City of Chicago, including the named Defendants, concealed
exculpatory evidence from Plaintiff.

94.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

95.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, manipulated, tricked, and improperly influenced the testimony of the victim's widow, Wilda Vargas.

96.     The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

97.     Prior to and during 1993, the year in which Plaintiff was falsely charged with the Vargas murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. The City's Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

98.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

17

99.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

100.     Defendants Guevara and Halvorsen have a long history of engaging in the kind of investigative misconduct that occurred in this case, including the manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Guevara and/or Halvorsen have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as they did in this case. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

101.     The City of Chicago and its Police Department failed in 1993 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.     The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been

identified in order to ensure that the evidence is made part of the criminal proceeding.

b.  The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

c.  The risks associated with relying on testimony from "jailhouse snitches."

d.  The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.  The risks of engaging in tunnel vision during investigation.

f.  The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

102.  The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

103.  The City's failure to train, supervise, and discipline its officers, including repeat offenders such as Defendants Guevara and Halvorsen, effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

104.  The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and

19

ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

105.    The policies and practices described in the foregoing paragraphs were consciously approved by the City of Chicago policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent Persons**

106.    In particular, Defendant Guevara has framed literally dozens of other innocent men over the span of two decades, men who have all lodged independent accusations of similar misconduct against him.

107.    For his part, Defendant Guevara is now refusing to testify about any of his activities as a Chicago police officer on grounds that truthful testimony would subject him to criminal liability.

108.     Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of identified cases in which Guevara has engaged in serious investigative misconduct, including many cases in which he has manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case.

109.    Given this extensive history, it is apparent that Guevara engaged in such misconduct because he had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

110.    Regarding his role in framing Plaintiff, Defendant Guevara has asserted his Fifth Amendment right to silence when questioned about: whether he framed Plaintiff; whether he

coerced Vicente to falsely implicate Plaintiff; whether he fed facts to Vicente; whether he coerced Rankins to falsely implicate Plaintiff; and whether he purposely misled Ms. Vargas into falsely identifying Plaintiff's car.

111.     Repeatedly, Defendant Guevara has also invoked his Fifth Amendment right not to answer any questions about allegations that he manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below.

112.     Examples of Defendant Guevara's misconduct include:

a.     Bill Dorsch is a former Chicago police detective.  While serving with the Chicago police department, Dorsch was assigned to investigate a murder.  Several months after the murder occurred, Defendant Guevara brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter.  While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "that's him."  The juvenile then agreed with Guevara, saying that was the person who committed the shooting. Dorsch then directed Defendant Guevara to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder.  Subsequently, Dorsch spoke to the two juveniles without Defendant Guevara being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for

the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b.  Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.  In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

d.  In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e.  Juan Johnson was later exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

22

f.   In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

g.   In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

h.   In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder.  Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

i.   In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by Guevara.

j.   In 1993, Defendant Guevara coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends.

Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

k. In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila told Guevara that he did not do it, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

l. In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant Guevara's misconduct to light.

m. In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

n. In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

o. In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like

24

smacking" her.  Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

p.  In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

q.  In 1995, Defendant Guevara engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the shooter. Melendez identified Sierra, but recanted his identification at trial.

r.  In 1996, Defendant Guevara coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

s.  In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification.  Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and

Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

t.  In 1997, Defendant Guevara withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Antonetty to Ariel Gomez. Gomez was accused of firing multiple shots from a car into a crowd. Ruth Antonetty told Guevara that she heard multiple shots coming from within the crowd, not from Gomez's vehicle. Guevara continued to pressure her to change her account, and when she would not, he told her he "had other witnesses" and "didn't need her." As a result, Ariel Gomez did not have access to key *Brady* material at his trial.

u.  In 1988, Defendant Guevara used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin.  As a result, Rivera was convicted of murder.  In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer.  As a result, Rivera received a new trial.  Ultimately, the State's Attorney dropped all charges against Rivera, who was granted a certificate of innocence.

v.  Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim of that shooting identified Jacques Rivera as his shooter before he died. Defendant Guevara claimed that the identification was made at a time that the victim was in a medically-induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him.

w.  In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a
trial in which Guevara was testifying and observed the testimony of trial
witnesses.  She then conferred with Guevara, even though the Court had ordered
all witnesses excluded from the courtroom to prevent collusion among the
witnesses.

x.  In 2011, the first district granted Tony Gonzalez a post-conviction hearing on the
basis that Defendant Guevara conducted an unduly suggestive lineup wherein he
concocted an array in which Gonzalez's photo was the only one that stood out
from the rest in a photo array.

y.  In 1982, Defendant Guevara and another officer arrested and physically assaulted
Annie Turner for smoking on a bus.  Guevara called her a "bitch" and pushed her
out the back door of the bus.  He twisted her arm, threatened to "snap" it, and
handcuffed her so tightly that her skin broke.  He also hit her across the face with
a metal bracelet he was wearing and called her a "nigger bitch."  Turner sought
medical treatment and filed a complaint with the Office of Professional Standards.

z.  In 1982, Defendant Guevara and three other officers broke through Almarie
Lloyd's locked front door and conducted a warrantless search of her home. When
Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd,
her brother, and two children, and left the home in shambles. Lloyd filed a
complaint with the Office of Professional Standards the next day.

aa.  In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt
from his home and handcuffed him to a ring in the wall at the police station where
he was beaten about the head, face, and body until he confessed to murder and

27

robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

bb.  In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch" and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

cc.  In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

dd.  In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS). Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head.

After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

ee.  In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody.

ff.  In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards (OPS). OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

gg.  In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

hh.   In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if he signed a statement, he could go home.

ii.   In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner, Defendant Halvorsen in the chest and torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession.

jj.   In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez (no relation to Plaintiff) without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

kk.   In 1993, Defendant Guevara arrested fifteen year old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

30

ll.    In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

mm.    In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

nn.    In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of

day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of *Miranda*.

oo.     In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by Guevara without *Miranda* warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

pp.     In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

qq.     In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated.

rr.     In 1998, Defendant Guevara repeatedly threatened and beat Arturo Reyes in an attempt to unconstitutionally coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement.

ss.     In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

32

**Plaintiff's Exoneration**

113.     The allegations of Defendant Guevara's abuses became so ubiquitous that the City of Chicago commissioned Sidley Austin to conduct an independent investigation into this case and others, to evaluate the credibility of the allegations.  After a thorough examination of witnesses and evidence, on February 2, 2015, the investigation yielded a detailed, 58-page report, known as "the Lassar Report."

114.     The Lassar Report found that neither Vincente nor Rankins provided any verifiable information about the crime that was not previously known to law enforcement. The Report concluded, "Looking at all the evidence, we conclude that Montanez and Serrano are more likely than not actually innocent."

115.     The City also determined that Robert Bouto, Gabriel Solache, and Arturo Reyes (men who were convicted of murder based on investigations conducted by Guevara) were all also wrongfully convicted.

116.     Plaintiff never stopped fighting to prove his innocence. On June 7, 2016, the Illinois Appellate Court reversed dismissal of his post-conviction petition. On November 2, 2016, the State moved to vacate Plaintiff's convictions and dismiss all charges against him, and the court granted that request. The court granted Plaintiff a Certificate of Innocence on November 2, 2016.

**Plaintiff's Devastating Injuries**

117.     During his twenty-three years of wrongful imprisonment, Plaintiff was deprived of the ability to interact freely with his loved ones; to be present for holidays, births, deaths and other life events; to pursue his passions and interests; to engage in meaningful labor and develop a career; and to live freely, as an autonomous being.

118.    Instead, Plaintiff was detained in harsh, dangerous, and isolating conditions in maximum security prisons. He was branded a murderer.

119.    As a result of his wrongful conviction and incarceration, Plaintiff must now attempt to rebuild his life outside of prison, all without the benefit of the life experiences that ordinarily equip adults for such a task.

120.    In addition to causing the severe trauma of Plaintiff's wrongful imprisonment and loss of liberty, Defendants' misconduct caused and continues to cause Plaintiff extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

## COUNT I – 42 U.S.C. § 1983
### Due Process: Fabrication of Evidence

121.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

122.    As described more fully above, Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by fabricating Vincente's and Rankins' testimonial inculpation of Plaintiff, as well as other evidence.

123.    In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from Vincente, Rankins, and Wilda Vargas implicating Plaintiff in the crime that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

124.    Defendants' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth

34

Amendment. Absent this misconduct, Plaintiff's prosecution could not and would not have been pursued.

125.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

126.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

127.     The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below, in Count VI.

**COUNT II – 42 U.S.C. § 1983**
**Due Process: *Brady* Violations**

128.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

129.     As described in detail above, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by withholding and suppressing exculpatory evidence. In the manner described more fully above, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from the prosecution, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

130.     In addition, in the manner described more fully above, the Defendant Officers knowingly fabricated and solicited false evidence implicating Plaintiff in the crime; obtained Plaintiff's conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

35

131.     The Defendant Officers' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

132.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

133.     As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

134.     The misconduct described in this Count by was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT III – 42 U.S.C. § 1983
### Malicious Prosecution and Unlawful Pretrial Detention

135.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

136.     In the manner described more fully above, the Defendant Officers individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional rights.

137.     The Defendant Officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

138.    In so doing, the Defendant Officers caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

139.    As a result of the Defendant Officers' false allegations and fabricated evidence, Plaintiff was seized on xx and remained incarcerated from that day continuing on through his trial and until his eventual exoneration.

140.    As a result of the misconduct of the Defendant Officers described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

141.    The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

### COUNT IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

142.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

143.    Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and deprive him of his constitutional rights by maliciously causing Plaintiff's prosecution, by fabricating evidence that would be used to convict Plaintiff; and by withholding exculpatory information from Plaintiff's defense and the prosecution, as described above.

144.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

37

145.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

146.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

147.    As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

### COUNT V – 42 U.S.C. § 1983
### Failure to Intervene

148.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

149.    During the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

150.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

151.    As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

152.    The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT VI – 42 U.S.C. § 1983
### Municipal Liability

153.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

154.    As described more fully herein, the City of Chicago is itself liable for the violation of Plaintiff's constitutional rights. Plaintiff's injuries were caused by the policies, practices, and customs of the Chicago Police Department, in that employees and agents of the Chicago Police Department, including Defendants in particular, regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein.

155.    This institutional desire to close cases through abusive tactics regardless of actual guilt or innocence, in order to enhance police officers' personal standing in the Department, was known to the command personnel, who themselves participated in the practice.

156.    The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the Chicago Police Department, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, the above-described widespread practices were allowed to flourish because the Chicago Police Department declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

157.    The constitutional violations described in this Complaint were also undertaken pursuant to the policy and practices of the Chicago Police Department in that the constitutional

violations were committed with the knowledge or approval of persons with final policymaking authority for City of Chicago and the Chicago Police Department.

158.     Chicago police officers who manufactured criminal cases against individuals such as Plaintiff had every reason to know that they not only enjoyed *de facto* immunity from criminal prosecution and/or Departmental discipline, but that they also stood to be rewarded for closing cases no matter what the costs.  In this way, this system proximately caused abuses, such as the misconduct at issue in this case.

159.     The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

### COUNT VII – State Law Claim
### Intentional Infliction of Emotional Distress

160.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

161.     In the manner described more fully above, Defendants engaged in extreme and outrageous conduct.

162.     The Defendants either intended that their conduct would cause severe emotional distress to Plaintiff or knew that there was a high probability that their conduct would cause severe emotional distress to Plaintiff.

163.     The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

164.     As a proximate result of this misconduct, undertaken within the scope of Defendants' employment, Plaintiff suffered injuries, including but not limited to severe emotional distress.

### Count VIII – State Law Claim

**Malicious Prosecution**

165.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

166.    All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of innocence.

167.    The Defendants accused Plaintiff of murdering Rodrigo Vargas, knowing that he was innocent of the crime. All of the individual Defendants fabricated evidence, manipulated the only witnesses and withheld material exculpatory evidence. The law enforcement officer Defendants knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

168.    As described more completely above, the Prosecutor Defendants would not have prosecuted Plaintiff but for the involvement and encouragement of Defendants Guevara, Halvorsen, and Mingey. Indeed, the Defendant Prosecutors would never have prosecuted the case without having at least one police officer available to document and testify to the version of events that led to the initiation of charges against Plaintiff.

169.    The Prosecutor Defendants needed Defendants Guevara, Halvorsen, and Mingey to write false reports and back up their fabricated charges against Plaintiff. Without the involvement, agreement, and false reports of the police officer Defendants, Defendants Dillon and Coughlan would never have initiated or continued the false charges against Plaintiff.

170.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

171.     As a direct and proximate result of this misconduct, undertaken within the scope of Defendants' employment, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

### Count IX – State Law Claim
### Respondeat Superior

172.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

173.     In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Chicago Police Department acting at all relevant times within the scope of their employment.

174.     Defendant City of Chicago is liable as principal for all torts committed by its agents.

175.     In committing the acts alleged in the preceding paragraphs, Defendants Coughlin and Dillon were members of, and agents of, the Cook County State's Attorney's Office, acting at all relevant times within the scope of their employment and under color of law.

176.     Defendant Cook County is liable as principal for all torts committed by its agents.

### COUNT VI – State Law Claim
### Civil Conspiracy

177.     Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

178.     As described more fully in the preceding paragraphs, each of the individual Defendants acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

179.     In furtherance of the conspiracy, the Defendants each committed overt acts and were otherwise willing participants in joint activity.

180. The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

181. As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

### Count XI – State Law Claim
### Indemnification

182. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

183. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

184. The Defendant Officers are or were employees of the Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

185. The City is liable to indemnify any compensatory judgment awarded against the Defendant Officers.

186. Defendant Cook County was at all times material to this complaint the employer of Defendants Coughlin and Dillon, and is therefore responsible for any judgment entered against Defendants Coughlin and Dillon and for any judgment entered against him during said employment with the County, making the County a necessary party to this complaint.

WHEREFORE, Plaintiff, JOSE MONTANEZ, respectfully requests that this Court enter judgment in his favor and against Defendants, CITY OF CHICAGO, CHICAGO POLICE OFFICERS REYNALDO GUEVARA, ERNEST HALVORSEN, EDWARD MINGEY,  AND UNKNOWN OFFICERS, and former Assistant State's Attorneys MATTHEW COGHLAN and JOHN DILLON, and COOK COUNTY, awarding compensatory damages, costs, and attorneys' fees, as well as any other relief this Court deems just and appropriate.

43

## JURY DEMAND

Plaintiff, JOSE MONTANEZ, hereby demands a trial by jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED:

s/ Russell Ainsworth
Attorney for Jose Montanez

Arthur Loevy
Jon Loevy
Russell Ainsworth
Debra Loevy
Ruth Brown
LOEVY & LOEVY
311 North Aberdeen Street
3rd floor
Chicago, IL 60607
(312) 243-5900

## **CERTIFICATE OF SERVICE**

I, Russell Ainsworth, an attorney, certify that on June 19, 2018, I served the foregoing Amended Complaint to all counsel of record via the CM/ECF filing sytem.

/s/ Russell Ainsworth