# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| Jose Montanez, | ) | |
| | ) | |
| Plaintiff, | ) | 17 C 45601 |
| | ) | |
| vs. | ) | Honorable Judge |
| | ) | Rebecca R. Pallmeyer |
| Chicago Police Officers Reynaldo Guevara, | ) | |
| Ernest Halvorsen, Edward Mingey, and | ) | |
| Unknown Officer; Matthew Coghlan, John Dillon; | ) | |
| The City of Chicago; and Cook County; | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT'S ANSWER TO PLAINTIFF'S CORRECTED FIRST AMENDED COMPLAINT

Now come Defendants, John Dillon and Cook County (collectively 'Defendants' or 'Cook County Defendants'), by his attorney KIMBERLY M. FOXX, State's Attorney of Cook County, through her Assistant State's Attorneys, Anthony Zecchin and Christina Chojnacki, and answers Plaintiff's Corrected First Amended Complaint as follows:

1.       Plaintiff Jose Montanez was wrongfully convicted of the 1993 shooting death of Rodrigo Vargas. Plaintiff was convicted solely because Defendants conspired among themselves and with others and coerced Francisco Vincente, a heroin addict facing over 100 years of incarceration on his own pending charges, to falsely implicate Plaintiff.

**Answer: Defendants admit that Plaintiff was convicted for the 1993 shooting death of Rodrigo Vargas. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 1 that are directed at other defendants.  Defendants deny the remaining allegations contained in paragraph 1.**

2.       This was a classic set-up by the now-notorious Chicago Police Detective

Defendant Reynaldo Guevara and his cohorts who specialized in precisely this type of misconduct. Over two decades, Defendants engaged in a disturbing succession of similar abuses, frequently preying on young Latino men in order to close unsolved cases by framing them.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 2.**

3.      Defendant Guevara has universally taken the Fifth about his activities as a Chicago police officer in the face of over 100 incidents of his misconduct, asserting his right to silence on grounds that truthful responses would subject him to criminal liability.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 3.**

4.      For his part, Vicente has testified that his allegations against Plaintiff were all fabricated, fed to him by the Defendant Detectives and coerced from him by force.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 4.**

5.      Shockingly, Vicente revealed that Defendants not only coerced him to frame Plaintiff, but also, time after time over a period of months, forced him to falsely implicate four other men. In each case, Vicente falsely claimed that the men had confessed murder to him.

**Answer: Defendants deny that Defendant Dillon that was involved in any coercion. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 5.**

6.      Former Assistant Cook County State's Attorneys Matthew Coghlan and John Dillon, while acting in an investigatory function before Plaintiff's arrest were in on the

conspiracy. The two conspired among themselves and with the law enforcement Defendants to fabricate the false testimony from Vincente.

**Answer:  Defendants deny the allegations contained in paragraph 6.**

7.      Due to Defendants' foul play, Plaintiff was convicted of Rodrigo Vargas's 1993 shooting death and was sentenced to 55 years in prison.

**Answer: Defendants admit that Plaintiff was convicted for Rodrigo Varga's 1993 shooting death.  Defendants deny the remaining allegations contained in paragraph 7.**

8.      In 2016, after more than two decades in prison, Plaintiff was finally vindicated. On June 7, 2016, the Appellate Court issued a scathing opinion directing the trial court to fully hear Plaintiff's claims of actual innocence. The Appellate Court characterized the presented mountain of evidence of Defendant Guevara's misconduct as "profoundly alarming."

**Answer:  Defendants admit that on June 7, 2016, the Appellate Court issued an opinion and the opinion speaks for itself. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 8.**

9.      Separately, the City conducted its own investigation into Defendant Guevara's misconduct against Plaintiff and determined that Plaintiff deserved to be exonerated based on his innocence.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9.**

10.      Subsequently, the State moved to dismiss all charges against Plaintiff, and he was  finally set free on July 20, 2016. Without opposition, the state court issued Plaintiff a Certificate  of Innocence on November 2, 2016.

**Answer: Defendants admit, based on court records, that a certificate of innocence was**

issued on November 2, 2016. **Defendants lack knowledge or information sufficient to form**

**a belief as to the truth of the allegations contained in paragraph 10.**

11.     Plaintiff now brings this action to obtain justice and redress the devastating

injuries that Defendants have caused him.

**Answer: Defendants admit that Plaintiff is seeking damages for purported claims in his**

**Amended Complaint, but denies that Plaintiff has suffered any injury, or is entitled to any**

**damages as a result of Defendant Dillon's conduct, which was at all times proper.**

**JURISDICTION AND VENUE**

12.     This action is brought pursuant to 42 U.S.C. § 1983 to redress Defendants'

deprivation of Plaintiff's rights secured by the U.S. Constitution.

**Answer:  Defendants admit that this action is brought pursuant to 42 U.S.C. § 1983 for**

**alleged violations of Plaintiff's constitutional rights.  Defendants deny that Plaintiff is**

**entitled to any relief.**

13.     This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C.

§ 1331 and supplemental jurisdiction over his state law claim for indemnification pursuant to

28 U.S.C. § 1367.

**Answer:  Defendants admit that this Court has jurisdiction.**

14.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial

district, the majority of the Defendants reside in this judicial district, and the events and

omissions giving rise to Plaintiff's claims occurred within this judicial district.

**Answer:  Defendants admit that venue is proper over the alleged claims.  Defendants deny,**

**however, the allegations and events asserted by Plaintiff insofar as they are directed to**

**Defendant Dillon and further deny liability to Plaintiff for any and all claims asserted in**

**the Amended Complaint**.

## PARTIES

15.     Plaintiff Jose Montanez is a resident of Cook County, Illinois, who spent approximately 23 years in prison for a crime he did not commit.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15.**

16.     Defendant City of Chicago is an Illinois municipal corporation and is and/or was  the employer of each of the Defendant Officers. The City of Chicago is liable for the acts of the  Defendant Officers while acting within the scope of their employment for the City.

**Answer:  Defendants admit that the City of Chicago is an Illinois Municipal Corporation and that the Chicago Police Department, at various dates and times, was the employer of the 'Defendant Officers.'  Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 16.**

17.     At all times relevant hereto, Defendants Reynaldo Guevara, Ernest Halvorsen, Edward Mingey, and other unknown law enforcement officers (collectively, the "Defendant Officers") were police officers in the Chicago Police Department acting under color of law and within the scope of their employment for the City of Chicago.

**Answer:  Defendants admit that Defendants Guevara, Havlorsen, and Mingey were members of the Chicago Police Department but lack sufficient knowledge or information to form a belief as to what periods of time they were so assigned. Defendants lack knowledge or information sufficient to form a belief as the truth of the remaining allegations contained in paragraph 17.**

18.     Defendant Edward Mingey, at all relevant times, supervised the Police Officer  Defendants. He facilitated, condoned and approved the constitutional violations

committed by the Police Officer Defendants.

**Answer: Defendants lack knowledge or information sufficient to form a belief as the truth of the allegations contained in paragraph 18.**

19.     At all relevant times, Matthew Coghlan and John Dillon were Assistant Cook County State's Attorneys. Coghlan and Dillon conspired with the Defendant Officers, prior to the initiation of probable cause to believe Plaintiff had committed a crime, and while acting in investigatory capacities, to conceal and fabricate evidence, manipulate witness testimony, and maliciously prosecute Plaintiff for Rodrigo Vargas's murder.

**Answer: Defendants admit that John Dillon and Matthew Coghlan were Assistant Cook County State's Attorneys. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 19.**

20.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its Cook County State's Attorney's Office, and was at all relevant times the employer of Defendants Matthew Coghlan and John Dillon. Defendant Cook County is a necessary party to this lawsuit.

**Answer: Defendant admits that Defendant Cook County is a governmental entity within the State of Illinois. Defendants admit that Cook County may have a duty to indemnify Defendant Dillon. Defendants deny the remaining allegations contained in paragraph 20.**

FACTS

21.     At about 5:30 a.m. on February 5, 1993, in the Humboldt Park neighborhood of Chicago, Rodrigo Vargas left his home to go to work.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations contained in paragraph 21.**

22.     Tragically, he was shot to death in his parked van, which was located directly in  front of his home, with the engine running.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22.**

23.     Investigators found his body along with the van's pull-out radio in his hand and $190 still in his wallet. There was no evidence that any property was stolen during the murder.  The shots that killed Vargas were fired from outside the van.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23.**

24.     A neighbor saw an older brown or tan car leave the scene. Apart from that vague  clue, there were no leads on who killed Vargas and no motive for the crime – Vargas was not a  member of a gang, a user of narcotics, or someone with enemies.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 24.**

### Defendants Meet Their Prize Witness, Heroin Addict Vicente

25.     The Vargas murder remained unsolved for months, without a lead or any further  documented investigative activity.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25.**

26.     On May 14, 1993, heroin addict Francisco Vincente was arrested and charged  with four felonies. He had been committing robberies to feed his heroin addiction.

**Answer: Defendants admit that Francisco Vincente was arrested.  Defendants lack**

**knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 26.**

27.     When he met the Defendant Officers, Vicente was facing up to 100 years in prison on his pending charges, was suffering symptoms of heroin withdrawal, and was highly  vulnerable to Defendants' manipulation.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 27.**

28.     Over the course of a few weeks during the summer of 1993, the Defendant Officers coerced Vicente to "solve" three unrelated murders, going back to him time and time  again to fraudulently close more and more cases.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 28.**

29.     First, Defendants violently coerced Vincente to falsely claim that while he was in  a holding cell upon his arrest, a stranger named Robert Bouto confessed to him about committing  murder.

**Answer:  Defendants deny the allegations contained in paragraph 29.**

30.     This was false. Bouto did not commit that murder and did not confess to Vicente.  Indeed, the City itself has determined that Bouto is innocent of the murder and that Vicente's  claim was a lie.

**Answer:  Defendants deny that Bouto did not commit that murder and did not confess to Vicente. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 30.**

31.     During the entirety of Vicente's cooperation with the Defendant Officers on

the Bouto case, Vicente did not mention anything about the Vargas murder or knowing about any other murders.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 31.**

32. Nevertheless, on June 2, 1993, Defendants Guevara and Halvorsen met with Assistant State's Attorneys Defendants Matthew Coughlan and John Dillon at the Cook County State's Attorney's office to discuss the prosecution of Robert Bouto and also the investigation of the Vargas murder.

**Answer: Defendants deny the allegations contained in paragraph 32.**

33. Faced with no other way to "solve" the Vargas murder, Defendants Guevara, Halvorsen, Coghlan, and Dillon agreed that they should go back to the well again to get Vicente to falsely implicate Plaintiff in the Vargas murder.

**Answer: Defendants deny the allegations contained in paragraph 32.**

34. As prosecutors, Defendants Coghlan and Dillon (the "Defendant Prosecutors") would not have acted on their own to falsely implicate Plaintiff and the men who would become his co-defendants in the murder case, Armando Serrano and Jorge Pacheco.

**Answer: Defendants deny that Defendant Dillon played any part in any alleged conspiracy Defendants further deny the remaining allegations contained in paragraph 34.**

35. As prosecutors, Defendant Prosecutors knew that they would need the help and active involvement of police officers in order to lodge false charges against Plaintiff. Indeed, the Defendant Prosecutors joined the conspiracy only because they knew that the Defendant Officers would be complicit in securing the false evidence to frame the accused.

**Answer:  Defendants deny that "false charges" were filed against the Plaintiff and deny that Defendant Dillon played any part in any alleged conspiracy.  Defendants further deny that Defendant Dillon played any role in the prosecution of Plaintiff or his co-defendants for the murder of Rodrigo Vargas. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 35.**

36.     In other words, the Defendant Prosecutors would not have filed false charges against Plaintiff without the Defendant Officers' willingness to fabricate evidence and their success in so doing. The Defendant Prosecutors would not have done the dirty work of beating  Vincente or creating their own false police reports; but in light of the Defendant Officers' ready  willingness to do both, the Defendant Prosecutors were willing to play their part in the  conspiracy.

**Answer:  Defendants deny that "false charges" were filed against the Plaintiff and deny that Defendant Dillon played any part in any alleged conspiracy.  Defendants further deny that Defendant Dillon played any role in the prosecution of Plaintiff or his co-defendants for the murder of Rodrigo Vargas. Defendants deny the remaining allegations contained in paragraph 36.**

37.     Quite simply, the Defendant Prosecutors would not have prosecuted Plaintiff but  for the involvement and encouragement of Defendants Guevara, Halvorsen, and Mingey. Indeed,  the Defendant Prosecutors would never have prosecuted the case without having at least one  police officer available to document and testify to the version of events that led to the initiation   of charges against Plaintiff.

**Answer:  Defendants deny the allegations contained in paragraph 37.  Defendants further deny that Defendant Dillon played any role in the prosecution of Plaintiff or his co-**

**defendants for the murder of Rodrigo Vargas.**

38.     The Prosecutor Defendants needed Defendants Guevara, Halvorsen, and Mingey  to write false reports and back up their fabricated charges against Plaintiff. Without the  involvement, agreement, and false reports of the police officer Defendants, Defendants Dillon   and Coughlan would never have initiated or continued the charges against Plaintiff.

**Answer:  Defendants deny the allegations contained in paragraph 38.**

39.     Although not reported in the Vargas murder investigation file, on May 25, 1993,  Defendant Guevara requested criminal history reports for Plaintiff, Serrano, and Pacheco.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 39.**

40.     There was no legitimate basis to run criminal history reports for any of the three  men at the time. For example, there is no suggestion that any of the three committed a crime on  or about that date, which would have justified running their backgrounds.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40.**

41.     Furthermore, the reports were run before anyone suggested that these men had  anything to do with the crime. Undoubtedly, this information was requested to determine  whether Defendants could plausibly frame the three for the Vargas murder.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 39 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 41.**

**Defendants Coerce Vincente to Implicate Plaintiff**

42.     On June 2, 1993, the Defendant Prosecutors arranged to have Vicente transported  from Cook County Jail to the Cook County State's Attorney's office. There, Detective Guevara  told Vicente, in the presence of Halvorsen, Coughlan, and Dillon, that he wanted Vicente to say  that he was present when Plaintiff, Serrano, and Pacheco attempted to rob Vargas.

**Answer:  Defendants admit that Vicente was transported from Cook County Jail to the Cook County State's Attorney's office on June 2, 1993.  Defendants deny that Defendant Dillon was present for, or participated in any meeting(s) with, Vicente, Coghlan, Detective Guevara or Detective Halvorsen on June 2, 1993. Defendants deny the remaining allegations contained in paragraph 42.**

43.     Pleading in the alternative, on June 2, 1993, Vincente met with Detectives Guevara and Halvorsen outside the presence of the Defendant Prosecutors and the Defendant  Prosecutors were unaware that all of Vincente's subsequent statements incriminating Plaintiff   were false and were coerced by the Defendant Officers.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 43.**

44.     Defendant Guevara presented Vincente with crime scene photos and photos of  Plaintiff, Serrano and Pacheco, telling Vincente that the three committed the murder. Defendants Guevara and Halvorsen supplied Vincente with the details of the crime and told him what they  wanted him to say in order to inculpate Plaintiff and the others. At this point in the Vargas  investigation, there was absolutely no suggestion from any source that Plaintiff, Serrano, or  Pacheco had anything to do with the crime.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations contained in paragraph 44.**

45.      Defendants tried to force Vincente to admit to being an eyewitness to the Vargas  murder. First, the Defendant Officers attempted to coerce Vincente to admit to witnessing the   shooting, as the driver of the supposed culprits' car. The Defendant Prosecutors promised  Vicente that he had nothing to worry about if he just cooperated and did what Guevara and  Halvorsen told him to do. However, Vicente insisted that he would not make himself an  eyewitness to the crime.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 45 that are directed at other defendants. Defendants deny the remaining allegations.**

46.      When Vincente refused, Defendants – reluctant to have yet another murder where  the (framed) culprits just "happened" to confess to Vincente – tried to force him to adopt a  version where the suspects gave Vincente the murder weapon. When Vincente again refused,  Defendants returned to their old stand-by and had Vincente claim that, once again, the villains  just happened to confess to him.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 46 that are directed at other defendants. Defendants deny the remaining allegations.**

47.      According to Vicente, the Defendant Officers beat him to persuade him to cooperate with their frame up. Having previously been beaten in the head repeatedly with a phone book before agreeing to frame Bouto, Vincente knew that his resistance was futile.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 47.**

48.     Defendants concocted a story for Vincente of how the murder transpired. One of the details Defendants fed to Vincente was their invented motive for the crime: that Plaintiff, Serrano, and Pacheco had encountered Mr. Vargas at a gas station with his family the night before the shooting, seen that he was carrying a lot of money, and decided to follow him and rob him later, when he was not with his family ("the Gas Station Encounter").

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 48 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 48.**

49.     Unexplained in Defendants' Gas Station Encounter story is how Plaintiff, Serrano, and Pacheco would know that Mr. Vargas would leave very early the next morning, providing them the opportunity to rob him when few people would be in a position to witness the events.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 49 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 49.**

50.     Nevertheless, as a result of physical abuse and undisclosed promises, Vincente falsely implicated Plaintiff, Serrano and Pacheco and, as instructed by Defendants, incorporated the Gas Station Encounter motive into his inculpation. He claimed that Plaintiff, Serrano, and Pacheco, after encountering the victim at the gas station, had laid in wait all night on the off-chance that the victim would be alone the following morning.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 50 that are directed at other defendants.**

**Defendants deny the remaining allegations contained in paragraph 50.**

51.     Defendants falsely reported that only after they learned of the Gas Station Encounter motive from Vincente that they independently confirmed with the decedent's widow,  Ms. Vargas, that the Gas Station Encounter had taken place. This was a complete fabrication.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 51 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 51.**

52.     In reality, the Defendants knew about the Gas Station Encounter long before they  fed this fact to Vicente.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 52 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 52.**

53.     Back in February 1993, Ms. Vargas told Defendants about events similar to the Gas Station Encounter. In her version of the event, while speculating about who could have killed her husband, the Gas Station Encounter was a benign event: The night before the shooting,   her family had stopped at the gas station, after her husband had cashed a check at the bank; an   occupant from a car had entered the gas station, as Rodrigo Vargas was leaving; because the car   was blocking her family's van, they had to wait for the car to leave before they could leave; and   the car left the same way as the Vargas' van and drove behind them for a short while.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 53 that are directed at other defendants.**

**Defendants deny the remaining allegations contained in paragraph 53.**

54.     Critically, Ms. Vargas's testimony about the encounter diverged from the story falsely regurgitated by Vicente in several material respects. According to her, there is no evidence that the three men from the gas station on the night before the murder saw Vargas' money, followed the Vargas family home, or were responsible for the murder.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 54 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 54.**

55.     To falsely corroborate Vicente's story, Defendants manipulated Ms. Vargas into identifying Plaintiff's car as the one she had seen at the gas station the night before the murder.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 55 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 55.**

56.     Specifically, Defendants Guevara and Halvorsen drove Ms. Vargas to Plaintiff's car and lied to her that ballistics evidence taken from Plaintiff's car forensically matched evidence from the scene of the crime. This was entirely false. There was no ballistics evidence that could possibly link Plaintiff's car to the crime scene, but Ms. Vargas trusted the detectives and, based on their misrepresentation to her, identified Plaintiff's car as the one she had seen at the gas station.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 56 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 56.**

57.     To cover up their misconduct, Defendants falsely claimed that Ms. Vargas

identified Plaintiff's car while they merely drove around with her until she indicated that she

spotted the car that she had seen (benignly) parked at the gas station the night before her

husband  was murdered four months before.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations contained in paragraph 57 that are directed at other defendants.**

**Defendants deny the remaining allegations contained in paragraph 57.**

58.     Defendants also withheld the fact that they had falsely told Ms. Vargas that

ballistics evidence from the crime scene matched Plaintiff's car.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations contained in paragraph 58 that are directed at other defendants.**

**Defendants deny the remaining allegations contained in paragraph 58.**

59.     Eventually, Vincente gave in to Defendants' coercion and falsely claimed that

on  February 5, 1993, at around 8:00 or 9:00 a.m., he encountered Montanez, Serrano, and

Pacheco  and that the three were talking about having just committed a murder.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations contained in paragraph 59 that are directed at other defendants.**

**Defendants deny the remaining allegations contained in paragraph 59.**

60.     According to Vincente's coerced statement, Montanez complained that Serrano

had botched the plan, so they were not able to get any money off of the victim. Vincente

claimed  that Montanez described the context for the shooting, explaining that the trio had seen

a Mexican  man at a gas station with a lot of cash the night before, so they decided to rob him,

but they waited until morning to get him alone, because the man had been with his wife and

children at  the gas station.

**Answer: Defendants deny that Vicente's statement was coerced. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 60.**

61.     After meeting with Vicente and the Defendant Prosecutors, Defendants Guevara and Halvorsen prepared a fictitious supplemental police report, falsely claiming that a confidential informant told them that Montanez admitted his involvement in the murder and further implicated Plaintiff, Serrano, and Pacheco.

**Answer: Defendants deny that Defendant Dillon was present for, or participated in any meeting(s) with, Vicente, Coghlan, Detective Guevara or Detective Halvorsen. Defendants further deny that Defendant Dillon played any role in the prosecution of Plaintiff or his co-defendants for the murder of Rodrigo Vargas. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 61 that are directed at other defendants.**

62.     Pleading in the alternative, after meeting with Vicente, Guevara and Halvorsen prepared a fictitious supplemental police report, falsely claiming that a confidential informant told them that Montanez admitted his involvement in the murder and further implicated Plaintiff,  Serrano, and Pacheco.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 62.**

63.     On June 28, 1993, the Defendant Prosecutors arranged to have Vicente brought to  the Cook County State's Attorney office to formalize the false witness statement Defendants constructed with him prior to Plaintiff's arrest.

**Answer:  Defendants admit that Vincente was brought to the Cook County State's**

**Attorney's office on June 28, 1993. Defendants deny the remaining allegations contained**

**in paragraph 63.**

### Yet Another Man Supposedly Confesses to Vincente

64.     After coercing Vincente to frame Montanez, Serrano, Pacheco, and Bouto,

Defendants returned to the Vincente well one final time and coerced Vincente to "solve" a third

unrelated murder.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations contained in paragraph 64 that are directed at other defendants.**

**Defendants deny the remaining allegations contained in paragraph 64.**

65.     At Defendants' behest, a few weeks after falsely accusing Plaintiff, Vincente

falsely implicated a man named Iglesias in that third murder. Vincente claimed that Iglesias

confessed that he committed murder to Vincente while the two were in the bullpen together,

awaiting court. Defendants again fed Vincente the details of the crime for the "confession."

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations contained in paragraph 65 that are directed at other defendants.**

**Defendants deny the remaining allegations contained in paragraph 65.**

66.     All told, in a matter of weeks, Vicente claimed that five different men confessed

to three murders – all reported by him after he was facing over 100 years in prison on pending

charges, and two of the "confessions" conveniently coming from strangers who supposedly

confessed to Vincente after he was incarcerated on his own charges.

**Answer: Defendants lack knowledge or information sufficient to form a belief as tot the**

**truth of the allegations contained in paragraph 66.**

67.     In exchange for his testimony on all three murder cases, Defendant Guevara

promised Vincente that his four pending felony charges, for which he was facing up to 100 years in prison, would "work out fine."

**Answer: Defendants lack knowledge or information sufficient to form a belief as tot the truth of the allegations contained in paragraph 67.**

68.     Defendant Guevara also paid Vincente money and arranged to get him special privileges while he was incarcerated. While in jail, Vincente received perks like cigarettes, a radio, home-cooked meals, conjugal visits, and other things not generally available to inmates, in order to ensure his continued cooperation in the Montanez prosecution.

**Answer: Defendants lack knowledge or information sufficient to form a belief as tot the truth of the allegations contained in paragraph 68.**

69.     In fact, after testifying before the grand jury, Vicente was placed in the State's Attorney's witness quarters where he spent the next three years, receiving a wide array of benefits in exchange for his cooperation in the three separate murder prosecutions. According to Vicente, he was transported back and forth between these quarters and the Cook County State's Attorney's office more times than he could count where he was prepped and coached by the Defendant Prosecutors in preparation for his testimony in the murder prosecutions against Bouto, Plaintiff (and his co-defendants), and Iglesias.

**Answer: Defendants admit that Vicente was placed in the State's Attorney's witness quarters. Defendants admit that, at various times, Vicente was brought to the Cook County State's Attorney's office. Defendants deny the remaining allegations contained in paragraph 69.**

### Defendants Coerce Evidence from Timothy Rankins

70.     Recognizing that their case against Plaintiff, Serrano, and Pacheco was flimsy,

Defendants sought to devise further false evidence. On June 10, 1993, a Chicago police officer arrested Timothy Rankins and put him in a car with Defendants Guevara, Halvorsen, and Mingey. Defendants told Rankins that he had to falsely implicate Plaintiff, Serrano and Pacheco for murder, and when Rankins refused, Defendants Guevara, Halvorsen, and Mingey kicked, beat and threatened him.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 70 that are directed at other defendants. Defendants deny that Defendant Dillon had any contact with Timothy Rankins. Defendants deny the remaining allegations contained in paragraph 70.**

71. Resorting to a tried and true method of abuse used by abusive Chicago Police detectives of that era, as part of this beating Defendants put a phone book against Rankins's head and struck the phone book, causing a very painful concussive effect without leaving physical marks.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 71 that are directed at other defendants. Defendants deny that Defendant Dillon had any contact with Timothy Rankins. Defendants deny the remaining allegations contained in paragraph 71.**

72. Defendants presented Rankins with a statement, purporting to be his own statement, and commanded him to learn the contents. During their efforts to force Rankins to adopt the statement as his own, Defendants choked Rankins, beat him, kicked him, and hit him in his genitals. He was assaulted until he agreed to sign the statement.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 72 that are directed at other defendants.**

**Defendants deny that Defendant Dillon had any contact with Timothy Rankins.**

**Defendants deny the remaining allegations contained in paragraph 72.**

73.     Defendants told Rankins that he would be charged with an armed robbery, but that the charges would be dismissed if he cooperated in implicating Plaintiff, Serrano and Pacheco.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 73 that are directed at other defendants. Defendants deny that Defendant Dillon had any contact with Timothy Rankins. Defendants deny the remaining allegations contained in paragraph 73.**

74.     Rankins' entire implication was false, fabricated by Defendants. Defendants forced Rankins to repeat the false accusations against Plaintiff to the prosecutor and the grand jury. Rankins did not know Plaintiff, Serrano, or Pacheco, and had never met them.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 74 that are directed at other defendants. Defendants deny that Defendant Dillon had any contact with Timothy Rankins. Defendants deny the remaining allegations contained in paragraph 74.**

75.     Defendants ensured that Rankins was housed along with Vincente in the special witness quarters. Defendants brought the two "witnesses" money and afforded them special privileges.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 75 that are directed at other defendants. Defendants deny that Defendant Dillon had any contact with Timothy Rankins. Defendants deny the remaining allegations contained in paragraph 75.**

76.     Nevertheless, Rankins ultimately refused to falsely implicate Plaintiff and did not testify at his trial.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 76.**

### Plaintiff, Serrano, and Pacheco Deny Involvement

77.     Defendants arrested Plaintiff, Serrano, and Pacheco based exclusively on evidence they fabricated via Vincente and Rankins.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 77.**

78.     Plaintiff remained incarcerated from the day of his arrest on July 9, 1993, through his trial, and until his eventual exoneration.

**Answer: Defendants admit that Plaintiff was incarcerated.  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 78.**

79.     Each man has consistently denied having any involvement in the Vargas murder from start to finish.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 79.**

80.     During Serrano's interrogation, Defendant Guevara hit him in the face with an open hand while Serrano was shackled to a police station wall in a failed attempt to get him to confess. When Serrano's mother and father arrived at the police station, they could hear their son screaming for a lawyer.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations contained in paragraph 80.**

## Plaintiff's Trial

81.     No inculpatory evidence other than the evidence fabricated by Defendants was relied upon at Plaintiff's criminal trial.

**Answer:  Defendants deny that Defendant Dillon fabricated any evidence. Defendants further deny that Defendant Dillon played any role in the prosecution of Plaintiff or his co-defendants for the murder of Rodrigo Vargas. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 81.**

82.     Vincente testified at trial in exchange for his plea deal. He testified, in accordance  with the Defendants' fabricated story, that on the morning of the shooting, he encountered  Plaintiff, Serrano, and Pacheco, and they confessed the murder to him. Per Defendants'  instructions, Vincente testified that the trio's motive for the murder was that they had seen the  decedent carrying a lot of money at a gas station the night before.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 82.**

83.     Defendants Guevara and Halvorsen falsely testified at trial that law enforcement first learned of the Gas Station Encounter from Vincente, confirmed that information with Ms. Vargas, and then had her independently identify Plaintiff's car.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 83.**

84.     The court found Plaintiff guilty of armed robbery and murder. The court expressly  found the evidence to be slim, and acquitted Pacheco on the same evidence. But the

court ultimately relied on Vincente's supposed insider knowledge of the Gas Station Encounter as proof that Plaintiff and Serrano must have confessed to him.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 84.**

85.     The court sentenced Plaintiff to 55 years of incarceration.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 85.**

86.     Without the Defendants' misconduct, Plaintiff would never have been prosecuted for or convicted of Vargas' murder.

**Answer: Defendants deny any misconduct. Defendants further deny that Defendant Dillon played any role in the prosecution of Plaintiff or his co-defendants for the murder of Rodrigo Vargas. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 86.**

87.     To secure Plaintiff's conviction, Defendant Dillon cut a deal with Vicente that gave him less than the minimum sentence for his crimes: Dillon gave Vicente 344 days of pre-trial custody credit to which he was not entitled, in effect knocking two years off the time he would have to serve in the penitentiary. This benefit was never disclosed to Plaintiff.

**Answer:  Defendants deny the allegations contained in paragraph 87.**

**Policy and Practice of Prosecuting Innocent Persons in Violation of Due Process**

88.     The Chicago Police Department is responsible for scores of miscarriages of justice. Since 1986, no fewer than 70 documented cases have come to light in which Chicago Police Detectives amassed "evidence" against an innocent person for a serious crime that he did not commit. There are undoubtedly many more such cases that have not yet been

discovered.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 88.**

89.     The false charges against innocent people include numerous cases in which Chicago Police Officers used the very same tactics that Defendants employed against Plaintiff in  this case, including: (1) procuring false witness testimony from detainees and "jailhouse snitches"; (2) concealment of exculpatory evidence; (3) manipulation of witnesses in order to obtain false identifications; (4) manipulation of witnesses in order to influence their testimony; and (5) the use of other tactics to secure the arrest, prosecution and conviction of a person without regard to his actual guilt or innocence of the offense.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 89.**

90.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to detainees to make false witness statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago Police Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable "jailhouse snitches" who then adopted those false witness narratives as their own for the purpose of wrongly convicting an innocent person. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a jailhouse witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 90.**

91.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, procured false  testimony from detainee witnesses knowing full well that their testimony was false and would  lead to the wrongful conviction of Plaintiff. The tactics and inducements used to gain  cooperation from these jailhouse witnesses was concealed from Plaintiff.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 91.**

92.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice,  these clandestine files were withheld from the State's Attorney's Office and from criminal  defendants, and they were routinely destroyed at the close of the investigation, rather than being  maintained as part of the official file.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 92.**

93.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the**

**truth of the allegations contained paragraph 93.**

94.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of influencing their testimony to conform to a false narrative contrived  by the officers themselves. As a matter of widespread practice and custom, these tactics were   also used to induce false identifications of suspects.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 94.**

95.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, manipulated,  tricked, and improperly influenced the testimony of the victim's widow, Wilda Vargas.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 95.**

96.     The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person  with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his  misconduct in any of those cases.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 96.**

97.     Prior to and during 1993, the year in which Plaintiff was falsely charged with the  Vargas murder, the City of Chicago operated a dysfunctional disciplinary system for Chicago  Police Officers accused of serious misconduct. The City's Office of Professional

Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 97.**

98. As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 98.**

99. As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 99.**

100.     Defendants Guevara and Halvorsen have a long history of engaging in the kind of  investigative misconduct that occurred in this case, including the manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Guevara and/or Halvorsen have engaged in serious investigative misconduct, including many cases in which they have manipulated and coerced witnesses and fabricated and concealed evidence, as they did in this case. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 100.**

101.     The City of Chicago and its Police Department failed in 1993 and in the years prior to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.     The constitutional requirement to disclose exculpatory evidence, including how to  identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal  proceeding.

b.     The need to refrain from manipulation or potentially coercive conduct in relation to witnesses.

c.     The risks associated with relying on testimony from "jailhouse snitches."

d.     The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.     The risks of engaging in tunnel vision during investigation.

f. The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 101.**

102. The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago Police Officers as alleged in the preceding paragraph proximately caused Plaintiff's wrongful conviction and his injuries.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 102.**

103. The City's failure to train, supervise, and discipline its officers, including repeat offenders such as Defendants Guevara and Halvorsen, effectively condones, ratifies, and sanctions the kind of misconduct that the Police Officer Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 103.**

104. The City of Chicago and officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 104.**

105.    The policies and practices described in the foregoing paragraphs were consciously  approved by the City of Chicago policymakers who were deliberately indifferent to the violations  of constitutional rights described herein.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 105.**

### Defendant Guevara's History of Framing Innocent Persons

106.    In particular, Defendant Guevara has framed literally dozens of other innocent men over the span of two decades, men who have all lodged independent accusations of similar misconduct against him.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 106.**

107.    For his part, Defendant Guevara is now refusing to testify about any of his activities as a Chicago police officer on grounds that truthful testimony would subject him to criminal liability.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 107.**

108.    Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. There are dozens of identified cases in which Guevara has engaged in serious investigative misconduct, including many cases in which he has

manipulated and coerced witnesses and fabricated and concealed evidence, as he did in this case.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 108.**

109.    Given this extensive history, it is apparent that Guevara engaged in such misconduct because he had no reason to fear that the City of Chicago and its Police Department would ever discipline him for doing so.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 109.**

110.    Regarding his role in framing Plaintiff, Defendant Guevara has asserted his Fifth Amendment right to silence when questioned about: whether he framed Plaintiff; whether he coerced Vicente to falsely implicate Plaintiff; whether he fed facts to Vicente; whether he coerced Rankins to falsely implicate Plaintiff; and whether he purposely misled Ms. Vargas into falsely identifying Plaintiff's car.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 110.**

111.    Repeatedly, Defendant Guevara has also invoked his Fifth Amendment right not to answer any questions about allegations that he manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 111.**

112.    Examples of Defendant Guevara's misconduct include:

a.   Bill Dorsch is a former Chicago police detective.  While serving with the Chicago police department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought two juveniles to the police station who purported to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, saying that was the person who committed the shooting. Dorsch then directed Defendant Guevara to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles without Defendant Guevara being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting.  After prosecutors spoke to the two juveniles, the suspect was released.

b.   Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According

to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c.  In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

d.  In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e.  Juan Johnson was later exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f.  In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

g.  In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

h.  In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false

identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

i.  In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by Guevara.

j.  In 1993, Defendant Guevara coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

k.  In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder. After Davila told Guevara that he did not do it, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to

see the shooter.

l.      In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup.  As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant Guevara's misconduct to light.

m.      In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

n.      In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

o.      In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt likesmacking" her.  Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

p.      In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false

testimony. Zaragosa was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

q.   In 1995, Defendant Guevara engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the shooter. Melendez identified Sierra, but recanted his identification at trial.

r.   In 1996, Defendant Guevara coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

s.   In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification.  Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

t.    In 1997, Defendant Guevara withheld physical evidence and failed to disclose the exculpatory statements of witness Ruth Antonetty to Ariel Gomez. Gomez was accused of firing multiple shots from a car into a crowd. Ruth Antonetty told Guevara that she heard multiple shots coming from within the crowd, not from Gomez's vehicle. Guevara continued to pressure her to change her account, and when she would not, he told her he "had other witnesses" and "didn't need her." As a result, Ariel Gomez did not have access to key Brady material at his trial.

u.    In 1988, Defendant Guevara used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin.  As a result, Rivera was convicted of murder.  In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer.  As a result, Rivera received a new trial.  Ultimately, the State's Attorney dropped all charges against Rivera, who was granted a certificate of innocence.

v.    Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim of that shooting identified Jacques Rivera as his shooter before he died. Defendant Guevara claimed that the identification was made at a time that the victim was in a medically-induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him.

w.    In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial

witnesses.  She then conferred with Guevara, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

x.      In 2011, the first district granted Tony Gonzalez a post-conviction hearing on the basis that Defendant Guevara conducted an unduly suggestive lineup wherein he concocted an array in which Gonzalez's photo was the only one that stood out from the rest in a photo array.

y.      In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus.  Guevara called her a "bitch" and pushed her out the back door of the bus.  He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Office of Professional Standards.

z.      In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day.

aa.     In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours

and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

bb.     In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch" and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

cc.     In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

dd.     In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS). Although Guevara denied the charges, Garcia's complaints

were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

ee.     In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody.

ff.     In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards (OPS). OPS sustained Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

gg.     In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he

confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

hh.    In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if he signed a statement, he could go home.

ii.    In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner, Defendant Halvorsen in the chest and torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession.

jj.    In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez (no relation to Plaintiff) without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

kk.    In 1993, Defendant Guevara arrested fifteen year old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a murder. Guevara also told Cruzado that he could go

home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

ll.     In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias- Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

mm.   In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

nn.    In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview

room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day. Flores eventually gave a statement to the police indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

oo.    In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

pp.    In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

qq.    In 1998, Defendant Guevara repeatedly pulled Adriana Mejia's hair and struck her once on the back of her neck while she was interrogated.

rr.    In 1998, Defendant Guevara repeatedly threatened and beat Arturo Reyes in an attempt to unconstitutionally coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement.

ss.    In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side

of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 112.**

113.    The allegations of Defendant Guevara's abuses became so ubiquitous that the City of Chicago commissioned Sidley Austin to conduct an independent investigation into this case and others, to evaluate the credibility of the allegations. After a thorough examination of witnesses and evidence, on February 2, 2015, the investigation yielded a detailed, 58-page report, known as "the Lassar Report."

**Answer: Defendants admit that the City of Chicago commissioned Sidley Austin to conduct an independent investigation. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained paragraph 113.**

114.    The Lassar Report found that neither Vincente nor Rankins provided any verifiable information about the crime that was not previously known to law enforcement. The Report concluded, "Looking at all the evidence, we conclude that Montanez and Serrano are more likely than not actually innocent."

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 114.**

115.    The City also determined that Robert Bouto, Gabriel Solache, and Arturo Reyes (men who were convicted of murder based on investigations conducted by Guevara) were all also wrongfully convicted.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 115.**

116.    Plaintiff never stopped fighting to prove his innocence. On June 7, 2016, the Illinois Appellate Court reversed dismissal of his post-conviction petition. On November 2, 2016, the State moved to vacate Plaintiff's convictions and dismiss all charges against him, and  the court granted that request. The court granted Plaintiff a Certificate of Innocence on November 2, 2016.

**Answer: Defendants admit, based on court records, that the State moved to vacate Plaintiff's conviction and moved to dismiss all charges on November 2, 2016.  Defendants also admit that Plaintiff's certificate of innocence was granted on November 2, 2016. Defendants lack sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in paragraph 116.**

### Plaintiff's Devastating Injuries

117.    During his twenty-three years of wrongful imprisonment, Plaintiff was deprived  of the ability to interact freely with his loved ones; to be present for holidays, births, deaths and  other life events; to pursue his passions and interests; to engage in meaningful labor and develop  a career; and to live freely, as an autonomous being.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 117.**

118.    Instead, Plaintiff was detained in harsh, dangerous, and isolating conditions in maximum security prisons. He was branded a murderer.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 118.**

119.     As a result of his wrongful conviction and incarceration, Plaintiff must now attempt to rebuild his life outside of prison, all without the benefit of the life experiences that ordinarily equip adults for such a task.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained paragraph 119.**

120.     In addition to causing the severe trauma of Plaintiff's wrongful imprisonment and  loss of liberty, Defendants' misconduct caused and continues to cause Plaintiff extreme physical  and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression,   despair, rage, and other physical and psychological effects.

**Answer: Defendants deny any allegation of misconduct. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained paragraph 120.**

**COUNT I – 42 U.S.C. § 1983**
**Due Process: Fabrication of**
**Evidence**

121.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Defendants incorporate each of the answers to the foregoing paragraphs as his answer to this paragraph as if fully set forth herein.**

122.     As described more fully above, Defendants, while acting individually, jointly, and  in conspiracy with one another, as well as under color of law and within the scope of their  employment, deprived Plaintiff of his constitutional right to a fair trial by fabricating Vincente's  and Rankins' testimonial inculpation of Plaintiff, as well as other evidence.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the**

truth of the allegations contained in paragraph 122 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 122.

123. In the manner described more fully above, Defendants fabricated, coerced, manipulated and/or solicited false testimony from Vincente, Rankins, and Wilda Vargas implicating Plaintiff in the crime that they knew he did not commit; falsified police reports; obtained Plaintiff's conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 123 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 123.**

124. Defendants' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution could not and would not have been pursued.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 124 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 124.**

125. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 125 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 125.**

126.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered  loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and  other grievous and continuing injuries and damages.

**Answer:  Defendants deny the allegations contained in paragraph 126.**

127.   The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner  more fully described below, in Count VI.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 127.**

### COUNT II – 42 U.S.C. § 1983
### Due Process: *Brady* Violations

128.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Defendants incorporate each of the answers to the foregoing paragraphs as his answer to this paragraph as if fully set forth herein.**

129.   As described in detail above, the Defendant Officers, while acting individually,  jointly, and in conspiracy with one another, as well as under color of law and within the scope of  their employment, deprived Plaintiff of his constitutional right to a fair trial by withholding and  suppressing exculpatory evidence. In the manner described more fully above, the Defendant  Officers deliberately withheld exculpatory evidence from Plaintiff and from the prosecution,  among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

**Answer: Count II is not directed against Defendants and, accordingly, no answer is due.**

130.   In addition, in the manner described more fully above, the Defendant Officers

knowingly fabricated and solicited false evidence implicating Plaintiff in the crime; obtained

Plaintiff's conviction using that false evidence; and failed to correct fabricated evidence that

they knew to be false when it was used against Plaintiff at his criminal trial.

**Answer:  Count II is not directed against Defendants and, accordingly, no answer is due.**


131.    The Defendant Officers' misconduct resulted directly in the unjust criminal

conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the

Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and

would not have been pursued.

**Answer: Count II is not directed against Defendants and, accordingly, no answer is due.**

132.    The misconduct described in this Count was objectively unreasonable and

was undertaken intentionally, with malice, with reckless indifference to the rights of others,

and in total disregard of the truth and Plaintiff's clear innocence.

**Answer: Count II is not directed against Defendants and, accordingly, no answer is due.**

133.    As a result of the Defendant Officers' misconduct described in this Count,

Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain

and suffering, and other grievous and continuing injuries and damages.

**Answer:  Count II is not directed against Defendants and, accordingly, no answer is due.**

134.    The misconduct described in this Count by was undertaken pursuant to the

policy and practice of the Chicago Police Department, in the manner more fully described

below in Count VI.

**Answer: Count II is not directed against Defendants and, accordingly, no answer is due.**

**COUNT III – 42 U.S.C. § 1983**
**Malicious Prosecution and Unlawful Pretrial**
**Detention**

135.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer:  Defendants incorporate each of the answers to the foregoing paragraphs as his answer to this paragraph as if fully set forth herein.**

136.     In the manner described more fully above, the Defendant Officers individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional rights.

**Answer:  Count III is not directed against Defendants and, accordingly, no answer is due. To the extent any allegations in this paragraph are directed at Defendant Dillon, Defendants deny them.**

137.     The Defendant Officers accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the  procedural and substantive due process components of the Fourteenth Amendment.

**Answer: Count III is not directed against Defendants and, accordingly, no answer is due. To the extent any allegations in this paragraph are directed at Defendant Dillon, Defendants deny them.**

138.     In so doing, the Defendant Officers caused Plaintiff to be unreasonably seized and  improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

**Answer: Count III is not directed against Defendants and, accordingly, no answer is due. To the extent any allegations in this paragraph are directed at Defendant Dillon, Defendants deny them.**

139.     As a result of the Defendant Officers' false allegations and fabricated

evidence, Plaintiff was seized on July 9, 1993 and remained incarcerated from that day continuing on through his trial and until his eventual exoneration.

**Answer: Count III is not directed against Defendants and, accordingly, no answer is due. To the extent any allegations in this paragraph are directed at Defendant Dillon, Defendants deny them.**

140. As a result of the misconduct of the Defendant Officers described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**Answer: Count III is not directed against Defendants and, accordingly, no answer is due. To the extent any allegations in this paragraph are directed at Defendant Dillon, Defendants deny them.**

141. The misconduct described in this Count by the Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**Answer: Count III is not directed against Defendants and, accordingly, no answer is due. To the extent any allegations in this paragraph are directed at Defendant Dillon, Defendants deny them.**

### COUNT IV – 42 U.S.C. § 1983
### Conspiracy to Deprive Constitutional Rights

142. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

**Answer: Defendants incorporate each of the answers to the foregoing paragraphs as his answer to this paragraph as if fully set forth herein.**

143. Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not

commit and deprive him of his constitutional rights by maliciously causing Plaintiff's prosecution, by fabricating evidence that would be used to convict Plaintiff; and by withholding exculpatory information from Plaintiff's defense and the prosecution, as described above.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 143 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 143.**

144.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 144 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 144.**

145.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 145 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 145.**

146.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 146 that are directed at other defendants.**

**Defendants deny the remaining allegations contained in paragraph 146.**

147.     As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**Answer:  Defendants deny the allegations contained in paragraph 147.**

### COUNT V – 42 U.S.C. § 1983
### Failure to Intervene

148.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer:  Defendants incorporate each of the answers to the foregoing paragraphs as his answer to this paragraph as if fully set forth herein.**

149.     During the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 149 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 149.**

150.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

**Answer:  Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 150 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 150.**

151.     As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish,

humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**Answer:   Defendants deny the allegations contained in paragraph 151.**

152.    The misconduct described in this Count by Defendant Officers was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 152.**

## COUNT VI – 42 U.S.C. § 1983
## Municipal Liability

153.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Defendants incorporate each of the answers to the foregoing paragraphs as his answer to this paragraph as if fully set forth herein.**

154.    As described more fully herein, the City of Chicago is itself liable for the violation of Plaintiff's constitutional rights. Plaintiff's injuries were caused by the policies, practices, and customs of the Chicago Police Department, in that employees and agents of the Chicago Police Department, including Defendants in particular, regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein.

**Answer: Count VI is not directed against Defendants and, accordingly, no answer is due.**

155.    This institutional desire to close cases through abusive tactics regardless of actual guilt or innocence, in order to enhance police officers' personal standing in the Department, was

known to the command personnel, who themselves participated in the practice.

**Answer: Count VI is not directed against Defendants and, accordingly, no answer is due.**

156.    The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the Chicago Police Department, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it. Furthermore, the above-described widespread practices were allowed to flourish because the Chicago Police Department declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

**Answer: Count VI is not directed against Defendants and, accordingly, no answer is due.**

157.    The constitutional violations described in this Complaint were also undertaken pursuant to the policy and practices of the Chicago Police Department in that the constitutional violations were committed with the knowledge or approval of persons with final policymaking authority for City of Chicago and the Chicago Police Department.

**Answer: Count VI is not directed against Defendants and, accordingly, no answer is due.**

158.    Chicago police officers who manufactured criminal cases against individuals such  as Plaintiff had every reason to know that they not only enjoyed *de facto* immunity from criminal  prosecution and/or Departmental discipline, but that they also stood to be rewarded for closing  cases no matter what the costs.  In this way, this system proximately caused abuses, such as the  misconduct at issue in this case.

**Answer: Count VI is not directed against Defendants and, accordingly, no answer is due.**

159.    The policies, practices, and customs set forth above were the moving force

behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

**Answer: Count VI is not directed against Defendants and, accordingly, no answer is due.**

### COUNT VII – State Law Claim Intentional
### Infliction of Emotional Distress

160.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Defendants incorporate each of the answers to the foregoing paragraphs as his answer to this paragraph as if fully set forth herein.**

161.    In the manner described more fully above, Defendants engaged in extreme and outrageous conduct.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 161 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 161.**

162.    The Defendants either intended that their conduct would cause severe emotional distress to Plaintiff or knew that there was a high probability that their conduct would cause severe emotional distress to Plaintiff.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 162 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 162.**

163.    The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to the rights of others.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 163 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 163.**

164.     As a proximate result of this misconduct, undertaken within the scope of Defendants' employment, Plaintiff suffered injuries, including but not limited to severe emotional distress.

**Answer: Defendants deny the allegations contained in paragraph 164.**

## Count VIII – State Law Claim

165.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Defendants incorporate each of the answers to the foregoing paragraphs as his answer to this paragraph as if fully set forth herein.**

166.     All of the individual Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in injury to Plaintiff. All such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of innocence.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 166 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 166.**

167.     The Defendants accused Plaintiff of murdering Rodrigo Vargas, knowing that he was innocent of the crime. All of the individual Defendants fabricated evidence, manipulated the only witnesses and withheld material exculpatory evidence. The law enforcement officer Defendants knowingly made false statements to prosecutors with the intent of exerting influence to institute and continue judicial proceedings against Plaintiff.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 167 that are directed at other**

**defendants. Defendants deny the remaining allegations contained in paragraph 167.**

168. As described more completely above, the Prosecutor Defendants would not have prosecuted Plaintiff but for the involvement and encouragement of Defendants Guevara, Halvorsen, and Mingey. Indeed, the Defendant Prosecutors would never have prosecuted the case without having at least one police officer available to document and testify to the version of events that led to the initiation of charges against Plaintiff.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 168 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 168.**

169. The Prosecutor Defendants needed Defendants Guevara, Halvorsen, and Mingey to write false reports and back up their fabricated charges against Plaintiff. Without the involvement, agreement, and false reports of the police officer Defendants, Defendants Dillon and Coughlan would never have initiated or continued the false charges against Plaintiff.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 169 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 169.**

170. The misconduct described in this Count was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 170 that are directed at other defendants. Defendants deny the remaining allegations contained in paragraph 170.**

171. As a direct and proximate result of this misconduct, undertaken within the scope of Defendants' employment, Plaintiff suffered injuries, including, but not limited to,

emotional distress, as is more fully alleged above.

**Answer: Defendants deny the allegations contained in paragraph 171.**

### Count IX – State Law Claim Respondeat Superior

172.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Defendants incorporates each of the answers to the foregoing paragraphs as his answer to this paragraph as if fully set forth herein.**

173.    In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members and agents of the Chicago Police Department acting at all relevant times within the scope of their employment.

**Answer: Count IX is not directed at Defendants and, accordingly, no answer is due.**

174.    Defendant City of Chicago is liable as principal for all torts committed by its agents.

**Answer: Count IX is not directed at Defendants and, accordingly, no answer is due.**

175.    In committing the acts alleged in the preceding paragraphs, Defendants Coughlin and Dillon were members of, and agents of, the Cook County State's Attorney's Office, acting at all relevant times within the scope of their employment and under color of law.

**Answer: The Court dismissed this Count as it pertains to Cook County, *see* Dkt. No. 88 at 18-19, and thus, no answer is required**.

176.    Defendant Cook County is liable as principal for all torts committed by its agents.

**Answer: The Court dismissed this Count as it pertains to Cook County, *see* Dkt. No. 88 at 18-19, and thus, no answer is required**.

### COUNT X – State Law Claim Civil Conspiracy

177.    Plaintiff repeats and re-alleges all of the paragraphs in this Complaint as if fully set forth herein.

**Answer:  Defendants incorporate each of the answers to the foregoing paragraphs as his answer to this paragraph as if fully set forth herein.**

178.    As described more fully in the preceding paragraphs, each of the individual Defendants acting in concert with one another and other co-conspirators, known and unknown,  conspired to accomplish an unlawful purpose by unlawful means.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 178 that are directed at other defendants.  Defendants deny the remaining allegations contained in paragraph 178.**

179.    In furtherance of the conspiracy, the Defendants each committed overt acts and  were otherwise willing participants in joint activity.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 179 that are directed at other defendants.  Defendants deny the remaining allegations contained in paragraph 179.**

180.    The misconduct described in this Count was undertaken with malice, willfulness and reckless indifference to Plaintiff's rights.

**Answer: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 180 that are directed at other defendants.  Defendants deny the remaining allegations contained in paragraph 180.**

181.    As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including, but not limited to, emotional distress, as is more fully alleged above.

**Answer: Defendants deny the allegations contained in paragraph 181.**

## Count XI – State Law Claim Indemnification

182.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

**Answer: Defendants incorporate each of the answers to the foregoing paragraphs as his answer to this paragraph as if fully set forth herein.**

183.     Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

**Answer: Defendants admit that Paragraph 183 states a legal conclusion as to which no answer is due.  Defendants deny the remaining allegations contained in Paragraph 183.**

184.     The Defendant Officers are or were employees of the Chicago Police Department who acted within the scope of their employment in committing the misconduct described above.

**Answer: Defendants admit that Defendant Officers were employees of the Chicago Police Department. Defendants lack knowledge or information sufficient to form a belief as to whether or not the Defendant Officers were acting within the scope of their employment. Defendants deny the remaining allegations contained in paragraph 184.**

185.     The City is liable to indemnify any compensatory judgment awarded against the Defendant Officers.

**Answer:  Defendants admit that Paragraph 185 states a legal conclusion as to which no answer is due.  Defendants deny the remaining allegations contained in Paragraph 185.**

186.     Defendant Cook County was at all times material to this complaint the employer of Defendants Coughlin and Dillon, and is therefore responsible for any judgment entered against Defendants Coughlin and Dillon and for any judgment entered against him during said employment with the County, making the County a necessary party to this complaint.

**Answer: Defendants admit that Cook County is a necessary party to this lawsuit in that it may have a duty to indemnify the Defendant Dillon. Defendant Dillon admits that he was employed by the Cook County State's Attorney's Office and acted within the scope of his employment. Defendants deny the remaining allegations contained in Paragraph 186.**

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### Absolute Prosecutorial Immunity

At all relevant times, the Defendant Dillon was assigned to the Gang Crimes and Prosecution Unit of the Cook County State's Attorneys' Office. In this capacity, Defendant Dillon took actions intimately associated with the judicial phase of the criminal process, including but not limited to the preparation for and initiation of judicial proceedings and trial. Because of the conduct complained of on the part of Defendant Dillon arises solely out of actions he allegedly took as prosecutor, and thus within his role as an advocate of the State, Plaintiff claims are barred on the basis of absolute immunity.

### SECOND AFFIRMATIVE DEFENSE
### Qualified Immunity

At all relevant times, Defendant Dillon was an Assistant State's Attorneys assigned to the Gang Crimes and Prosecution Unit of the Cook County State's Attorney's Office. To the extent any of his actions are not protected by absolute prosecutorial immunity, they are protected by qualified immunity as his actions were at all times proper in light of clearly established law.

### THIRD AFFIRMATIVE DEFENSE
### Sovereign Immunity

Plaintiff's claims against the Defendant Dillon are really claims against a State official based upon their actions as an Assistant State's Attorney, functions that fall within the scope of their employment and authority as an Assistant State's Attorney.

In this capacity, Defendant Dillon took actions intimately associated with the judicial phase of the criminal process, including but not limited to the preparation for and initiation of judicial proceedings and trial.

The State's Attorney is the constitutional officer vested with exclusive discretion in the initiation and management of a criminal prosecution. The prosecution of Plaintiff's case is, therefore, well within the scope of the State's Attorney's authority. The Illinois Court of Claims has sole and exclusive jurisdiction over Plaintiff's state law claims against Defendant Dillon. Defendant Dillon.

**FOURTH AFFIRMATIVE DEFENSE**
**Statute of Limitations – Federal Claims**

To the extent that any of Plaintiff's claims pursuant to 42 U.S.C. § 1983 accrued more than two years prior to the filing of Plaintiff's Complaint, these claims are time barred.

**FIFTH AFFIRMATIVE DEFENSE**
**Statute of Limitations – State Law Claims**

To the extent any of Plaintiff's claims pursuant to Illinois State law accrued more than one year prior to the filing of Plaintiff's Complaint, these claims are time barred pursuant to 745 ILCS 10/8-101(a).

**SIXTH AFFIRMATIVE DEFENSE**
**Failure to Mitigate Damages**

To the extent Plaintiff failed to mitigate any of his claimed injuries or damages, any verdict or judgment obtained by Plaintiff must be reduced by application of the principle that a Plaintiff has a duty to mitigate his or her damages.

## SEVENTH AFFIRMATIVE DEFENSE
### Good Faith

Defendant Dillon always acted in good faith and for the furtherance of lawful objectives.

## EIGHT AFFIRMATIVE DEFENSE
### Tort Immunity Act 745 ILCS 10/2-204

Because Defendant Dillon was, at all times relevant to Plaintiff's Complaint, a public employee acting within the scope of his employment, he is immune from suit pursuant to 745 ILCS 10/2-204 for any injury caused by the act or omission of another person.

Further, the acts or omissions of Defendant Dillion allegedly took would have been acts or omissions in his capacity as a public employee in the execution or enforcement of a law and because those acts or omissions did not constitute willful or wanton conduct, Defendant Dillon is immune from suit pursuant to 745 ILCS 10/2-202.

## NINTH AFFIRMATIVE DEFENSE
### Absence of Causation

There were intervening and superseding causes of Plaintiff's prosecution following the limited role by Defendant Dillon played months earlier in the matters alleged in Plaintiff's Complaint.

## TENTH AFFIRMATIVE DEFENSE
### Res Judicata and Collateral Estoppel

Plaintiff's claims in the Complaint are barred by the doctrines of res judicata and collateral estoppel to the extent that they involve issues or claims that were, or could have been, resolved in the underlying criminal or post-conviction proceedings.

WHEREFORE, the Defendants Dillon and Cook County respectfully request that this Court enter judgment in their favor and against Plaintiff, that the action be dismissed with prejudice, and that costs be assessed against Plaintiff.

## JURY DEMAND

Defendants John Dillon and Cook County hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: July 10, 2018

Respectfully Submitted,

KIMBERLY M. FOXX
State's Attorney of Cook County

By:     */s/ Christina Chojnacki*
        Christina Chojnacki
        Assistant State's Attorney
        500 Richard J. Daley Center
        Chicago, IL 60602
        (312) 603-3473
        Christina.chojnacki@cookcountyil.gov

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that on the 10th day of July, 2018, I filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois by using the CM/ECF system, which will send notification electronically to all counsel of record.

/s/ Christina C. Chojnacki
_____

*Counsel for Defendant John Dillon and*
*Cook County*