UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARMANDO SERRANO,

        Plaintiff,

    v.

REYNALDO GUEVARA, et al.,

        Defendants.

and

JOSE MONTANEZ,

        Plaintiff,

    v.

REYNALDO GUEVARA, et al.,

        Defendants.

No. 17 CV 2869 and
No. 17 CV 4560

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Plaintiffs Armando Serrano and Jose Montanez were wrongfully convicted of murdering Rodrigo Vargas and spent over twenty years in prison. The state court vacated their convictions due to evidence of misconduct in the underlying investigation and prosecution. Now Serrano and Montanez seek damages from the police officers and prosecutors who were involved, alleging constitutional and state-law claims. Defendants—former police officers Reynaldo Guevara, Ernest

Halvorsen,[1] and Edward Mingey, and former prosecutors Matthew Coghlan and John Dillon—move for summary judgment on some of Serrano's and Montanez's claims. Both sides advance their version of the truth. But the facts of this case are complicated and two-sided. The defendants assert that a witness, Francisco Vicente, voluntarily implicated Serrano and Montanez as the murderers, and that Vicente's testimony was corroborated by Vargas's widow, Wilda, and another witness, Timothy Rankins. Plaintiffs counter that the defendants forced Vicente and Rankins, two susceptible individuals facing jail time on unrelated criminal charges, to adopt a false narrative to incriminate plaintiffs. The police then manufactured additional evidence through Vargas's widow to corroborate the false narrative. Because issues of credibility cannot be resolved on summary judgment, the defendants' motions are largely denied.

## I.  Legal Standard

Summary judgment is appropriate if the defendants show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As the movants, defendants bear the burden of establishing that the summary judgment standard is met, but plaintiffs must still put forward enough evidence to establish every element of their claims and

---

[1] Defendant Halvorsen died earlier this year. JoAnn Halvorsen, his Special Representative, was substituted as the named party under Federal Rule of Civil Procedure 25(a)(1). [281].

show that they can carry their burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). I construe the facts and draw reasonable inferences in Serrano's and Montanez's favor. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 377–78 (7th Cir. 2020).

## II.    Facts

### A.    The Initial Investigation

Someone murdered Rodrigo Vargas in February 1993.[2] [259] ¶ 19.[3] Vargas was headed to work at approximately 5:30 a.m., when he was shot to death in his van

---

[2] Serrano and Montanez each brought their own lawsuits against defendants. Because their lawsuits are based on the same criminal investigation and prosecution in which they were codefendants, their factual allegations and claims are largely identical. For this reason, the two cases were consolidated for pre-trial and discovery purposes. The parties submitted coordinated materials on summary judgment, and defendants' motions for summary judgment are amenable for resolution in a single opinion. I refer to all defendants as "defendants," unless otherwise noted.

[3] Bracketed numbers refer to entries on the *Serrano* district court docket, No. 17-cv-2869, unless otherwise indicated. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are generally taken from the parties' consolidated Local Rule 56.1 statements: [259], [260], [272], and [275]. I disregarded arguments, additional facts, conclusory statements, and unsupported assertions, and deemed undisputed any facts not properly controverted. N.D. Ill. Local R. 56.1. I do not address each of defendants' Local Rule 56.1 objections, but note that both parties' 56.1 statements contained instances of non-compliance with the local rules. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994) (whether to apply Local Rule 56.1 strictly or to overlook transgressions is at the district court's discretion). One hearsay issue merits explanation. Hearsay is an unsworn statement made out of court, offered to prove the truth of the statement's contents. Fed. R. Evid. 801(c). "Inadmissible hearsay evidence may not be considered on summary judgment." *Servin v. City of Chicago*, 796 Fed. Appx. 307, 309 (7th Cir. 2020) (citing Fed. R. Civ. P. 56(c)(2) and *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)). The documents from Sidley Austin's investigations on behalf of the City of Chicago, [262-6], [262-42], [262-47], [262-48], [262-61], and the notes taken by Northwestern students, [262-44], are unauthenticated documents containing multiple levels of hearsay. Plaintiffs do not argue any hearsay exception applies. These exhibits are inadmissible on summary judgment, and I do not consider facts taken from the Sidley Austin report unless the parties expressly stipulated to them. Vicente's affidavit, [262-17], is admissible. *See* Fed. R. Civ. P. 56(c)(4); *Celotex*, 477 U.S. at 322.

parked outside his family home. *Id.*; [260] ¶ 3. Vargas did not belong to a gang, use drugs, or have enemies. [272] ¶ 6.

Chicago Police Detectives Richard Schak and Neal Jack visited the crime scene that day. [260] ¶ 5. Schak and Jack spoke with Vargas's neighbor, Ana Velez, who said she saw Vargas's van running around 5:30 a.m. and heard gun shots around the same time. *Id.* ¶ 6. An hour and a half later, Ana noticed Vargas's car was still running and went outside and found Vargas lying between the seats. *Id.* Ana's son, Frank Velez, also told the detectives that he heard gun shots around 5:30 a.m. but did not see anything. *Id.* ¶ 7. Another witness said she saw Vargas leave his house that morning, and after hearing gunshots, observed what she thought was a brown car driving northbound. *Id.* ¶ 8. Another neighbor described the car as an older, light brown Chevrolet. *Id.* ¶ 9. According to Schak and Jack's police report, Vargas's "personal belongings all appeared to be intact and there was no evidence of a successful robbery." [262-1] at 122.

The next day, Detectives Reynaldo Guevara and Ernest Halvorsen—two of the defendants in this case—were assigned to investigate the homicide. [260] ¶¶ 2, 10. Guevara and Halvorsen pursued Frank Velez as a suspect. [272] ¶ 78. He was interrogated and accused of murdering Vargas. *Id.* ¶¶ 78–80. His mother, Ana Velez, also took a polygraph test. [260] ¶ 11.[4] The parties dispute whether the detectives accused Ana of covering up Frank's involvement in the Vargas murder. [272] ¶ 80.

---

[4] It appears that the Velezes were questioned in mid-March 1993. The parties agree Ana took a polygraph in mid-March, [260] ¶ 11, and Frank's affidavit suggests he was questioned at the police station on the same day as his mother. [262-73].

That February, another defendant in this case—then-Cook County Assistant State's Attorney Matthew Coghlan—was prosecuting a different murder. [259] ¶ 3; [272] ¶ 26. In that case, Coghlan examined a witness, who testified that Detectives Guevara and Halvorsen hit him with a flashlight and forced him to sign a statement fabricated by the detectives that falsely implicated the criminal defendant. *Id.*; [262-49] at 15–16. The parties dispute whether the witness's initial statement incriminating the criminal defendant was actually fabricated by the detectives. [272] ¶ 26. Coghlan eventually became the trial attorney prosecuting the Vargas murder case. *Id.* ¶ 14.

### B. The Arrest of Francisco Vicente

In mid-May, Francisco Vicente, a member of the Imperial Gangsters, was arrested on multiple robbery charges, unrelated to the murder of Vargas. [259] ¶ 20; [272] ¶ 8. Vicente faced at least 9 to over 30 years in prison. *Id.*[5] The parties dispute whether Guevara and Halvorsen promised Vicente a "sweet deal" on his robbery charges if he cooperated with them on other cases. *Id.* ¶ 33. At the time of his arrest, Vicente was also experiencing heroin withdrawal. *Id.* ¶ 9.

The next day, ASA Kevin Hughes, with Detective Halvorsen present, took Vicente's statement about Salvador Ruvalcaba, who had been murdered the previous day. [259] ¶ 21; [272] ¶ 10. According to the statement, Vicente had a conversation in lockup with another detainee named Robert Bouto, who confessed to killing

---

[5] The parties dispute whether Vicente faced a maximum of 97 years in prison based on whether his sentences could run consecutively or concurrently. [272] ¶ 8.

Ruvalcaba. [202-6]; [272] ¶ 2. The parties dispute whether Vicente's statement incriminating Bouto was coerced and fabricated by Detectives Guevara and Halvorsen. [259] ¶ 21. A few days later, another prosecutor, Mary Roberts, handled the grand jury proceeding for the Ruvalcaba murder, where Vicente testified that Bouto confessed to him. [259] ¶ 22; [207-1]. At some point after ASA Hughes took Vicente's statement, ASA John Dillon—another defendant in this case—was assigned to prosecute the Ruvalcaba murder at trial. [259] ¶ 24; [272] ¶ 14.

At the Cook County State's Attorney's Office, prosecutors were typically assigned to different stages of a single case: felony review, preliminary hearing, and trial. [259] ¶¶ 8–13. Felony review prosecutors, like Kevin Hughes, evaluated evidence from law enforcement to determine whether to approve warrants and file charges against suspects. *Id.* ¶ 9. After charges were filed, a different prosecutor, like Mary Roberts, would handle the bond hearing, preliminary hearings, or grand jury proceedings. *Id.* ¶ 10. If the case made it to trial, it would be assigned to a trial attorney. *Id.* ¶ 13. Coghlan and Dillon—the two prosecutor-defendants in this case— worked in the gang crimes unit, which tried gang-related felonies. *Id.* ¶¶ 3–4, 14,16. Gang unit trial attorneys typically picked up cases at the homicide branch of the police station. *Id.* ¶ 18. In these instances, the charges against the suspect had usually already been approved by a felony review prosecutor. *Id.* [6]

---

[6] Another way trial attorneys got cases was when experienced ASAs would give cases to the ASAs new to the gang crimes unit. [202-2] at 23.

### C. Inquiries into Armando Serrano, Jose Montanez, and Jorge Pacheco

In late May, Detective Guevara requested and received the criminal histories of Armando Serrano and Jose Montanez—the plaintiffs in this case—and Jorge Pacheco, all of whom were members of the Imperial Gangsters. [259] ¶ 36; [260] ¶ 13. According to the defendants in this case, after making this request, Guevara informed Halvorsen that a source had told him that two Imperial Gangsters—"Pistol Pete," which was Montanez's nickname, and "Mando," which was Serrano's nickname—had murdered Vargas. *Id.* ¶¶ 12, 14. The parties dispute whether a source ever came forward to Guevara, and whether Guevara actually made this statement to Halvorsen. *Id.* There is no documented record of the alleged tip. *Id.* Halvorsen said that he looked in his nickname file to try and find out who "Pistol Pete" was but that "there were just too many Pistol Petes" to identify a particular suspect. [202-9] at 42–44.

### D. Arranging a Meeting

At the end of May, Vicente, who was in jail, informed either Detective Halvorsen or Guevara about a visit from the defense attorney for Robert Bouto, the person Vicente had incriminated in the murder of Salvador Ruvalcaba. [259] ¶¶ 25–26. Halvorsen informed Dillon, the prosecutor on the Ruvalcaba case, that Bouto's attorney had attempted to bribe Vicente if Vicente recanted. *Id.* ¶ 26.[7] The parties

---

[7] Cook County Department of Corrections records indicate that an officer found $17.00 in Vicente's shirt pocket after the attorney visit. [202-8] at 4–10. Vicente denied that he had been given any money. *Id.* at 8.

7

dispute whether Vicente had been offered a bribe, or if the defendants in this case fabricated this story. *Id.* ¶¶ 25–26; [272] ¶ 29. Dillon, who had yet to meet Vicente, arranged a meeting with him at the Cook County State's Attorney's Office. [259] ¶ 27. The parties dispute whether the purpose of the meeting was to document the attempted bribe. *Id.*

Up until this point, it appeared that the investigation of Vargas's murder had been inactive for months. No arrests had been made, and there had been no documented activity since early February, except for Vargas's toxicology results, the polygraph of Ana Velez, and a ballistics report. [259] ¶ 19; [272] ¶ 7. That was all about to change.

### E.     The Vicente Interview

On June 2, 1993, Vicente was brought to a conference room in the gang crimes unit. [259] ¶ 29. The main area of the unit was square-shaped. [202-2] at 23, 37, 51–52. The conference room and other offices and rooms were located along the perimeter of the square, creating an open area in the middle. *Id.* Dillon's office was outside the square, approximately 15 to 20 yards away. *Id.*; [259] ¶ 33. Many of the rooms had glass along the side of the door. [272] ¶ 15.

Dillon and Halvorsen discussed the visit from Bouto's attorney with Vicente inside the conference room. [259] ¶ 29. What happened next is hotly contested. Vicente implicated Serrano, Montanez, and Pacheco in the Vargas murder, but the parties dispute whether Vicente offered this statement truthfully and voluntarily, or whether Detectives Guevara and Halvorsen and prosecutors Coghlan and Dillon

fabricated Vicente's statement and forced Vicente to sign it using physical threats and promises. *See e.g.* [259] ¶ 36; [272] ¶¶ 16–18.

Plaintiffs—based on new testimony from Vicente—allege that the detectives fed Vicente three different versions of the incriminating statement. *Id.* ¶ 16.[8] The first version made Vicente an eyewitness to the Vargas murder. *Id.* In the second version, Montanez, Serrano, and Pacheco gave Vicente the murder weapon. *Id.* ¶ 17. In the third version, Vicente stood on a street the morning of the murder, when he saw Serrano, Montanez, and Pacheco drive up between 8:30 and 9:00 am, in a tan car. *Id.* ¶ 18; [262-10] at 3. The car pulled over, and the group talked for a few hours. [262-34] at 13. Serrano, Montanez, and Pacheco were arguing about a murder, which they described as a robbery gone wrong. *Id.* at 13–17. Vicente heard them say that the night before, they had gone to a gas station, where Montanez saw someone with a lot of cash. *Id.* at 17–18. They did not rob their victim immediately because his family was in the car. *Id.* at 19. Instead, Serrano, Montanez, and Pacheco followed the victim home and waited until 5:00 am to rob him. [207-3] at 13. Vicente learned that they shot the victim but did not rob him. *Id.* at 14. Vicente says he adopted this third version of the story of Vargas's murder to avoid being an accomplice. [272] ¶¶ 16–18.

Detective Halvorsen was inside the conference room with Vicente when the Vargas murder came up. [259] ¶ 32. According to the defendants, Halvorsen and

---

[8] Plaintiffs suggest that Guevara placed photos of the crime scene in front of Vicente, but that suggestion is not supported by Vicente's 2018 deposition. *See* [262-18] at 18.

Case: 1:17-cv-04560 Document #: 261 Filed: 06/04/20 Page 10 of 60 PageID #:8544


Vicente were alone when Halvorsen asked Vicente about "Pistol Pete," which prompted Vicente to voluntarily provide a lengthy statement implicating Serrano, Montanez, and Pacheco in the Vargas murder. *Id.* ¶ 36.

Based on Halvorsen's and Dillon's testimony, defendants argue Guevara was not in the room. *See e.g.* [272] ¶ 16; [202-2] at 49. But plaintiffs argue he was, based on Vicente's testimony that Guevara was loudly threatening and beating him. *See e.g.* [272] ¶¶ 24, 28; [262-18] at 17, 19, 53. Halvorsen and Guevara's joint police report indicated that detectives, plural, talked to Vicente. [262-1] at 98.

Defendant Dillon says he was not involved when the discussion turned to Vargas. *See e.g.* [259] ¶¶ 33, 35; [272] ¶ 20. According to Dillon, he would go in and out of the conference room to his office, which was too far away to hear anything. [259] ¶ 33; [202-2] at 52, 77. When Halvorsen told Dillon that Vicente "just gave us another murder," Dillon was not inside the conference room, but rather in the open area just outside the conference room. [259] ¶ 37; [202-2] at 51. Dillon did not ask Halvorsen for any details. [202-2] at 51. Dillon also testified that he believed he questioned Vicente about the Bouto case in one setting but recalled going back into the conference room "a few times." [202-2] at 77.

Like Dillon, defendant Coghlan also claims that he did not participate in the Vargas discussion with Vicente. *See e.g.* [272] ¶¶ 20–21, 77. Coghlan says he became aware of Vicente and the Vargas murder over a month later. [259] ¶ 40. According to Coghlan, in late July, Dillon overheard Coghlan talking about wanting more cases. [202-1] at 6–7. Dillon responded that he knew of a witness that had come forward

with information that the police had independently corroborated. *Id.* After they spoke, Coghlan went to the police station to pick up the Vargas file. *Id.*[9] To the extent Coghlan was in the office at work on June 2, Coghlan testified that he did not remember seeing Vicente, Halvorsen, or Dillon that day, and that he never saw Vicente in the State's Attorney's office the entire month of June. [202-1] at 13, 15. Halvorsen and Dillon also testified that Coghlan was not at the June 2 meeting. [202-9] at 94; [202-2] at 78. Contemporaneous written records did not reference Coghlan until late July. [259] ¶ 79.

However, according to plaintiffs, based on old and new testimony from Vicente, both Coghlan and Dillon were present for the June 2 meeting with Vicente. *See e.g.* [272] ¶¶ 21–23, 25. At the criminal trial of Serrano and Montanez, which was in 1994, Vicente testified as follows: when asked about which prosecutor he spoke with on June 2, Vicente responded Coghlan and then said Dillon, but never clarified whether he spoke with Coghlan or not. [262-34] at 27–28. The subsequent questions were about Vicente's discussions with Dillon about the Ruvalcaba murder. *Id.* In response to a question about who was present when the Vargas murder first came up, Vicente responded Halvorsen and Guevara. *Id.* at 127.

In 2018, Vicente was deposed for this case. [262-18]. Vicente testified that he was "not sure about dates because it happened 20-something years ago" but was

---

[9] According to Coghlan's testimony, he learned of the Vargas case directly from Dillon, which was not one of the typical ways gang unit trial attorneys picked-up cases. *See* [259] ¶¶ 8–13, 18; [202-2] at 23–24. Defendants' statement that Coghlan picked up the Vargas case in a "typical" way is disregarded. [272] ¶ 14. So is plaintiffs' characterization that Coghlan prosecuted the case "at Dillon's request," because the citations do not support that assertion. *Id.*

confident that he first spoke about the Vargas murder with Halvorsen and Guevara. [262-18] at 17. The detectives threatened him, and Guevara beat him. *Id.* Vicente first met Dillon and then Coghlan and said that he met with the four of them—the two detectives and two prosecutors—many times because Vicente was involved in three different cases, the Ruvalcaba murder, the Vargas murder, and the murder of Monica Roman. *Id.* at 17–18. Coghlan and Dillon were in the open area outside the conference room, and when Guevara and Halvorsen fed Vicente different scenarios about the Vargas murder, Coghlan and Dillon were within earshot. *Id.* Whenever Vicente saw one prosecutor, he saw the other. *Id.* at 21. During the June 2 interrogation, the conference room door was ajar, and Guevara and Halvorsen would go in and out of the room, and sometimes Dillon and Coghlan would stick their heads in the door. *Id.* at 37.

Vicente also testified that no prosecutors were inside the conference room when the Vargas murder came up, only Guevara and Halvorsen. *Id.* at 52. Vicente could not hear the prosecutors in the hallway because Guevara would knock him out, and Vicente would hear "stars and [] shit in my ear." *Id.* at 54. Dillon and Coghlan were present, and while Vicente could not "recall right—you know, 20 something years ago, but I know they were up there." *Id.* Vicente could hear Guevara, Halvorsen, Dillon, and Coghlan talking outside the door, "whispering, and talking, and trying to figure out different scenarios." *Id.* at 55. He could "hear little talk about what I was saying, and what I wasn't going to say, and what they wanted me to say." *Id.* Vicente visited the State's Attorney's office 30 to 40 times to talk about the three different cases he

12

was involved in. *Id.*[10] Vicente never reported to anyone in the State's Attorney's Office that his testimony was false. *Id.* at 56.[11] When questioned further, Vicente testified that he was not sure if he saw Coghlan on June 2 because he was dealing with so many people, and that he could not say whether or not he heard Coghlan's voice that day, and that Coghlan "could have been" inside the room when the Vargas murder came up. *Id.* at 64. Vicente concluded "I just don't remember. So many meetings with Dillon, and Coghlan, and Guevara, and Halvorsen." *Id.*[12]

### F. Wilda Vargas[13]

The parties next dispute whether after the meeting with Vicente, the detectives corroborated his testimony with Wilda, Vargas's widow, or whether the detectives learned of key information from Wilda much earlier, which they then fed to Vicente on June 2 to enhance his statement implicating plaintiffs. Almost everything is contested—in part because Wilda's testimony lacks coherence, and both parties mix and match it. The factual disputes concern the substance of Wilda's testimony, the timeline created by her testimony, and her identifications of plaintiffs

---

[10] Coghlan testified he met with Vicente face-to-face at least 3 times before trial. [272] ¶ 27; [262-33] at 210. Plaintiffs' characterization of Vicente's 30 to 40 visits is misleading. [272] ¶ 27. The underlying citations establish the visits spanned three different cases, not just plaintiffs' case.

[11] Vicente added that the prosecutors knew his testimony was false. [262-18] at 56. This assertion by Vicente is inadmissible, and I disregard it. (That does not mean, however, that a jury could not infer Coghlan's and Dillon's knowledge from other admissible testimony.)

[12] Vicente's testimony was in response to "the meeting [he] testified a lot about today up in the State's Attorney's Office." [262-18] at 64. This, and the testimony prior to this section, sufficiently references the June 2 meeting.

[13] To avoid confusion, I refer to Rodrigo Vargas as "Vargas" and to his wife as "Wilda."

and Montanez's car during the criminal investigation and prosecution. *See e.g.* [260] ¶¶ 4, 16–21; [272] ¶¶ 62–68.

Plaintiffs' theory is the following: according to Wilda's 2018 deposition testimony, the day of her husband's murder in February 1993, Wilda told detectives Schak and Jack about an incident at a gas station, and then told Guevara about it the following day. [262-21] at 25–27. At the 1994 criminal trial, Wilda testified that she told Guevara (in June 1993) that the night before Vargas was murdered, they went to the gas station after cashing a check at the bank. [262-23] at 8–19. Vargas went inside to pay. *Id.* at 8–9. Another car—a "cream colored four-door brown on top" with three people in it—pulled in, blocking the exit path. *Id.* at 14. Around this time, Vargas came back out to pump gas. *Id.* at 8–9, 18. Someone from the cream and brown vehicle then went inside the gas station. *Id.* at 17–18. Vargas honked his horn so the car would move and cursed to himself. *Id.* at 18. The person inside the station came back out, moved the car, and screeched the tires. *Id.* Vargas screeched his tires. *Id.* The cream and brown car followed them, but after the Vargas family turned left on a street, Wilda did not know whether the brown car followed them home. *Id.*; *see also id.* at 49–54. At her 2018 deposition, Wilda said that after sharing this information with the police in February, she went to the police station. [262-21] at 15, 27–30. The police department had "gang books," consisting of photographs of known gang members, which were used to help in suspect-identifications. [272] ¶ 67. Guevara and Halvorsen knew that they were required to document any gang book identifications, even if unsuccessful. *Id.* Guevara showed Wilda books with photos in them, and Wilda

14

identified two people from the car at the gas station. [262-21] at 15, 27–30. The identifications were not placed into evidence. [272] ¶ 68.

Defendants' theory is the following: according to Halvorsen's testimony, he and Guevara first learned of the gas station incident from Vicente at the June 2 meeting in the State's Attorney's Office, and the detectives corroborated Vicente's story with Wilda later that day at her house. [202-9] at 91. Wilda's 1994 trial testimony supported this sequence of events. [262-23] at 8–9. Defendants then emphasize that at her 2018 deposition, Wilda testified that the Vargas family stopped at the gas station the night before the murder. [212-6] at 4–12. A vehicle blocking the exit path was already there. *Id.* It was a big, four-door car: the top was made of a brown cloth material, and the bottom was a cream color or a light brown. *Id.* Three strangers that looked Latino were in it. *Id.* The driver and front seat passenger did not get out of the car. *Id.* Vargas went inside to pay and was there for approximately ten minutes. *Id.* Vargas then came back outside to fill the gas tank. *Id.* Vargas honked his horn at the vehicle blocking his exit. *Id.* The car would not move. *Id.* Profanity was exchanged. *Id.* The vehicle then followed the family home. *Id.*

Halvorsen and Guevara's police report from June 1993 contained a third version of Wilda's gas station story. According to the report, the police corroborated Vicente's testimony with Wilda. [202-10] at 4. Wilda described a tan car, with three Latino men. *Id.* The car pulled up directly in front of the Vargas's car at the gas station. *Id.* Vargas, who had a roll of money, went inside the gas station, and the driver of the tan car walked in behind Vargas. *Id.* Vargas got back into the car to exit

and had to back out to get around the tan car. *Id*. The tan car followed them home. *Id*. This police report is dated June 2 and June 3, but contains information that the detectives say they received around June 6—Halvorsen chalked up the discrepancy to a mistake in the dating of the report; plaintiffs suggest this shows the unreliability of the detectives' statements about the timeline of their interactions with Wilda. [262-9] at 67–69.

According to defendants, after speaking with Wilda, Guevara showed her a photo array with eight photos, and Wilda identified Montanez as the driver and Serrano as a passenger in the car that blocked the Vargas's car at the gas station. [260] ¶ 18; [272] ¶ 66.[14]

The last major factual dispute about Wilda concerns her identification of Montanez's car. *See e.g.* [260] ¶¶ 19–20. Plaintiffs claim that a few days after the murder, around February 8, a police officer took Wilda around to look for the car. [262-23] at 59; [272] ¶ 63. Defendants claim that a few days after June 2, Halvorsen and Guevara located Montanez's vehicle, a Buick Regal with two bullet holes and a damaged left front fender, and drove Wilda to the area, where she identified Montanez's Buick as the car from the gas station incident. [260] ¶¶ 19–20; [262-50] at 27–28. While it is not clear whether plaintiffs believe Wilda went to look for cars

---

[14] It is unclear whether plaintiffs agree with defendants that Wilda viewed a photo array with Guevara on June 2 (in addition to the gang book identifications). [272] ¶¶ 66, 68. Defendants' position on Wilda's photo identifications is also confusing. Defendants agree that Wilda viewed gang books but claim she viewed them with Guevara on the same day she saw the photo array, June 2. [260] ¶ 25; [272] ¶ 68. But defendants do not reconcile Wilda's testimony that she viewed gang books at the police station, [262-21] at 15, with Halvorsen's testimony that they showed Wilda photos (not books) at her house. [202-9] at 39.

only once (in February) or twice (in February and June), the parties agree that Guevara told Wilda he would take her to see abandoned cars in a neighborhood where cars were dumped. [272] ¶ 72. The cars Guevara and Halvorsen showed Wilda appeared abandoned or seriously damaged, even though no evidence suggested the car associated with Vargas's murder was damaged. *Id.* Wilda testified that Guevara told her "bad things happen[ed]" in the neighborhood that they drove around in. [262-21] at 60. Wilda saw approximately 5 other abandoned cars that did not match the size or color of the car she saw at the gas station. *Id.* at 32; [272] ¶ 73. Wilda told Guevara to stop when she recognized a car, because the material on top of the car was different from the bottom, like the car at the gas station. [262-21] at 17–18. Wilda asked why the vehicle she identified was damaged and had a bullet hole. *Id.* at 18. Guevara told her the damage occurred during her husband's murder. *Id.* at 32.[15] According to Wilda, the detectives, primarily Guevara, told her "that the bullet—that the vehicle had looked like the bullet that Rodrigo had, that that could be the vehicle" and "that the bullet matched with the hole in the car." [262-21] at 18, 32. The parties dispute whether Guevara ever said ballistics evidence from Montanez's car forensically matched the scene of the crime. [272] ¶ 75.[16] Guevara also told Wilda

---

[15] The parties dispute when and why Montanez's car sustained damage, specifically whether it was damaged during the Vargas murder or if the damage happened later for unrelated reasons. *See e.g.* [272] ¶ 75; [212-18] (car mechanic's affidavit that Montanez's car was not damaged on February 19, 1993).

[16] The only alleged support for any bullet-matching theory was Vicente's testimony that Montanez's car had been shot during the murder. [272] ¶ 75.

that the car she identified had been abandoned. *Id.* ¶ 74. Wilda testified that Guevara and Halvorsen did not force or tell her to pick a particular car. [262-21] at 18.

## G.   The First Serrano Interview

On June 8, 1993, Serrano was placed in a room at a police station, where Guevara interviewed him. [272] ¶ 39. Guevara lied and said that Pacheco, who was in custody, told police officers that Serrano had committed the Vargas murder. *Id.* The parties dispute whether Guevara repeatedly slapped and punched Serrano, and whether Halvorsen participated. *Id.* Serrano was released the next day. *Id.* ¶ 40. Guevara opened the door to the room where Serrano was held and said, "get the fuck out." *Id.* Serrano made no statements implicating himself or anyone else in the Vargas murder. *Id.*

## H.   Vicente's Subsequent Meeting with Dillon

On June 9, the day Serrano was released, Vicente visited the gang crimes unit again. [259] ¶ 47.[17] The parties dispute the purpose of the visit. *Id.* Dillon testified that the purpose was to discuss and document a second alleged bribe from Bouto's attorney, because Dillon was the trial attorney on the Ruvalcaba case. [202-2] at 49–50, 53. Vicente testified that while another attorney might have visited him, he never met with that attorney or received a bribe. [262-18] at 50–51. The parties dispute whether at this second meeting, Dillon and Vicente discussed the Vargas murder. [259] ¶ 49. Ultimately, Dillon never called Vicente as a witness in the Ruvalcaba trial

---

[17] As a general matter, the parties dispute the number of times Dillon and Vicente met. [259] ¶¶ 49, 51.

because Dillon believed Vicente's testimony was distracting. *Id*. ¶ 55. Bouto was convicted of murdering Ruvalcaba, but over twenty years later, Bouto's conviction was vacated, and he was granted a certificate of innocence. [272] ¶ 11.

### I. The Timothy Rankins Interview

The day after Dillon's second meeting with Vicente, Timothy Rankins was arrested for an unrelated robbery with Demond Williams, also known as "Shorty Folks." [260] ¶ 26; [272] ¶ 41. The next day, June 11, Rankins signed a statement saying that he witnessed Serrano, Montanez, and Pacheco murder Vargas. [259] ¶ 56; [260] ¶ 26. The parties dispute many facts about the circumstances and substance of Rankins's statement. *See e.g.*, *id*.

According to a police report by Detectives Halvorsen and Guevara: Sergeant Edward Mingey—the last individual defendant in this case—knew Rankins was a member of the Spanish Cobras, so Mingey asked Rankins, alone on June 11, about the murder of Monica Roman, because the suspect was supposedly a Spanish Cobra. [202-14] at 3; [260] ¶ 2. When Mingey realized Rankins was a witness to the Vargas murder, Mingey contacted Halvorsen and Guevara, who interviewed Rankins. [202-14] at 4. Rankins told the detectives that he was with two other people, "Shorty Folks" and his girlfriend Sabrina, when he met Serrano, Montanez, and Pacheco in a park, at 4:00 am on February 4, the morning of Vargas's murder. *Id*. at 3–4; [260] ¶ 28. The Spanish Cobras were friendly with the Imperial Gangsters, and Rankins had picked up drugs and guns with Serrano, Montanez, and Pacheco before. [202-14] at 4. Rankins then accompanied them to the murder scene in a different car, a red van

19

with white stripes that remained farther away from the crime scene. *Id.* at 4–5. Serrano, Montanez, and Pacheco confronted Vargas outside his home. *Id.* at 5. Vargas ran to his van, and one of the plaintiffs yelled "DO HIM, DO HIM." *Id.* Six to nine shots were fired; Rankins heard glass on the driver's side window shatter. *Id.* Then they all drove away. *Id.* After Rankins shared this story, Halvorsen and Guevara drove Rankins by Vargas's home to verify the information, and Rankins's pointed to the crime scene. *Id.* Halvorsen and Guevara then showed Rankins a photo array of suspects, and Rankins identified Serrano, Montanez, and Pacheco. *Id.* at 5–6. Guevara and Halvorsen also obtained the identities of "Shorty Folks" and Sabrina. [272] ¶ 49.

The parties dispute whether Sergeant Mingey was ever alone with Rankins. [272] ¶ 44. Rankins testified that Halvorsen, Guevara, and Mingey all interviewed him at the same time. [262-53] at 9. And, like Vicente's statement, the parties dispute whether Rankins's statement was truthful and voluntary, or knowingly fabricated by Guevara, Halvorsen, and Mingey with the use of threats and physical force. *See e.g.* [259] ¶ 56; [260] ¶¶ 26, 28; [272] ¶¶ 42–44. Rankins testified the statement was beaten and forced out of him, and that the state's attorney offered to make his robbery charges disappear if he cooperated. [262-53] at 15–18, 45–46. Rankins also testified that Mingey told him that the police wanted to frame Serrano, Montanez, and Pacheco for murder because they were drug dealers that the police had been unable to catch. [262-31] at 3.

20

Finally, the parties dispute whether prosecutors Dillon and Coghlan were present when Rankins was driven by the crime scene. *See e.g.* [259] ¶ 64; [272] ¶¶ 45, 52. In 2012, Rankins testified that Guevara, Halvorsen, Mingey, and Coghlan were in the car. [262-64] at 22. In 2019, Rankins testified that it was Halvorsen, Guevara, and Dillon, and that he met at least one prosecutor that day. [262-53] at 14, 42. Rankins said that Dillon followed them in a separate car. *Id.* at 77.[18] Rankins also testified that he told Coghlan and Dillon that his statement was a lie that day. [272] ¶ 50; [262-53] at 57; [262-64] at 21. Coghlan, however, maintains that he was not aware of the Vargas case until late July, and that he first met Rankins in September. [259] ¶ 40; [202-1] at 17; [202-19] at 6. Dillon testified that he was not aware of Rankins until this lawsuit was filed. [272] ¶ 45[19]; [202-2] at 65. And in 1994, Rankins wrote that he did not tell the prosecutors that his statement was false. [272-1] at 3. The parties also dispute Mingey's level of interaction with Dillon and Coghlan about the Vargas murder. [260] ¶ 45.[20] In 2019, Rankins testified that after he was arrested in June 1993, he started selling drugs for Guevara. *Id.* ¶ 35.

---

[18] Dillon says that Rankins testified that the crime scene drive-by happened on Saturday, June 12 and suggests that it is unreasonable to believe Dillon was working on a Saturday. [276] at 8, n.3. But Dillon's citations fail to suggest this timeline, and even the detectives' police reports indicate that the drive-by took place on Friday, June 11.

[19] Paragraph 45 of plaintiffs' additional statement of facts, [272] ¶ 45, has many problems, including too many facts and citations. Coghlan's handwritten notes confirm that Rankins was driven by the scene, likely on June 11. [262-65]. But they don't evince Coghlan's participation.

[20] Mingey never had direct contact with Vicente or Wilda. [260] ¶ 46.

### J.    Serrano's Arrest

After Rankins identified plaintiffs in a photo array on June 11, Serrano was arrested that same day. [259] ¶ 57; [272] ¶ 47; [202-14] at 6. As Serrano was escorted past Mingey's office, Mingey gave Serrano a "thumbs down." [260] ¶ 44; [272] ¶ 47. Serrano was placed in an interview room, where Guevara showed him a photo of Rankins. *Id.* Serrano told Guevara that he knew Rankins only because Serrano had previously testified against Rankins's brother. *Id.* Serrano and Rankins were not friends. *Id.* ¶ 48.[21] After the arrest, police reports indicate that Rankins and Wilda identified Serrano in a line-up. [259] ¶¶ 59–60; [202-14] at 6; [202-16] at 2; [262-53] at 14. But the parties dispute whether the line-up was fair, and whether Rankins even viewed one. [259] ¶¶ 59–60.

Halvorsen and Guevara then notified the felony review unit. [202-14] at 6. ASA John King arrived and reviewed the Vargas file, which included the contents of Vicente's statement. *Id.*; [259] ¶ 61. King also interviewed Rankins and took Rankins's statement, which Rankins signed. *Id.*; [202-14] at 6.[22] King and Guevara then interviewed Serrano, who did not provide an alibi or statement. *Id.*; [259] ¶ 61.[23]

---

[21] Serrano and Rankins encountered each other a single time in the "bullpen" shortly after they were arrested. [272] ¶ 48. According to Rankins, the two did not converse and Rankins thought that Serrano "wanted to do something to him." *Id.* The two men had no additional contact with one another ever again. *Id.*

[22] Rankins testified that King was not there when he signed the statement, only the detectives, who had to take a second statement because there was blood on the first one from beating Rankins. [202-18] at 41–42. Rankins also testified he saw Dillon, not King on June 11. *Id.* at 58.

[23] Defendants' characterization that King "attempted" to interview Serrano is unsupported by the underlying citations and disregarded. [259] ¶ 61.

Either late at night on June 11 or early morning June 12, King approved murder charges against Serrano. *Id.* ¶ 62. King did not recall having any contact with Coghlan about the Vargas murder prior to approving these charges. *Id.* ¶ 63.

### K.    Rankins's Grand Jury Testimony

According to plaintiffs, a few days after his arrest, Rankins told Dillon, Coghlan, and two other state's attorneys that his statement was a lie and that he had been beaten. [272] ¶ 50; [262-53] at 58. Rankins also claimed that he met with Coghlan, Halvorsen, and Guevara on the day of the grand jury, June 15, and told them that his statement was forced and false. [272] ¶ 50; [262-53] at 21. According to Rankins, Coghlan threatened him to testify consistently with the signed statement. *Id.* Ultimately, Rankins did implicate Serrano and Montanez before a grand jury. [259] ¶ 65; [272] ¶ 56.[24] At the grand jury, Rankins testified that his statement was given voluntarily, that he had not been threatened, and that he had not received any promises in exchange for his testimony. [207-2] at 19–20. ASA Dan Galivan handled the proceeding. [259] ¶ 65.[25]

Defendants dispute Rankins's version of events. *See e.g.* [272] ¶¶ 51–52, 55. According to defendants, Coghlan met Rankins in September, and Dillon first learned of Rankins years later. [259] ¶ 40; [202-1] at 17; [202-19] at 6; [272] ¶ 45; [202-2] at 65.

---

[24] Rankins claimed that he testified twice before the grand jury. [202-18] at 61–62.

[25] Plaintiffs do not cite to any evidence placing Coghlan inside the grand jury room.

The parties do agree, however, that Coghlan was responsible for moving Rankins to the State's Attorney's witness quarters, the "Q." [272] ¶ 54. Rankins testified that at the "Q," he told Coghlan and Dillon that his statement was a lie, but that Coghlan and Dillon threatened to move Rankins back to county jail if he failed to testify. [272] ¶ 50; [262-53] at 23–24. Rankins also claimed that at some point, he told Coghlan and Dillon that he had an alibi for the Vargas murder. [272] ¶ 50; [262-53] at 25. The parties dispute whether Rankins' testimony was true, what perks Rankins received in the "Q," and whether the perks were disclosed to Serrano's and Montanez's criminal defense attorneys. [272] ¶ 54.

### L.    Vicente's Second Signed Statement

About a week after Rankins's grand jury testimony, defendants claim that Detectives Guevara and Halvorsen spoke with Vicente again, and that this time, Vicente voluntarily shared information about a third murder, specifically that a man named Geraldo Iglesias had confessed to murdering Monica Roman. [272] ¶ 2. A few days later, ASA Solita Pandit took Vicente's statement about the Vargas murder, which implicated Serrano, Montanez, and Pacheco, and Vicente signed it. [259] ¶ 67. According to the statement, Vicente said that he had "been treated well by the police and Assistant State's Attorney and ha[d] not been threatened or promised anything in exchange for making this statement." [202-21] at 7. Halvorsen was present. *Id.* at 2. Dillon was not, but notes that this is when he first learned the details of Vicente's

statements incriminating plaintiffs in the Vargas murder. [259] ¶¶ 52; 71.[26] ASA Pandit also approved requests for arrest warrants for Pacheco and Montanez. *Id.* ¶ 72.

### M.    Vicente's Grand Jury Testimony

ASA Galivan handled Vicente's grand jury proceeding on July 1, where Vicente testified that Serrano, Montanez, and Pacheco had confessed to murdering Vargas. [259] ¶ 69.[27] Vicente testified that he had not been threatened and had not received any promises in exchange for his testimony. [272] ¶ 38. Serrano was indicted on first-degree murder, attempted armed robbery, and unlawful use of a weapon. [259] ¶ 73. Dillon did not participate in the proceeding. *Id.* ¶ 71.[28] The next day, a Cook County judge issued arrest warrants for Pacheco and Montanez. *Id.* ¶ 72.

At some point during this time, Vicente was moved to the "Q," where he received cigarettes, a Walkman radio, a Nike sweatsuit, three meals per day, and visits with his girlfriend. [272] ¶ 32; [262-34] at 80–82. He was also able to make free calls. [272] ¶ 32.[29]

---

[26] Plaintiffs do not present any evidence placing Dillon or Coghlan at the meeting with ASA Pandit.

[27] Prior to giving his grand jury testimony, Vicente met with a state's attorney, whom he did not identify as either Coghlan or Dillon. [259] ¶ 70.

[28] Again, plaintiffs do not present any evidence placing Dillon at Vicente's grand jury or bond hearing.

[29] The parties dispute whether the meals were the same as Cook County jail meals and if Vicente also received drugs, jogging suits, and jewelry in the "Q." [272] ¶ 32.

### N.     More Arrests and Indictments

Montanez was arrested a few days after Vicente gave his grand jury testimony. [259] ¶ 74. Wilda identified Montanez in a line-up conducted by Halvorsen and Guevara. [260] ¶ 23. The parties dispute the fairness of the line-up. *Id.* ASA Lynn Weaver from the felony review unit approved filing murder charges against Montanez. [259] ¶ 74. Pacheco was arrested next. *Id.* ¶ 75. ASA Hughes, who had taken Vicente's statement about the Ruvalcaba murder, approved murder charges against Pacheco. *Id.* Montanez and Pacheco were indicted in late July 1993 for first degree murder and attempted armed robbery of Vargas. *Id.* ¶ 76. Serrano was charged in a superseding indictment for the same offenses. *Id.* ASA Galivan handled the indictments. [202-32] at 14–16.

### O.     Rankins's Recantation

At some point, Rankins met Montanez in jail. [260] ¶ 29; [212-9] at 15–16. Rankins told Montanez that the police forced him to incriminate Montanez. *Id.* In March 1994, months after plaintiffs had been indicted, Rankins provided Montanez with an affidavit recanting his statement. [260] ¶ 29. Montanez gave it to his attorney. *Id.* Rankins's affidavit described police coercion and false testimony. *Id.* ¶ 32. A few months later, Rankins provided a similar letter to an informal investigator working with both of plaintiffs' criminal defense attorneys. *Id.* ¶¶ 30–31; [212-23] at 3.

Coghlan saw Rankins's written recantations before the trial. [260] ¶ 39; [272] ¶ 58; [262-33] at 298. The parties dispute whether during this time, Vicente refused

to testify, and whether in response, Coghlan and Dillon threatened to move him from the "Q" back to general population. [272] ¶ 28.

### P. The Criminal Trial

The trial took place in October 1994 before a judge, not a jury. [259] ¶ 80. Vicente testified that in response to questions about "Pistol Pete," he voluntarily revealed that plaintiffs had confessed to him. [272] ¶¶ 30, 64. Vicente described the details of plaintiffs' alleged confession, including the gas station encounter—the third version of the made-up story, according to plaintiffs' theory. *Id.* Vicente also said that he had not received any promises in exchange for incriminating Serrano, Montanez, Pacheco, and Bouto. *Id.* ¶ 38. The parties dispute whether important information, about the number of times Vicente had met with prosecutors, the threats they made, and the conditions of Vicente's confinement, including the perks he received, was properly disclosed to plaintiffs' criminal defense attorneys prior to trial. *Id.* ¶¶ 31–32.

Wilda testified about the gas station encounter. [260] ¶ 41. The prosecution elicited Wilda's identifications of plaintiffs and Montanez's car. [272] ¶¶ 70, 77. During an in-court identification of Montanez, Wilda testified that he looked "heavier now" compared to the man she had seen at the gas station. [262-23] at 17. The judge described some of Wilda's identifications as unreliable, in part because she mis-identified plaintiffs in court. [262-8] at 4–5; [262-23] at 16–17. The parties dispute whether the tactics used to secure Wilda's identifications were properly disclosed to plaintiffs' defense counsel prior to trial. [272] ¶¶ 68, 76. In 2018, Wilda testified that

27

during the trial, she could not tell Serrano and Pacheco apart, even after practicing identifying them with the prosecutor. [262-21] at 46.

Around this time, Rankins stayed with Montanez's family in Puerto Rico to avoid being called as a witness and did not testify at plaintiffs' criminal trial. [260] ¶¶ 33, 40; [272] ¶ 57. Rankins wrote to Montanez, thanking him for not killing him in jail, for saving his life, and for being treated like family in Puerto Rico. [260] ¶ 34. At trial, Coghlan presented an investigator who testified about the State's unsuccessful efforts to locate Rankins. [272] ¶ 60; [262-68]. Coghlan then requested a continuance to make one last effort to locate Rankins, which the judge denied. [272] ¶ 61.

Nevertheless, the parties dispute whether Rankins's statement was presented through Halvorsen's testimony. [260] ¶ 40. At trial, Halvorsen testified as follows: on June 11, 1993, Mingey informed Halvorsen about Rankins being an eyewitness to the Vargas murder. [272] ¶ 59. Guevara and Halvorsen interviewed Rankins and drove Rankins to the crime scene. *Id.* Halvorsen said that he told Rankins that he wanted to believe what Rankins was saying but Rankins needed to provide proof. *Id.* Halvorsen told Rankins that Rankins would have to show Halvorsen that Rankins knew exactly where the crime took place. *Id.* As they drove past the Vargas's home, Rankins pointed to it. *Id.* Halvorsen and Guevara returned Rankins to the office, and then went to look for Serrano. *Id.* They found Serrano, placed him in custody, and conducted a line-up that Rankins and Wilda viewed. *Id.* The detectives called an Assistant State's Attorney, who took Rankins's statement. *Id.* The judge ruled that

Halvorsen's testimony was admissible to show the detectives' course of conduct in the investigation and that it was relevant, overruling defense objections based on hearsay and prejudice. *Id.* During the trial, the criminal defense attorneys suggested that Guevara and Halvorsen fed information to Wilda and Vicente. *See e.g.* [262-23] at 39–40, 73; [262-70] at 4. In closing argument, Coghlan made no mention of Rankins or the detectives' use of Rankins during their investigation. *See* [262-70]. Coghlan's closing focused on Vicente's testimony and credibility, and the testimony and identifications of Wilda. *Id.*

The parties dispute whether the prosecution failed to disclose information about the treatment Rankins received and the circumstances of his initial statement, the notes Mingey took, if any, and the identities of "Shorty Folks" and "Sabrina." [260] ¶ 27; [272] ¶¶ 46, 49, 53. The criminal defense attorneys for Serrano, Montanez, and Pacheco should have received the same discovery materials from the State's Attorney's office. [260] ¶ 38; [212-13] at 5. But plaintiffs do not have a copy of the criminal defense attorney files for Serrano and Montanez. [216] at 17, n.7. Pacheco's criminal defense file exists, and does not contain disclosures of Mingey's notes, Rankins's treatment, or the identities of Shorty Folks and Sabrina. [272-43]. The parties agree that Guevara and Halvorsen did not disclose that they considered Frank Velez as an alternative murder suspect. [272] ¶ 81.[30]

---

[30] As noted earlier, the parties dispute whether the officers accused Frank's mother Ana of covering up for her son's involvement in the Vargas murder. [272] ¶ 81. Plaintiffs also claim that this information was improperly withheld from their criminal defense counsel.

Serrano and Montanez were convicted in late October. [259] ¶ 80; [260] ¶¶ 1, 36, 42. The judge stated that, "The focal testimony belongs to that of a Francisco Vicente, a twenty four year old person who has four very serious felonies pending in the Circuit Court…" [262-70] at 13. The court also referenced Wilda's testimony about the gas station "confrontation" but noted her identifications were unreliable. [262-8] at 4–5. The parties did not include the entirety of the judge's findings in the summary judgment record, but the judge made no apparent reference to Rankins or his value as investigative corroboration for the prosecution's theory of the case. [262-70]; [262-8].[31]

## Q.    Vicente's Sentencing

About two years after the trial, Vicente, who pled guilty to three armed robberies and one simple robbery, was sentenced. [259] ¶ 81. Vicente had served nearly all of his pre-trial custody time in the "Q" or DuPage County Jail. [272] ¶ 35. While Dillon drafted Vicente's sentencing order, the parties dispute whether Dillon or the public defender calculated the sentence. [259] ¶¶ 82–84; [272] ¶¶ 35–36. Ultimately, Vicente's sentence included 156 days of credit that he did not actually earn. [259] ¶ 82; [272] ¶¶ 35–36.[32] And instead of serving approximately 4.5 years on his 9-year sentence, Vicente ended up serving about 3.5 years. [272] ¶ 37.

---

[31] Plaintiffs did not attach five pages of the trial court's findings; pages 113–117 are missing. [262-8]; [262-70] at 13.

[32] There is no evidence that Vicente's sentencing credit was known at the time of plaintiffs' trial.

### R.    Vicente's Recantation and Plaintiffs' Post-Conviction Relief

A decade after the trial, in 2004, Vicente submitted an affidavit to Northwestern University students recanting his testimony against Serrano, Montanez, and Pacheco, alleging that he was threatened, intimidated, and physically abused by Guevara and Halvorsen. [272] ¶ 3. Over ten years later, in the summer of 2016, plaintiffs' convictions were reversed by the Illinois Appeals Court due to evidence of "profoundly alarming acts of misconduct in the underlying investigation and prosecution." *People v. Serrano*, 404 Ill.Dec. 189, 192 (1st Dist. 2016); *People v. Montanez*, 404 Ill.Dec. 218, 220 (1st Dist. 2016); [260] ¶ 1. On remand, the Cook County State's Attorney moved to vacate the convictions and dropped the charges. [260] ¶ 1. In November 2016, Serrano and Montanez were granted certificates of innocence. *Id.* An investigation commissioned by the City of Chicago concluded that Serrano, Montanez, and Pacheco were more likely innocent than not. [272] ¶ 1.

Plaintiffs then filed this civil rights lawsuit. [1]. Guevara asserted his Fifth Amendment right against self-incrimination. [272] ¶ 4. Halvorsen and Mingey initially invoked their Fifth Amendment rights but then later changed their minds and agreed to testify. *Id.* ¶ 5. Vicente submitted a new affidavit, swearing that all inculpatory statements against Montanez, Serrano, Pacheco, Bouto, and Iglesias were false and that Guevara and Halvorsen coerced and fabricated these statements through physical abuse and threats. *Id.* ¶ 3. In January 2020, Detective Halvorsen passed away. [266].

31

### III.   Analysis

Section 1983 of the Civil Rights Act allows private citizens to sue state actors who commit constitutional wrongs. *King v. Hendricks County Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020). Plaintiffs Serrano and Montanez raise multiple claims under § 1983: fabrication of evidence, pretrial detention, suppression of evidence, conspiracy, and failure to intervene. To be held liable for any of these claims, each defendant—Guevara, Halvorsen, Mingey, Coghlan, and Dillon—must be personally responsible for the alleged deprivation of plaintiffs' constitutional rights. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018). The constitutional violation must occur at the defendant's direction or with his knowledge or consent. *Id.* A civil suit for damages based on due-process violations requires proof that defendants acted intentionally or at least recklessly. *See Cairel v. Alderden*, 821 F.3d 823, 832 n.2 (7th Cir. 2016); *Bolden v. City of Chicago*, No. 17 CV 417, 2019 WL 3766104, at *13–14 (N.D. Ill. Aug. 9, 2019) (§ 1983 action has a mental state requirement greater than negligence). Serrano and Montanez also raise related claims under state law: malicious prosecution, civil conspiracy, intentional infliction of emotional distress, and vicarious liability. Defendants argue that plaintiffs cannot prove many of their legal claims. Coghlan and Dillon also assert prosecutorial immunity.

### A.   Fabrication of Evidence

Under the Due Process Clause of the Fourteenth Amendment, the Constitution guarantees the right to a fair trial in state criminal prosecutions. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *see also Coleman v. City of Peoria, Illinois*, 925 F.3d 336,

344 (7th Cir. 2019). A defendant violates due process when he uses false evidence to deprive a criminal defendant of his liberty in some way. *Coleman,* 925 F.3d at 344; *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012). For this claim, plaintiffs must show that 1) the defendants "manufactured" the witness statements; 2) the defendants knew with certainty that the statements were false; and 3) the false evidence was used to convict plaintiffs. *Coleman*, 925 F.3d at 344–45.

The 1994 criminal trial rested solely on witness testimony, because there was no physical or forensic evidence connecting Serrano or Montanez to the murder of Rodrigo Vargas. Now, over 25 years later, plaintiffs' civil case rests solely on witness testimony—from the same witnesses. At the summary judgment stage, all evidence must be viewed in the light most favorable to plaintiffs. When resolving a factual dispute depends on evaluating a witness's credibility, summary judgment is improper. *Hackett v. City of South Bend*, 956 F.3d 504, 507 (7th Cir. 2020) ("In fact-intensive cases, credibility traps abound, and courts must be alert to avoid them."). The rare exception is when a witness's testimony is so internally inconsistent that no reasonable factfinder would credit it in light of all the evidence—only then is summary judgment appropriate. *Seshadri v. Kasraian*, 130 F.3d 798, 802 (7th Cir. 1997) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

      1.   *Vicente's Statement*

Coghlan and Dillon argue they played no role eliciting Vicente's statement at the June 2 meeting. Coghlan has weighty evidence that he was not involved in the

interview and first learned about the case a month later, in July. *See e.g.* [259] ¶ 40. Similarly, Dillon has significant evidence that his work with Vicente was limited to the Ruvalcaba murder and that he was never involved in the Vargas case. *See e.g.* [202-2] at 78. The prosecutors argue that the only evidence of their involvement comes from Vicente's testimony, and because Vicente's testimony is so internally inconsistent and flatly refuted by hard evidence, it must be rejected on summary judgment.

Vicente's testimony implicating the prosecutors is weak and uncorroborated. But it cannot be rejected as a matter of law—that decision is for the finder of fact— and if credited, it situates Coghlan and Dillon as knowing participants in the fabrication of evidence. Vicente testified, based on personal knowledge, that when the Vargas murder first came up on June 2, Vicente could hear Coghlan, Dillon, Guevara, and Halvorsen talking about what they wanted Vicente to say. [262-18] at 55. Vicente also testified that 1) the conference room door was ajar; 2) Halvorsen and Guevara went in and out of the room; 3) Dillon and Coghlan stuck their heads in the door; and that 4) through this process, defendants developed three different narratives. *See e.g. id.* at 37, 52–54. A jury could infer from this sequence that Coghlan and Dillon knowingly worked together with the detectives to develop and elicit a false story from Vicente to frame Serrano and Montanez.[33] A ruling in defendants' favor would require

---

[33] Plaintiffs add that Vicente's 1994 trial testimony, [262-34], put Coghlan at the scene of the fabrication, but that is not correct. The testimony is too ambiguous to support any inference that Coghlan manufactured false evidence with certainty. Coghlan's knowledge of another earlier accusation of fabrication against Guevara and Halvorsen, however, may lend some credence to Coghlan's knowledge of their tactics against Vicente.

concluding that Vicente is incredible—a conclusion that falls outside the province of summary judgment.[34]

Nor does Vicente's testimony fit the rare exception when internally inconsistent testimony can be rejected on summary judgment. Vicente's concession that he could not confirm his voice identifications of Coghlan and Dillon and was uncertain of dates, [262-18] at 17, 54, 64, is not impossible to reconcile with his testimony that he heard these two prosecutors discussing the false stories that the detectives fed to him. When viewed in the light favorable to plaintiffs, it is simply a concession that he would not adopt defendants' demand for certainty. A jury would not be required to be so certain—although if Vicente cannot be sure, one wonders how a jury could comfortably sign a verdict in plaintiffs' favor. Nevertheless, a jury would be permitted to credit parts of Vicente's testimony notwithstanding his wavering. The testimony has holes, but it is not impossibly contradictory.

Furthermore, Vicente's testimony is not "flatly refuted by the hard evidence." *Melton v. Tippecanoe County*, 838 F.3d 814, 819 (7th Cir. 2016) (citation omitted). Dillon said he was right outside the conference room when Halvorsen told him that Vicente "gave us another murder." [202-2] at 51. Dillon also testified that he finished discussing the Ruvalcaba murder in one setting but continued to go in and out of the conference room, which supports a reasonable inference that Dillon was, at points,

---

[34] Defendants also characterize Vicente's testimony as evidence of coercion. But Vicente's testimony is evidence of fabrication because he said his statement incriminating plaintiffs was made up—he never heard plaintiffs confess to murder. In contrast, coercion is when a "witness is forced by improper means to give [] testimony [that] may be true or false." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014).

inside the conference room during the Vargas discussion. *Id.* at 77. While defendants' contemporaneous written records did not reference Coghlan, the documents are not objective—they are documents susceptible to human error (or intentional obfuscation) and cannot establish with certainty that Coghlan was not present. *See* [259] ¶ 79; [262-1] at 98; [262-9] at 67–69. While Vicente's testimony may not be persuasive at trial, it is sufficient to defeat summary judgment.[35]

### 2. *Wilda's Testimony and Identifications*

Defendants argue that Wilda's testimony and identifications were not made up, and so summary judgment is warranted. But plaintiffs' theory is not that the gas station encounter and later identifications did not occur, but that Coghlan, Dillon, Guevara, and Halvorsen 1) fabricated when they learned about the gas station encounter from Wilda and 2) the substance of her identifications were false and defendants knew it.

Plaintiffs have evidence that the timing of Wilda's information was used to corroborate Vicente's testimony and was false. The State's theory at trial was that Wilda corroborated Vicente's testimony about the gas station encounter, which explained why Serrano, Montanez, and Pacheco targeted Vargas: "they saw him with a large amount of money" at the gas station and wanted to rob him. [262-45] at 5. Plaintiffs argue Coghlan, Dillon, Guevara, and Halvorsen made this up and present

---

[35] Because sufficient evidence has been presented, I need not address defendants' arguments about using post-June 2 conduct (such as threats, incentives, and sentencing credits) to infer Coghlan's and Dillon's knowledge of and involvement in falsifying Vicente's statements on June 2. Nevertheless, as a matter of evidence and inference, there is no prohibition on using post-event evidence to draw an inference about an earlier event.

evidence that the police officers learned about the gas station incident from Wilda months before June 2. [262-21] at 25–27.[36] Plaintiffs' theory is that Coghlan, Dillon, Guevara, and Halvorsen then fed this information to Vicente to make up a convincing story implicating plaintiffs. Accepting plaintiffs' version of Vicente's fabricated statements means that Coghlan, Dillon, Guevara, and Halvorsen knew, with certainty, that Wilda did not corroborate Vicente's testimony.[37] The suspicious dates on Halvorsen and Guevara's police report lend some support to plaintiffs' theory that Wilda did not confirm Vicente's story. [262-9] at 67–69. Information about Wilda's corroboration came out during trial through Wilda's and the officers' testimony, which bolstered the credibility of Vicente's testimony. [260] ¶ 41; [262-23] at 8–9; [262-50] at 9–10. As such, the false evidence of timing was used to deprive plaintiffs of their liberty.

Plaintiffs also allege that defendants made up Wilda's identifications, which were used at trial. [272] ¶¶ 70, 77. As noted, defendants' alleged knowledge of Vicente's fabricated testimony permits a reasonable inference that Coghlan, Dillon, Guevara, and Halvorsen all knew with certainty that any identification made by

---

[36] Contrary to the police defendants' contention, [274] at 17, there is evidence that Wilda described an "encounter" prior to June 2—not just a routine visit to the bank and gas station. [262-21] at 26.

[37] The police defendants argue that evidence about the alleged fabrication of Vicente's statements is impermissible propensity evidence and cannot be used to prove that defendants fabricated Wilda's statement. [274] at 16, n.10; Fed. R. Evid. 404(a). However, plaintiffs do not offer this evidence to prove that the defendants acted in conformity with a character trait of fabricating evidence. Rather, the evidence is being offered to show knowledge, specifically that the defendants knew Montanez and Serrano did not commit the offense (and they knew that Wilda did not see Montanez and Serrano at the gas station).

Wilda was false. Plaintiffs also point out that the detectives used unduly suggestive techniques to secure Wilda's identifications. "[T]he Fourteenth Amendment's Due Process Clause requires the exclusion of an eyewitness identification if the unduly suggestive circumstances are so egregious as to taint the entire trial." *Coleman*, 925 F.3d at 347. The test looks at the totality of the circumstances to determine the reliability of the identification. *Id.* While not determinative of § 1983 liability, these principles help to evaluate eyewitness identifications. *Id.* Although Wilda was not forced to pick a particular car, plaintiffs have some evidence that the detectives used suggestive techniques to obtain Wilda's identification of Montanez's car. [262-21] at 18. The detectives only showed Wilda one car that was similar to the suspect car and Guevara in particular provided misleading answers to her questions about car damage and bullet holes. [272] ¶¶ 72–75; [262-21] at 18, 32. Montanez also argues that Wilda's identifications of plaintiffs were fabricated. The parties dispute whether the line-ups Wilda viewed were unfair. [259] ¶ 60; [260] ¶ 23. And based on the circumstances surrounding Wilda's car identification, Guevara's Fifth Amendment invocations, and the cumulative fabrication evidence, it is also reasonable to infer Guevara used unduly suggestive techniques to obtain Wilda's photo identifications. [262-21] at 15, 27–30; [260] ¶ 18; [272] ¶ 66. All of which then supports an inference that the detectives (with the prosecutors' knowing participation) fabricated the identifications.

Detectives Guevara and Halvorsen maintain that they first learned of the gas station incident from Vicente on June 2 and then met with Wilda to corroborate it.

[202-9] at 91. They also argue that Wilda's identifications were fair and voluntary. [260] ¶¶ 22, 25. Coghlan and Dillon argue they were never a part of the investigation. The only evidence of Coghlan's and Dillon's personal involvement in manufacturing Wilda's statements and identifications is their alleged act of knowingly participating in the fabrication of Vicente's statements. Plaintiffs' evidence against the two prosecutors is slim, as discussed above, but not so weak as to entitle the prosecutors to a directed verdict on this record. How the evidence plays out at trial may be different matter. There are material disputes at this stage of the case, and plaintiffs' fabrication claim based on Wilda's statements survives summary judgment.

### 3. Rankins's Statement

Plaintiffs argue that the defendants fabricated Rankins's statement against plaintiffs. The first issue is whether Rankins's statement was actually used "in some way" to deprive Serrano and Montanez of liberty. *Whitlock*, 682 F.3d at 580. Recall that Rankins did not testify at the bench trial and stayed with Montanez's family in Puerto Rico to avoid being called as a witness. [260] ¶¶ 33, 40; [272] ¶ 57.

At the trial, Halvorsen testified that Mingey told him that Rankins was an eyewitness to the Vargas murder. [272] ¶ 59; [262-50] at 14. The trial judge overruled the defense's hearsay objection, ruling that Halvorsen's testimony was admissible to show the "course of investigation." *Id.* Halvorsen continued, saying that he and Guevara interviewed Rankins and drove Rankins by the crime scene. *Id.* at 15. Halvorsen testified that he told Rankins that he "wanted to believe what [Rankins] was telling [him] but [Rankins] was going to have to prove to [Halvorsen]…" *Id.* Here,

39

defense counsel objected to the whole line of questioning based on hearsay and the testimony's prejudicial effect. *Id.* at 15–16. The judge overruled these objections and emphasized that whatever Rankins said or saw "doesn't come in. So this is all investigation." *Id.* at 16–17. Halvorsen explained that in response to a question about where the crime took place, "Rankins pointed to a house and a fence," which Halvorsen recognized as the Vargas's home. *Id.* at 17. No objection was raised. Halvorsen stated that Rankins and Wilda viewed a line-up, and that Rankins's statement was taken by an Assistant State's Attorney. *Id.* at 20. An investigator also testified about the State's unsuccessful efforts to locate Rankins, and the trial judge denied Coghlan's request for a continuance. [272] ¶¶ 60–61. In closing argument, Coghlan focused on Vicente's testimony and credibility, and the testimony and identifications of Wilda. [262-70]. The summary judgment record of the trial court's verdict has no mention of Rankins or "course of investigation" evidence. [262-8]; [262-70] at 13.

Out-of-court statements made to law enforcement are not hearsay when they explain or clarify investigative steps a police officer took concerning evidence relevant to the alleged crime. *Jones v. Basinger*, 635 F.3d 1030, 1045 (7th Cir. 2011). For example, law enforcement personnel may testify about investigative steps to dispel accusations of wrongdoing. *Id.* at 1046.[38] This hearsay exception can be abused. *Id.* At the same time, during "bench trials, judges routinely hear inadmissible evidence

---

[38] Here, there is evidence that the detectives were accused of wrongdoing at the criminal trial. *See e.g.* [262-23] at 73; [262-70] at 4–5, 9.

that they are presumed to ignore when making decisions." *United States v. Reed*, 744 F.3d 519, 525 (7th Cir. 2014) (quoting *Harris v. Rivera*, 454 U.S. 339, 346–47 (1981)). To overcome this presumption, a party must present some evidence that the inadmissible statement influenced the district court's decision-making. *Id.* (citation and quotation omitted).

At the motion to dismiss stage, I concluded that the trial judge did not admit Rankins's statements substantively through Halvorsen's testimony, and therefore Rankins's statements were not used to convict plaintiffs. [88] at 19–20.[39] At summary judgment, plaintiffs do not point to any evidence suggesting the contents of Rankins's statements influenced the trial judge's decision-making. The trial judge considered Vicente's statements the "focal testimony," noted Wilda's testimony about the gas station "confrontation," and did not reference the contents of Rankins's statements at all. [262-70] at 13; [262-8]. The judge explained that whatever Rankins said or saw would not come in for the truth of the assertions. [262-50] at 16–17. And the investigator's testimony about locating Rankins, without more, does not prove the trial judge ignored his own ruling. [272] ¶¶ 60–61; [262-68].[40] Plaintiffs fail to present any evidence that the trial judge was improperly influenced by inadmissible evidence.

---

[39] Plaintiffs' legal claim was dismissed without prejudice. The plaintiffs amended their complaints and now reassert their argument.

[40] Both sides may have misled the trial judge about Rankins. Coghlan never shared his misgivings about Rankins's credibility, and neither side, including then-criminal defendants Serrano and Montanez, ever introduced Rankins's recantation at trial. [272] ¶ 58; [262-33] at 199, 202; [274] at 20, n.12.

That Rankins's statements were not used substantively does not mean they were not used at all. The course of investigation testimony referenced Rankins and his pointing to Vargas's house as some type of corroboration for the reliability of the investigation (the only proper purpose for which it was admitted). But that is not enough to support a judgment in favor of plaintiffs—the fabricated Rankins evidence must have been a proximate cause of plaintiffs' loss of liberty. *Whitlock*, 682 F.3d at 582. Focusing on "proximate cause" eliminates legal liability when the injury is "too remote" from the wrongful conduct. *Id.* at 583. Multiple proximate causes of an injury may exist. *Id.* The allegedly fabricated statements from Rankins that directly incriminated plaintiffs had no role in their ultimate conviction—that evidence was effectively stuck in a drawer and other events broke the chain of causation from Rankins's statements to the convictions. *See id.* at 582 ("[I]f an officer (or investigating prosecutor) fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest.") (citing *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994)).

Plaintiffs argue that the made-up evidence was used in the course of investigation testimony: Halvorsen testified that Rankins was interviewed, driven by the crime scene, and then viewed a line-up with Wilda. [262-50] at 15, 20. But plaintiffs point to no evidence to suggest this testimony had any material influence on the verdict. It was not argued by the prosecution, not referenced by the trial judge, and plaintiffs' criminal defense attorneys made no attempt to introduce Rankins's

42

recantation at trial (indicating that Rankins was a minor sideshow from even plaintiffs' perspective). Although Rankins's role in the investigation was mentioned at trial, it was not a proximate cause of the conviction and defendants are entitled to summary judgment on this portion of plaintiffs' claim.

Plaintiffs present sufficient evidence of a § 1983 fabrication of evidence claim based on Vicente's and Wilda's statements, but not Rankins's.[41]

## B.    Pretrial Detention

The Fourth Amendment protects citizens from unreasonable seizures. U.S. Const. amend. IV. A person is seized when an official restrains his freedom of movement and he is not free to leave. *Lewis v. City of Chicago*, 914 F.3d 472, 476 (7th Cir. 2019) (citing *Brendlin v. California*, 551 U.S. 249, 254–55 (2007)). Reasonable seizures are constitutional when probable cause exists. *Id.* (citing *Bailey v. United States*, 568 U.S. 186, 192 (2013)). Probable cause exists when there are enough facts and circumstances to reasonably believe someone had committed or was committing an offense. *Coleman*, 925 F.3d at 350 (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "[T]he obvious assumption is that there will be a *truthful* showing" of probable cause. *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978). Pretrial detention without probable cause violates the Fourth Amendment. *Lewis*, 914 F.3d at 476.[42] All the defendants

---

[41] Plaintiffs conceded that they have no fabrication claim against Mingey based on Vicente's and Wilda's statements. [261] at 15, n.3. Mingey is entitled to judgment as a matter of law on the entirety of the evidence fabrication claim.

[42] The Fourth Amendment is the exclusive source for a pretrial detention claim, *Lewis v. City of Chicago*, 914 F.3d 472, 479 (7th Cir. 2019), so plaintiffs' pretrial detention claim based on the Fourteenth Amendment is dismissed. *McDonough v. Smith* did not overturn this precedent. 139 S. Ct. 2149 (2019).

seek summary judgment on plaintiffs' § 1983 pretrial detention claim.[43] However, when viewing the facts in the light most favorable to plaintiffs, their fabrication evidence against each defendant shows that there was never any probable cause to detain Serrano and Montanez, [259] ¶ 74; [272] ¶ 40, because the most important evidence was made up.[44] There was no sound reason to believe plaintiffs murdered Vargas.

Nevertheless, the defendants argue that plaintiffs' time to file this claim expired because their pretrial detention ended in 1994, and the statute of limitations for § 1983 claims is two years. *See Owens v. Evans*, 878 F.3d 559, 563 (7th Cir. 2017). But a § 1983 claim that implicates the validity of the underlying criminal conviction cannot accrue until the detention terminates in the accused's favor. *Savory v. Cannon*, 947 F.3d 409, 423 (7th Cir. 2020). Any legal challenge to plaintiffs' pretrial detention would have automatically implicated the validity of their criminal convictions because both injuries are premised on the same set of facts. Plaintiffs

---

[43] Defendants argue that Montanez impermissibly attempts to amend his complaint by accusing all the defendants of a pretrial detention claim when his complaint only mentions the police officers. It is true that plaintiffs may not advance a new argument in response to a summary judgment motion. *Abuelyaman v. Illinois State University*, 667 F.3d 800, 814 (7th Cir. 2011). This typically happens when plaintiffs raise new and drastic factual allegations. *Whitaker v. Milwaukee County, Wisconsin*, 772 F.3d 802, 808 (7th Cir. 2014). Here, all of Montanez's and Serrano's claims rest on the same set of facts. Serrano implicated Coghlan and Dillon in his complaint. Permitting Montanez to pursue a pretrial detention claim against the prosecutors would not result in any unfair surprise or prejudice to defendants and would permit consistency in the joint resolution of the two cases.

[44] Montanez labels his § 1983 claim "Malicious Prosecution and Unlawful Pretrial Detention." [257] at 37, Docket No. 17-cv-4560. To the extent Montanez bases his "malicious prosecution" claims on the Fourteenth Amendment, they are barred because state-law malicious prosecution claims (which plaintiffs also allege) provide them with a remedy. *Newsome v. McCabe*, 256 F.3d 747, 750–52 (7th Cir. 2001), *overruled on other grounds by Manuel v. City of Joliet*, 137 S. Ct. 911 (2017).

received favorable termination in 2016 and filed their complaints in 2017. Their § 1983 pretrial detention claim based on the Fourth Amendment is timely.

### C.  Brady Claims

Police officers have an affirmative duty to disclose exculpatory evidence to the prosecutor. *Anderson*, 932 F.3d at 504 (citing *Brady v. Maryland*, 373 U.S. 83 (1963)).[45] Suppressing exculpatory evidence violates a criminal defendant's right to a fair trial under the Due Process Clause of the Fourteenth Amendment. *Id.* To demonstrate a *Brady* violation, plaintiffs must show that 1) the evidence in question was favorable to them; 2) the police suppressed the favorable evidence; and 3) the suppression of evidence prejudiced plaintiffs because the suppressed evidence was material to their convictions. *Id.* Mingey, Guevara, and Halvorsen all seek summary judgment on plaintiffs' *Brady* claims.

Evidence is exculpatory when it tends to establish a criminal defendant's innocence. *Brady*, 373 U.S. at 89. Impeachment evidence can be exculpatory. *Anderson*, 932 F.3d at 504. Evidence is suppressed when 1) the prosecution fails to disclose the evidence in enough time for the defendant to make use of it, and 2) the evidence was not available to the defendant through reasonable diligence. *Id.* at 504–05. Evidence known to the defendant is not suppressed. *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017). "Reasonable diligence" asks whether the defendant had access to the exculpatory evidence through other means. *Boss v. Pierce*, 263 F.3d

---

[45] Plaintiffs' *Brady* claims against Coghlan and Dillon were dismissed with prejudice at the motion to dismiss stage based on absolute prosecutorial immunity. [88] at 11–13.

734, 741 (7th 2001). Finally, to establish prejudice, plaintiffs must prove materiality, meaning there is a reasonable probability that the suppressed evidence would have led the trier of fact to a different verdict in light of the cumulative evidence. *Anderson*, 932 F.3d at 505.

### 1. *Vicente Evidence*

Plaintiffs' argue that Guevara and Halvorsen failed to disclose all of the physical force, threats, and promises they used to elicit Vicente's statement implicating plaintiffs. *See e.g.* [272] ¶¶ 24, 28, 33. Because plaintiffs' defense counsel could have used this information to impeach the credibility of the most important witness against them, it was exculpatory and material. The evidence was also suppressed to the extent the police officers did not disclose it to an appropriate prosecutor. *See Whitlock*, 682 F.3d at 576. While police detectives are not required to disclose all the circumstances surrounding their investigation, *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015), they must disclose impeachment evidence, including the "pressure tactics and inducements" used on a witness. *Avery*, 847 F.3d at 443. Plaintiffs' Vicente-based *Brady* claim against Guevara and Halvorsen survives summary judgment.

### 2. *Rankins Evidence*

Plaintiffs argue that the police suppressed evidence about the physical abuse and lies used to elicit Rankins's statements, the fact that Rankins sold drugs for Guevara, and the identities of "Shorty Folks" and Sabrina—the two people Rankins allegedly said he was with the morning of the Vargas murder. But plaintiffs' claims

46

against all three police defendants fail. Plaintiffs had access to all of this information through the exercise of reasonable diligence, so the evidence was never suppressed. Rankins provided Montanez with a recantation that described police coercion and false testimony prior to trial. [260] ¶¶ 29, 32. Rankins also stayed with Montanez's family in Puerto Rico. *Id.* ¶¶ 33, 40; [272] ¶ 57. Montanez had enough information and access to easily ask Rankins about any physical threats, lies, or promises the police made, who "Shorty Folks" and Sabrina were, and Rankins's relationship with Guevara. While Serrano and Rankins were not friends, Serrano also obtained a recantation letter from Rankins, before trial, through the informal investigator. *Id.* ¶¶ 31. Their strained relationship did not stop Serrano from accessing helpful information from Rankins. With reasonable diligence, Serrano could have learned from Montanez's counsel everything that Montanez knew about Rankins. Plaintiffs' *Brady* claim based on Rankins fails.[46]

### 3. *Wilda Evidence*

Plaintiffs allege Guevara and Halvorsen suppressed the following evidence related to Wilda: 1) their lie about when Wilda shared the gas station story; 2) the tactics used to secure her identification of Montanez's car; and 3) Wilda's gang book identifications. Plaintiffs' first claim is a non-starter. Failing to disclose falsified evidence, or "keeping quiet" about that evidence, is the same as a fabrication of evidence claim and cannot be recast as a *Brady* allegation. *Saunders-El*, 778 F.3d at

---

[46] For the same reasons I concluded that Rankins's statements were not used substantively and not the proximate cause of plaintiffs' conviction, I conclude that the evidence was not prejudicial or material for purposes of the *Brady* claim.

562. As for plaintiffs' second theory, as discussed above, evidence of "pressure tactics and inducements" used on a witness is relevant impeachment evidence. *Avery*, 847 F.3d at 443. While Serrano and Montanez knew (by virtue of their innocence) that Wilda's car identification was false, they did not know the methods the detectives used to obtain Wilda's identification, like showing her dissimilar cars and providing misleading answers to her questions. *See id.*; [272] ¶¶ 72–75. And there is a reasonable probability that had they known to impeach Wilda's testimony, they could have weakened her testimony so as to undermine confidence in the verdict.

Finally, plaintiffs present evidence that Wilda did not identify Serrano and Montanez in her gang book identifications. Wilda's gang book identifications should have been documented and preserved but were not. [272] ¶ 67–68.[47] And if they had been of Serrano and Montanez, then the police theory that plaintiffs did not become suspects until Guevara received a tip in May would make no sense. Mere speculation about the existence of a record is insufficient to establish a *Brady* violation. *United States v. Hilliard*, 851 F.3d 768, 782 (7th Cir. 2017). And some of Wilda's testimony suggests she identified Serrano and Montanez in the gang books. [262-21] at 33. But Wilda's testimony also suggests that she made gang book identifications of two unknown men months before June 2. [262-21] at 15, 27–30. The facts are messy, but plaintiffs present more than a bare assertion to support a reasonable inference of

---

[47] Montanez advances two theories: that the gang book identifications were suppressed or destroyed. [224] at 28, Docket No. 17-cv-4560.

exculpatory and prejudicial value. Plaintiffs' first *Brady* claim based on Wilda fails, while the second two against Guevara and Halvorsen survive.

### 4. *Mingey Evidence*

Plaintiffs do not present sufficient evidence to support their *Brady* claim based on Mingey's alleged notes. Mingey testified that all police officers should document everything a witness says, including "the good and bad." [262-60] at 54, 56. Mingey also testified that he may have taken notes during the Rankins interview, either on a piece of paper or on his hand, and that he would have only written down the suspects' nicknames. *Id.* at 64–66. But there is no evidence in the record suggesting that these notes, to the extent they even existed, contained exculpatory information. Plaintiffs' speculation cannot survive summary judgment.

### 5. *Frank Velez Evidence*

Guevara and Halvorsen did not disclose that they considered Frank Velez as an alternative suspect. [272] ¶ 81. This evidence was suppressed. *See Boss*, 263 F.3d at 741 ("defense counsel cannot be expected to ask witnesses about matters completely unrelated to the witness's role in the case."). The parties also dispute whether the detectives accused Ana of covering up her son's involvement in the Vargas murder. [272] ¶ 81. But all this shows is that at one point in the investigation, the police considered a different suspect. This fact, standing alone, does not tend to establish Serrano's and Montanez's innocence, or increase the probability that the trial judge would have reached a different verdict.

The police defendants' assertion of their Fifth Amendment rights does not justify a denial of their motions for summary judgment. An adverse inference may be drawn against a defendant in a civil case who invokes his right to remain silent. *See Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 603 (7th Cir. 2019). But that silence does not preclude a defendant from seeking summary judgment, and to defeat defendants' motions, plaintiffs must point to additional evidence beyond the adverse inference drawn from defendants' silence. *See Anderson v. City of Rockford*, 932 F.3d 494, 511 (7th Cir. 2019) (non-movants defeated summary judgment by pointing to additional evidence beyond movant's assertion of Fifth Amendment rights); *see also Kluppelberg v. Burge*, 2017 WL 3142757, at *4 (N.D.Ill. 2017) (non-movants must "point to some evidence in addition to defendant's silence to avoid summary judgment"). Halvorsen's and Mingey's reversal on pleading the Fifth, [272] ¶ 5, is a problematic deposition tactic when it permits a witness to avoid discovery. *Evans v. City of Chicago*, 513 F.3d 735, 744–46 (7th Cir. 2008). But here, plaintiffs suffered no prejudice. Plaintiffs do not allege that they were deprived of information or unable to obtain additional discovery to cure the prejudice. Plaintiffs do not have a right to conduct discovery in a particular order. Fact discovery was extended, [153], and the parties agreed to finish outstanding fact discovery after the deadline. [184]. Plaintiffs were given sufficient time to probe and question Halvorsen and Mingey about their about-face and new testimony. Halvorsen's and Mingey's initial Fifth Amendment invocations do not raise a genuine dispute of material fact.

Plaintiffs fail to marshal sufficient evidence to pursue a *Brady* claim based on Frank Velez.

### D.    Malicious Prosecution

Plaintiffs assert a malicious prosecution claim under Illinois law against all the defendants.[48] Plaintiffs must prove 1) the defendants commenced or continued a judicial proceeding; 2) the proceeding terminated in plaintiffs' favor; 3) the absence of probable cause; 4) the presence of malice; and 5) damages. *Lund v. City of Rockford, Illinois*, 956 F.3d 938, 949 (7th Cir. 2020) (citing *Swick v. Liautaud*, 169 Ill.2d 504 (Ill. 1996)).

Typically, "the State's Attorney, not the police, prosecutes a criminal action." *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996). However, liability may extend to anyone, including police officers, if they played a "significant role" in causing the prosecution. *Beaman v. Freesmeyer*, 131 N.E.3d 488, 498 (Ill. 2019). Defendants play a significant role when their conduct was so "active and positive" to "amount to advice and co-operation" or when they "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him or her, concealed exculpatory evidence, or otherwise engaged in wrongful or bad-faith conduct instrumental in the initiation of the prosecution" *Id.* at 500 (citations omitted). The

---

[48] Serrano is permitted to amend his malicious prosecution claim (Count VII) to include all defendants. Montanez's claim (Count VIII) was against all defendants, so the amendment would not result in any unfair surprise or prejudice and would permit consistency in the joint resolution of the two cases. *See supra* note 43.

key issue is whether the defendants' actions were the but-for and proximate cause of plainitffs' wrongful prosecution. *Id.* at 499–500.

Only the first and third elements—initiating the legal proceeding and the existence of probable cause—are at issue here. Based on how the Cook County State's Attorney's Office was structured, different prosecutors were involved at various stages of plaintiffs' criminal case. [259] ¶¶ 8–13. ASAs King and Weaver from the felony review unit initiated the legal proceeding by filing murder charges against Serrano and Montanez. *Id.* ¶¶ 62, 74. ASA Galivan handled the grand jury proceedings, where Serrano and Montanez were formally indicted. *Id.* ¶ 69; [202-32] at 14–16. And Coghlan tried the case, where plaintiffs were convicted. [272] ¶ 14.

Plaintiffs present sufficient evidence that Guevara, Halvorsen, and Mingey played a "significant role" in the commencement of plaintiffs' criminal prosecution. The police defendants knowingly presented false information to and withheld exculpatory evidence from the felony review and grand jury attorneys who initiated the legal proceedings against Serrano and Montanez, overcoming the presumption of prosecutorial independence. And plaintiffs' have presented sufficient evidence of the police officers' and Dillon's wrongful conduct and active cooperation with Coghlan to bring a case against Serrano and Montanez, creating a factual issue that could support co-conspirator liability for malicious prosecution. Plaintiffs raise a genuine factual dispute about proximate cause, notwithstanding the evidence of Coghlan's knowing participation as the trial attorney continuing the prosecution.

The probable cause standard for a malicious prosecution claim is the same as a § 1983 pretrial detention claim. *Coleman*, 925 F.3d at 350 (citing *Swick*, 169 Ill.2d at 504 and *Fleming v. Livingston Cty.*, 674 F.3d 874, 878 (7th Cir. 2012)). As discussed above, plaintiffs' version of the facts suggests that no probable cause existed to indict plaintiffs because defendants framed them, meaning there were no facts or circumstances to reasonably believe Serrano and Montanez murdered Vargas. Plaintiffs' malicious prosecution claim against all defendants survives summary judgment.[49]

### E. Intentional Infliction of Emotional Distress

Coghlan and Dillon seek summary judgment on plaintiffs' intentional infliction of emotional distress claim.[50] Under Illinois law, plaintiffs must prove Coghlan and Dillon engaged in 1) extreme and outrageous conduct; 2) intended to inflict severe emotional distress, or had knowledge that there was a high probability of it; and 3) their conduct caused plaintiffs' distress. *Feltmeier v. Feltmeier,* 207 Ill.2d 263, 269 (Ill. 2003); *see also Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016). The conduct

---

[49] In their amended complaints, plaintiffs plead in the alternative that Coghlan and Dillon did not know the witness statements were false. Plaintiffs do not present any evidence to support this alternative theory. The defendants moved for summary judgment on this alternative theory, so plaintiffs' failure to marshal evidence in support entitles the defendants to summary judgment on this ground. Plaintiffs may not argue at trial that the prosecutor defendants did not know of police misconduct. But as discussed above, the evidence is sufficient to show that the police defendants wrongfully influenced the initiation and prosecution of the case.

[50] Plaintiffs' IIED claims were timely filed within the one-year statute of limitations period. 745 ILCS 10/8–101(a). Plaintiffs abandoned their intentional infliction of emotional distress claim against Mingey in response to his motion for summary judgment. [261] at 15, n.3. Mingey is entitled to judgment as a matter of law on the claim. And plaintiffs also abandoned their failure-to-intervene claim against Mingey. [261] at 15, n. 3. His motion on that claim is granted.

must be "so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Feltmeier,* 207 Ill.2d at 270 (citation omitted). Fabricating and manufacturing evidence and concealing exculpatory evidence, "for the purpose of falsely and maliciously detaining, arresting, and charging plaintiffs, knowing that such charges lacked probable cause" constitutes extreme and outrageous conduct. *Bianchi v. McQueen*, 405 Ill.Dec. 419, 439 (2nd Dist. 2016) (permitting an IIED claim based on a malicious prosecution claim). Plaintiffs present sufficient evidence of such extreme and outrageous conduct, so their IIED claim against Coghlan and Dillon survives summary judgment.

### F.    Conspiracy

Defendants Coghlan and Dillon also seek summary judgment on plaintiffs' conspiracy claims under § 1983. Plaintiffs must show that the prosecutors 1) reached an agreement to deprive plaintiffs of their constitutional rights and 2) engaged in overt acts that deprived plaintiffs of those rights. *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018) (citations and quotations omitted). Put differently, Serrano and Montanez must "show an underlying constitutional violation" and "demonstrate that the defendants agreed to inflict the constitutional harm." *Id.* Conspirators are liable for any wrongful act committed within the scope of the conspiracy. *Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002). Because conspiracies are often carried out in secret and direct evidence is rarely available, plaintiffs can use circumstantial evidence to prove the existence of one, as long as the evidence is not speculative. *Beaman v. Freesmeyer*, 776 F.3d 500, 511 (7th Cir. 2015).

Plaintiffs have presented sufficient evidence of "underlying constitutional violations," since their fabrication of evidence, pretrial detention, and suppression of evidence claims survive summary judgment largely intact. And as discussed in the fabrication of evidence section, when the facts are construed in the light most favorable to plaintiffs, they provide sufficient evidence of a conspiratorial agreement. Vicente's testimony that the prosecutors worked with the detectives on June 2, just outside the conference room, to develop multiple false narratives to frame Serrano and Montanez, *see e.g.* [262-18] at 17–18, 21, 37, 54–56, is "sufficient for a reasonable jury to conclude a meeting of the minds had occurred and the parties had an understanding to achieve the conspiracy's objectives." *Sow v. Fortville Police Dept.*, 636 F.3d 293, 305 (7th Cir. 2011).[51] While plaintiffs' evidence is slim, Vicente's testimony is not speculative or just a hunch. It is based on his personal knowledge as the central witness in plaintiffs' criminal trial, and it is the jury's responsibility to evaluate his credibility. To the extent Halvorsen initiated the conversation with Vicente alone, Vicente's testimony still permits a reasonable inference that Coghlan and Dillon joined the conspiracy and knew of its scope. *See Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).

Coghlan and Dillon likewise seek summary judgment on plaintiffs' civil conspiracy claim under Illinois law. To state a claim for civil conspiracy, plaintiffs must show 1) an agreement between two or more persons and 2) a tortious act

---

[51] Plaintiffs present no evidence suggesting the prosecutors had a pre-meeting with detectives, as alleged in their complaint. [90] at ¶ 39.

committed in furtherance of that agreement. *McClure v. Owens Corning Fiberglas Corp.*, 241 Ill.Dec. 787, 803 (Ill.1999). Plaintiffs must show the defendants "knowingly and voluntarily" participated in a common scheme. *Id.* If the defendants understand the general objectives of the conspiratorial scheme, accept them, and agree, either explicitly or implicitly to do their part to further those objectives, they are liable as conspirators. *Id.* If plaintiffs rely on circumstantial evidence to prove a conspiracy, that evidence must be "clear and convincing." *Id.* Because plaintiffs have presented sufficient, albeit slim, evidence of Dillon's and Coghlan's knowing agreement to participate in framing Serrano and Montanez, and evidence of underlying torts in furtherance of that agreement—malicious prosecution and intentional infliction of emotional distress—plaintiffs' state law conspiracy claim against the two prosecutors survives summary judgment.

### G.   Prosecutorial Immunity

Coghlan and Dillon argue that they are protected by absolute immunity under federal and state law because they acted within the scope of their duties as advocates for the state. *Buckley v. Fitzsimmons*, 509 U.S. 259, 272 (1993); *Frank v. Garnati*, 370 Ill.Dec. 931, 934 (5th Dist. 2013) ("the state and federal doctrines of prosecutorial immunity are coterminous and prosecutors acting within the scope of their prosecutorial duties are absolutely immune from liability under state law"). The analysis focuses on the nature of the function performed by the prosecutor. *Buckley*, 509 U.S. at 269. Tasks related to trial preparation, including evaluating evidence assembled by law enforcement, are protected prosecutorial functions. *Id.* at 273. This

generally means that prosecutorial activity that occurs at or after the probable cause determination is immune from suit. *Id.* at 274. This rule reflects a public policy choice to encourage prosecutors to make decisions without being influenced by the fear of personal liability, at the risk of allowing some prosecutorial wrongdoing to go unpunished. *Id.* at 270, n.4. However, when a prosecutor engages in "investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings," he is not entitled to absolute immunity. *Id.* at 273. Investigatory functions include "searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested." *Id.*

As discussed above, Coghlan argues that he got involved in the Vargas case in late July, after felony review prosecutors had reviewed the case and approved filing murder charges against plaintiffs. [202-1] at 6–7; [259] ¶¶ 62, 74. By then Serrano had already been indicted and a judge had issued arrest warrants for Montanez and Pacheco. *Id.* ¶¶ 72–73. Thus, consistent with the structure of the State's Attorney's office, Coghlan, a trial lawyer, picked up the case after a probable cause determination had been made, and his only role was to prosecute the case as an advocate for the state. *Id.* ¶¶ 8–13.

Dillon argues that he was never involved in the Vargas case. ASAs King and Weaver handled felony review; Galivan handled the preliminary hearings; and Coghlan handled the trial. [259] ¶¶ 62, 69, 74; [202-32] at 14–16; [272] ¶ 14. Dillon also testified that he did not ask Halvorsen for any details about Vicente's incriminating statement on June 2, [202-2] at 51, because Dillon's role was limited to

evaluating Vicente as a witness in the Ruvalcaba case. [259] ¶ 24; [272] ¶ 14. Because Dillon was operating solely as the trial prosecutor on a different, post-indictment murder case, he argues his activity was also protected by absolute immunity.

If a jury finds Coghlan's and Dillon's testimony credible, then they are correct that they are absolute immune from plaintiffs' lawsuit. *See e.g. Bianchi v. McQueen*, 818 F.3d 309, 318 (7th Cir. 2016). However, as discussed above, when viewing the facts in the light most favorable to plaintiffs, Vicente's testimony—that he heard and saw Coghlan and Dillon plotting to frame Serrano and Montanez with Guevara and Halvorsen—cannot be disregarded on summary judgment. *See e.g.* [262-18] at 37, 52–54. Based on Vicente's testimony, the prosecutors were acting as investigators, manufacturing a false story to create probable cause to charge new suspects with the Vargas murder. To the extent Dillon argues his role was limited to evaluating Vicente as a witness on the Ruvalcaba case, Vicente's testimony—if credited—puts Dillon into an investigatory role in the Vargas case. Dillon was not just testing Vicente's credibility; rather, a jury could reasonably infer Dillon was participating in the creation of new evidence to assist the detectives and Coghlan in bringing a new case. Plaintiffs' case against Dillon is even weaker than their case against Coghlan, because there is little explanation for Dillon assuming an investigatory role and no corroboration for Vicente's claim. But at summary judgment, a court must accept Vicente's version and if credited, a jury could conclude that Dillon was, like Coghlan, investigating the Vargas murder.

Based on plaintiffs' version of the facts, Dillon's qualified immunity arguments similarly fail. In the absence of absolute immunity, "qualified immunity" protects officials from civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). To determine whether qualified immunity applies, courts consider 1) was there a constitutional violation and if so 2) was it clearly established at the time of the misconduct. *Id.* at 232. By 1993, it was long established that "a government lawyer's fabricating evidence against a criminal defendant was a violation of due process," *Fields*, 740 F.3d at 1114, and that probable cause was required to detain someone. *See Baker v. McCollan*, 443 U.S. 137, 142 (1979); *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978). A reasonable prosecutor would have known using false evidence as a substitute for probable cause to detain or prosecute someone violated that individual's constitutional rights. While plaintiffs' theory hangs on a sliver of Vicente's testimony, Dillon must wait until trial to present his side of the story as an uninvolved prosecutor who was working on a different case.

## IV.     Conclusion

Defendants' motions for summary judgment, [200], [205], [211] on the *Serrano* docket, no. 17-cv-2869 and [182], [187], and [191] on the *Montanez* docket, no. 17-cv-4560, are granted in part, denied in part in accordance with this opinion.

To summarize, these claims remain: fabrication of evidence against Coghlan, Dillon, Guevara, and Halvorsen based on Vicente's and Wilda's statements; pretrial

detention against all individual defendants; malicious prosecution against all individual defendants; federal and state-law conspiracy against all individual defendants; *Brady* claims against Guevara and Halvorsen based on Vicente's statement and Wilda's identifications; intentional infliction of emotional distress against Coghlan, Dillon, Guevara, and Halvorsen; and failure to intervene against Guevara and Halvorsen.

Defendants are entitled to judgment as a matter of law on the following claims along with any corresponding claims based on respondeat superior or indemnification against the City of Chicago or Cook County: fabrication of evidence against Mingey, and fabrication of evidence based on Rankins's statement; *Brady* claims against the police defendants based on Rankins, Wilda's corroboration, Mingey's notes, and Frank Velez (so no *Brady* claims against Mingey survive); intentional infliction of emotional distress against Mingey; failure to intervene against Mingey; and any malicious prosecution claim dependent on the prosecutor defendants' lack of knowledge of police misconduct.

A status hearing is scheduled for June 18, 2020 at 9:30 a.m.


ENTER:

Manish S. Shah
United States District Judge

Date: June 4, 2020

60